Nos. 23-10008, 23-10536, and 23-10836

In the

# United States Court of Appeals
### for the Fifth Circuit

CHARLENE CARTER,

*Plaintiff-Appellee/Cross-Appellant*,

v.

LOCAL 556, TRANSPORT WORKERS UNION OF AMERICA;
SOUTHWEST AIRLINES CO.,

*Defendants-Appellants/Cross-Appellees*.

CHARLENE CARTER,

*Plaintiff-Appellee*,

v.

SOUTHWEST AIRLINES CO.,

*Defendant-Appellant*.

On Appeal from the United States District Court for the
Northern District of Texas, Case No. 3:17-cv-02278-X,
Hon. Brantley Starr, *United States District Judge*

## SOUTHWEST AIRLINES COMPANY'S OPENING BRIEF

Paulo B. McKeeby
Brian K. Morris
REED SMITH LLP
2850 N. Harwood St., Ste. 1500
Dallas, TX 75201

Andrew B. Ryan
RYAN LAW PARTNERS LLP
3811 Turtle Creek Blvd., Ste. 780
Dallas, TX 75219

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Steven Marcus
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Defendant-Appellant/Cross-Appellee Southwest Airlines Co.*

## CERTIFICATE OF INTERESTED PERSONS

**Nos. 23-10008 & 23-10536,** *Charlene Carter v. Local 556, Transport Workers Union of America; Southwest Airlines Co.*

**No. 23-10836,** *Charlene Carter v. Southwest Airlines Co.*

## I.    Appellant Southwest Airlines Co.

Southwest Airlines Co. is a publicly traded entity and is traded on the NYSE (LUV). The Vanguard Group has filed a Form 13G with the Securities and Exchange Commission stating that it beneficially owns more than 10% of the shares of Southwest Airlines Co. Southwest has no parent corporation, no other entity has reported holdings of over 10%, and there is not any other entity related to, or affiliated with Southwest that has a financial interest in the outcome of the claims asserted against it in this case.

## II.    Interested parties

### A.    Opposing counsel

Opposing counsel in the litigation are:

- Matthew B. Gilliam, National Right to Work Legal Defense Foundation

- Milton L. Chappell, National Right to Work Legal Defense Foundation

- Bobby G. Pryor, Pryor & Bruce

- Matthew D. Hill, Pryor & Bruce

• David E. Watkins, Jenkins & Watkins, PC

**B.    Other interested parties**

Additional firms and persons with an interest in the outcome of the litigation are:

• Cloutman & Cloutman, L.L.P.

• Law Offices of Cloutman and Greenfield, PLLC

• Kerrie Forbes, Southwest Airlines

• Chris Maberry, Southwest Airlines

• Kevin Minchey, Southwest Airlines

• Norton Rose Fulbright US LLP

• Reed Smith LLP

• Ryan Law Partners LLP

• Sheppard Mullin Richter & Hampton LLP

• Skadden, Arps, Slate, Meagher & Flom LLP

## REQUEST FOR ORAL ARGUMENT

Southwest Airlines Co. requests oral argument. The district court's judgment against Southwest turns Title VII of the Civil Rights Act of 1964 into a shield immunizing hostile and abusive workplace behavior. The judgment conflates religious-belief-based discrimination and religious-practice-based discrimination, and it rests on legally insufficient evidence and flawed jury instructions. Moreover, the Supreme Court's recent decision in *Groff v. DeJoy*, 143 S. Ct. 2279 (2023), changed the standard governing Southwest's undue-hardship defense against religious-practice discrimination. The district court's rulings also exceed the outer bounds of the Railway Labor Act. To top it all off, the district court issued an extraordinary, unprecedented contempt order requiring three in-house Southwest attorneys to attend "religious-liberty training" with the Alliance Defending Freedom. Oral argument is likely to assist the Court in deciding this novel appeal. *See, e.g., Brotherhood of Locomotive Engineers v. Union Pacific Railroad*, 31 F.4th 337 (5th Cir. 2022) (argument in RLA case); *Nobach v. Woodland Village Nursing Center, Inc.*, 799 F.3d 374 (5th Cir. 2015) (argument in Title VII case).

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .......................................................i

REQUEST FOR ORAL ARGUMENT.................................................. iii

TABLE OF AUTHORITIES.......................................................... viii

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF ISSUES .............................................................2

INTRODUCTION .........................................................................4

STATEMENT OF THE CASE.........................................................9

I.    Factual background ...............................................................9

    A.    Carter sends fellow flight attendant Audrey Stone hostile
        and graphic direct messages on Facebook. ....................................9

    B.    Carter posts graphic videos on her public Facebook
        account, which identified her as a Southwest employee. ..........11

    C.    Southwest investigates Carter's behavior and fires her for
        it.......................................................................................11

    D.    Carter, represented by Local 556, grieves her termination,
        and the arbitrator sides with Southwest. .....................................14

II.   Procedural background ...........................................................15

    A.    Carter sues Southwest and Local 556, and the district
        court denies Southwest's motion to dismiss and motion
        for summary judgment.....................................................15

    B.    A jury rules for Carter....................................................18

    C.    The district court denies Southwest's Rule 50(b) motion...........23

# TABLE OF CONTENTS
(continued)

**Page**

    D.    The district court holds Southwest in contempt and this Court stays that order. ...................................................................25

SUMMARY OF ARGUMENT ...........................................................28

STANDARD OF REVIEW ................................................................36

ARGUMENT ....................................................................................37

I.    Carter failed to prove religious-belief-based discrimination as a matter of law, and the erroneous undue-hardship instruction requires a new trial on religious-practice-based discrimination. ........37

    A.    Title VII prohibits discrimination against an employee because of her religious belief or practice....................................39

        1.    Religious belief and religious practice are definitionally distinct, and an employee cannot simply recast practice-based discrimination as belief-based discrimination. ..................................................39

        2.    An employee claiming discrimination must introduce direct evidence, or satisfy the test under *McDonnell Douglas* for claims based on indirect evidence. ...............................................................41

        3.    An employer defeats a religious-practice-based discrimination claim (also known as a failure-to-accommodate claim) by showing that accommodating the employee's religious practice would impose an undue hardship on the employer's business...............................................44

    B.    Carter's religious-belief-based discrimination claim fails as a matter of law because she introduced no evidence that Southwest fired her because of her religious belief. ...........48

## TABLE OF CONTENTS
### (continued)

**Page**

    1.    Carter didn't introduce direct evidence of belief-based discrimination. ...........................................................49

    2.    Indirect evidence cannot sustain the jury verdict, either, because Carter waived a pretext theory and introduced legally insufficient evidence of pretext anyway..................................................................50

C.    A new trial is required on Carter's religious-practice-based discrimination claim. ..........................................53

    1.    Southwest tried the case under controlling precedent making clear that the mere possibility of adverse effects on employee morale is undue hardship, and the district court erred in failing to instruct the jury on that rule...................................54

    2.    *Groff*'s new test requires a new trial. ....................57

II.    The verdict on Carter's RLA claim must be reversed because Carter produced no evidence that Southwest acted with anti-union animus, and she did not engage in protected activity...............59

A.    Carter's RLA claim fails as a matter of law because Carter produced no evidence that Southwest fired her with anti-union animus. ...................................................................60

    1.    RLA § 152 Third and Fourth provide a very narrow cause of action for post-certification plaintiffs alleging anti-union animus...................................60

    2.    Carter introduced no evidence of anti-union animus or any other evidence of intent to interfere with the union. ......................................................................64

# TABLE OF CONTENTS
## (continued)

**Page**

B. Even if Carter properly reached the jury, a new trial would be required because the district court erroneously instructed the jury that the RLA protects obscene and abusive activity. ...............................................................67

 1. The RLA does not protect obscene and abusive activity.................................................................................67

 2. The district court's protected activity instruction was legally wrong and prejudiced Southwest. .................69

III. The Contempt Order rests on an invalid judgment, exceeds the district court's authority, and violates the First Amendment..............71

A. The Contempt Order must be vacated because the verdict and judgment are invalid. .................................................71

B. The Contempt Order is invalid even if the Court affirms the underlying judgment. .................................................71

 1. The Contempt Order is invalid because Southwest substantially complied with the judgment. ......................72

 2. The district court exceeded its civil-contempt power by ordering religious-liberty training. ...............................73

 3. The contempt order violates Southwest's First Amendment rights.................................................................76

CONCLUSION ...................................................................................79

CERTIFICATE OF COMPLIANCE ...................................................80

CERTIFICATE OF SERVICE .............................................................81

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alkhawaldeh v. Dow Chemical Co.,*
  851 F.3d 422 (5th Cir. 2017) .............................................. 29, 37, 38, 43, 44, 53

*American Airlines, Inc. v. Allied Pilots Ass'n,*
  228 F.3d 574 (5th Cir. 2000) ............................................................................73

*Atlantic Steel Co.,*
  245 NLRB 814 (1979) ............................................................... 68, 69, 70

*Baddock v. Villard (In re Baum),*
  606 F.2d 592 (5th Cir. 1979) ............................................................................71

*Baisden v. I'm Ready Products, Inc.,*
  693 F.3d 491 (5th Cir. 2012) ..........................................................................36

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ..........................................................................................76

*Beckington v. American Airlines, Inc.,*
  926 F.3d 595 (9th Cir. 2019) ..................................................................... 64, 65

*Biziko v. Van Horne,*
  981 F.3d 418 (5th Cir. 2020) ..........................................................................51

*Boylan v. Detrio,*
  187 F.2d 375 (5th Cir. 1951) ...........................................................................73

*Brener v. Diagnostic Center Hospital,*
  671 F.2d 141 (5th Cir. 1982) ..................................................................... 44, 56

*Brotherhood of Locomotive Engineers v. Kansas City Southern Railway,*
  26 F.3d 787 (8th Cir. 1994) ...............................................................................63

*Brotherhood of Locomotive Engineers v. Union Pacific Railroad,*
  31 F.4th 337 (5th Cir. 2022) ................................................................. 60, 61, 65

*Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,*
  394 U.S. 369 (1969) ..................................................................................... 67, 68

*Clark v. Champion National Security, Inc.,*
  952 F.3d 570 (5th Cir. 2020) ..................................................................... 37, 42

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Cliett v. Hammonds*,
 305 F.2d 565 (5th Cir. 1962) ............................................................71

*Dediol v. Best Chevrolet, Inc.*,
 655 F.3d 435 (5th Cir. 2011) ................................................... 30, 47

*Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*,
 188 F.3d 278 (5th Cir. 1999) ..................................... 32, 33, 57, 58, 59

*Dixon v. The Hallmark Companies, Inc.*,
 627 F.3d 849 (11th Cir. 2010) .................................... 29, 40, 41

*Equal Employment Opportunity Commission*
 *v. Abercrombie & Fitch Stores, Inc.*,
 575 U.S. 768 (2015) ............................................................40

*Evance v. Trumann Health Services, LLC*,
 719 F.3d 673 (8th Cir. 2013) ............................................42

*Eversley v. Mbank Dallas*,
 843 F.2d 172 (5th Cir. 1988) ................................................. 44, 45

*Federal Communications Commission v. Fox Television Stations, Inc.*,
 567 U.S. 239 (2012) ............................................................78

*First National Bank of Boston v. Bellotti*,
 435 U.S. 765 (1978) ............................................................77

*Gentile v. State Bar of Nevada*,
 501 U.S. 1030 (1991) ..........................................................78

*Geraci v. Moody-Tottrup, International, Inc.*,
 82 F.3d 578 (3d Cir. 1996) ........................................... 37, 42

*Goodyear Tire & Rubber Co. v. Haeger*,
 581 U.S. 101 (2017) ............................................................74

*Groff v. DeJoy*,
 143 S. Ct. 2279 (2023) .............................. 2, 3, 7, 28, 30, 32, 38, 45,
 ................................................... 46, 47, 48, 53, 57, 58, 59, 77

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Harper v. Virginia Department of Taxation,*
  509 U.S. 86 (1993) ...................................................................................57

*Harris v. Public Health Trust of Miami-Dade County,*
  No. 21-11016, 2023 WL 6451164
  (11th Cir. Oct. 4, 2023) ..........................................................................51

*Hawaiian Airlines, Inc. v. Norris,*
  512 U.S. 246 (1994) .................................................................................61

*Held v. American Airlines, Inc.,*
  No. 06-cv-4240, 2007 WL 433107
  (N.D. Ill. Jan. 31, 2007) .........................................................................66

*Herster v. Board of Supervisors of Louisiana State University,*
  887 F.3d 177 (5th Cir. 2018) ........................................... 29, 41, 42, 50

*Howard v. Haverty Furniture Cos.,*
  615 F.2d 203 (5th Cir. 1980) ........................................ 30, 32, 45, 47, 54

*In re Murphy-Brown, LLC,*
  907 F.3d 788 (4th Cir. 2018) ..................................................................77

*In re Oliver,*
  333 U.S. 257 (1948) ........................................................................ 74, 76

*In re Stewart,*
  571 F.2d 958 (5th Cir. 1978) ..................................................................73

*In re United States Bureau of Prisons,*
  918 F.3d 431 (5th Cir. 2019) ..................................................................73

*International Brotherhood of Electrical Workers v. Foust,*
  442 U.S. 42 (1979) ...................................................................................64

*International Brotherhood of Teamsters v. United Parcel Service, Co.,*
  447 F.3d 491 (6th Cir. 2006) ..................................................................63

*Janvey v. Dillon Gage, Inc. of Dallas,*
  856 F.3d 377 (5th Cir. 2017) ..................................................................36

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Johnson v. Express One International, Inc.,*
944 F.2d 247 (5th Cir. 1991) ................................................ 61, 62, 68

*Jowers v. Lincoln Electric Co.,*
617 F.3d 346 (5th Cir. 2010) ...............................................................36

*Konop v. Hawaiian Airlines, Inc.,*
302 F.3d 868 (9th Cir. 2002) ...............................................................67

*Krystek v. University of Southern Mississippi,*
164 F.3d 251 (5th Cir. 1999) ...............................................................48

*Lee v. Kansas City Southern Railway,*
574 F.3d 253 (5th Cir. 2009) ......................................................... 52, 53

*Linn v. United Plant Guard Workers of America, Local 114,*
383 U.S. 53 (1966) ...............................................................................69

*Luster v. Illinois Department of Corrections,*
652 F.3d 726 (7th Cir. 2011) ...............................................................42

*Massaro v. Palladino,*
19 F.4th 197 (2d Cir. 2021) .................................................................71

*McCoy v. City of Shreveport,*
492 F.3d 551 (5th Cir. 2007) ...............................................................43

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) ...................................................... 2, 6, 29, 31, 37,
........................................................................... 38, 41, 43, 50, 51

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.,*
934 F.3d 447 (5th Cir. 2019) ...............................................................43

*Minjares v. Independent Ass'n of Continental Pilots,*
293 F.3d 895 (5th Cir. 2002) ...............................................................61

*National Institute of Family & Life Advocates v. Becerra,*
138 S. Ct. 2361 (2018) .........................................................................76

*National Railroad Passenger Corp. v. Lamaw,*
915 F.2d 43 (1st Cir. 1990) ....................................................... 61, 62, 63

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Natural Gas Pipeline Co. of America v. Energy Gathering, Inc.*,
    86 F.3d 464 (5th Cir. 1996) ..................................................................74

*National Labor Relations Board v. City Disposal Systems Inc.*,
    465 U.S. 822 (1984) ..............................................................................68

*Nobach v. Woodland Village Nursing Center, Inc.*,
    799 F.3d 374 (5th Cir. 2015) ..................................................... 36, 41

*Norman Bridge Drug Co. v. Banner*,
    529 F.2d 822 (5th Cir. 1976) .............................................................73

*Peterson v. Hewlett-Packard Co.*,
    358 F.3d 599 (9th Cir. 2004) .................................... 30, 45, 46, 47

*Portis v. First National Bank of New Albany*,
    34 F.3d 325 (5th Cir. 1994) ......................................................... 41, 42

*Reef Industries v. National Labor Relations Board*,
    952 F.2d 830 (5th Cir. 1991) .............................................................67

*Renneisen v. American Airlines, Inc.*,
    990 F.2d 918 (7th Cir. 1993) ..................................... 16, 17, 64

*Rightnour v. Tiffany & Co.*,
    354 F. Supp. 3d 511 (S.D.N.Y. 2019) ............................................45

*Ripoll v. Dobard*,
    618 F. App'x 188 (5th Cir. 2015) ...................................................51

*Sandstad v. CB Richard Ellis, Inc.*,
    309 F.3d 893 (5th Cir. 2002) .................................... 41, 42, 43

*Shapolia v. Los Alamos National Laboratory*,
    992 F.2d 1033 (10th Cir. 1993) ................................................ 40, 41

*Tagore v. United States*,
    735 F.3d 324 (5th Cir. 2013) .............................................................39

*Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*,
    489 U.S. 426 (1989) ............................................ 34, 62, 65, 66, 68, 70

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Trans World Airlines, Inc., v. Hardison*,
   432 U.S. 63 (1977) ............................................................. 25, 44, 45, 47

*Trautman v. Time Warner Cable Texas, LLC*,
   756 F. App'x 421 (5th Cir. 2018) ...................................................51

*United States v. CITGO Petroleum Corp.*,
   801 F.3d 477 (5th Cir. 2015) .........................................................36

*United States v. Rizzo*,
   539 F.2d 458 (5th Cir. 1976) .........................................................74

*United Transportation Union v. National Railroad Passenger Corp.*,
   588 F.3d 805 (2d Cir. 2009) ..........................................................63

*University of Texas Southwestern Medical Center v. Nassar*,
   570 U.S. 338 (2013) .....................................................................40

*Vaughn v. Woodforest Bank*,
   665 F.3d 632 (5th Cir. 2011) ................................. 31, 32, 43, 51, 52

*Weber v. Roadway Express, Inc.*,
   199 F.3d 270 (5th Cir. 2000) ........................... 2, 5, 6, 19, 20,
   ................................................................... 29, 30, 32, 44, 47, 54

*Whitfield v. Pennington*,
   832 F.2d 909 (5th Cir. 1987) .........................................................71

*Wightman v. Springfield Terminal Railway*,
   100 F.3d 228 (1st Cir. 1996) .................................. 33, 34, 59, 62, 65

*Wilson v. U.S. West Communications*,
   58 F.3d 1337 (8th Cir. 1995) .........................................................45

*Wooley v. Maynard*,
   430 U.S. 705 (1977) .....................................................................76

## CONSTITUTION AND STATUTES

U.S. Const. art. III .........................................................................76

U.S. Const. amend. I ........................................... 3, 9, 35, 70, 75, 76, 77

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

28 U.S.C. § 1291..................................................................................1

28 U.S.C. § 1331..................................................................................1

National Labor Relations Act,
  29 U.S.C. § 151 *et seq.*..................................................... 67, 68, 69, 70

  29 U.S.C. § 157................................................................ 67, 68

Religious Freedom Restoration Act of 1993,
  42 U.S.C. § 2000bb *et seq.* ................................................................75

Title VII of the Civil Rights Act of 1964,
  42 U.S.C. § 2000e *et seq.*........................................... 1, 4, 5, 6, 7, 9, 15,
  .......................................................................... 17, 18, 19, 20, 21, 23, 28,
  .......................................................................... 29, 30, 33, 35, 37, 38, 39, 42, 43,
  .......................................................... 44, 45, 46, 47, 48, 58, 59, 72, 75, 76, 78, 79

  42 U.S.C. § 2000e.................................................................. 1, 2, 4

  42 U.S.C. § 2000e-2(a)...............................................................2, 28

  42 U.S.C. § 2000e-2-(a)(1)...............................................................39

  42 U.S.C. § 2000e(j) ........................................... 2, 6, 28, 29, 39, 40, 44

Railway Labor Act,
  45 U.S.C. § 151 *et seq.*................................................... 1, 3, 4, 5, 7, 8, 9, 15, 16,
  .......................................................................... 17, 18, 20, 22, 23, 33, 34, 59,
  .......................................................................... 60, 61, 64, 65, 66, 67, 68, 69, 70, 79

  45 U.S.C. § 151 Sixth...............................................................63

  45 U.S.C. § 152.................................................................. 64, 68

  45 U.S.C. § 152 Third.................................................. 3, 7, 8, 15, 16, 17, 20, 21,
  .......................................................................... 24, 25, 33, 60, 61, 62, 64, 66

  45 U.S.C. § 152 Fourth ........................................ 3, 7, 8, 15, 16, 17, 20, 21, 24
  .......................................................................... 25, 33, 60, 61, 62, 64, 66, 67, 68

  49 Stat. 1189 (1936) (45 U.S.C. § 181) .............................................................60

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

RULES

Fed. R. Civ. P. 50(a)(1) ...........................................................36

Fed. R. Civ. P. 50(b) ...................................................... 1, 23, 36

Fed. R. Civ. P. 50(d) ...................................................................1

Fed. R. Civ. P. 59(a) ....................................................................1

Fed. R. Crim. P. 42 ....................................................................74

OTHER AUTHORITIES

Caroline M. Corbin,
*The First Amendment Right Against Compelled Listening*,
89 B.U. L. Rev. 939 (2009) ................................................78

Douglas W. Hall et al.,
The Railway Labor Act § 5-33
(4th ed. 2016) .......................................................................63

Equal Employment Opportunity Commission,
Compliance Manual (2021) ................................................46

Compliance Manual, § 12-IV(C)(6)(a) ..........................................46

Compliance Manual, § 12-III(D) .................................................46

*Groff v. DeJoy*, No. 22-174 (U.S.), Docket,
https://tinyurl.com/3n5snraj......................................................58

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because Plaintiff-Appellee/Cross-Appellant Charlene Carter claims violations of federal law—Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Railway Labor Act, 45 U.S.C. § 151 *et seq.*

On December 5, 2022, the district court entered judgment implementing the jury verdict against Defendant-Appellant/Cross-Appellee Southwest Airlines. ROA.23-10836.8953-8955. On January 2, 2023, Southwest timely moved for judgment as a matter of law and a new trial under Federal Rules of Civil Procedure 50(b) and 59(a). ROA.23-10836.9454-9455; *see* Fed. R. Civ. P. 50(b), (d). On April 24, 2023, the district court denied the motion. ROA.23-10836.10395-10416. On May 22, 2023, Southwest timely appealed. ROA.23-10836.10602-10603.

On August 7, 2023, the district court held Southwest in contempt and ordered religious-liberty training. ROA.23-10836.10641-10669. On August 9, 2023, Southwest appealed. ROA.23-10836.10670-10671.

This Court has jurisdiction to review both the judgment and contempt order because they are final decisions under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

**1.** Whether Carter's failure to introduce direct evidence of discrimination, or comparator evidence necessary to show pretext under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), requires judgment as a matter of law for Southwest on her claim of religious-belief-based discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a).

**2.** Title VII doesn't protect an employee's religious practice if accommodating that practice would impose an "undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). At the time of trial, this Court's precedent made clear that "[t]he mere possibility of an adverse impact on co-workers" from accommodating a religious practice constituted undue hardship, *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 274 (5th Cir. 2000), and no evidence of business costs was required. Southwest relied on that standard to present its undue-hardship defense. But the district court erred in instructing the jury that undue hardship required a showing of financial harm. After the verdict and judgment, the Supreme Court announced a new standard in *Groff v. DeJoy*, 143 S. Ct. 2279, 2295 (2023), holding that the employer must show substantial business costs. The question is whether the district court's jury instructions were erroneous when

given, and *Groff*'s change in law requires a new trial permitting Southwest to present evidence to meet *Groff*'s new standard.

**3.** Whether Carter's failure to show that Southwest acted with anti-union animus in firing her requires judgment as a matter of law for Southwest on Carter's Railway Labor Act claim under 49 U.S.C. § 152 Third and Fourth, which protect from employer interference employees' "right to organize and bargain collectively through representatives of their own choosing." 49 U.S.C. § 152 Fourth.

**4.** Whether the district court erred in instructing the jury that § 152 Third and Fourth protect all organizing activity, even if it is abusive.

**5.** Whether the district court exceeded its civil-contempt authority by ordering religious-liberty training that would neither ensure compliance with the judgment nor compensate Carter for any noncompliance.

**6.** Whether the district court violated Southwest's and its in-house attorneys' First Amendment rights by sanctioning Southwest for expressing its disagreement with the court's orders and promising to superintend Southwest's speech in the future, and ordering Southwest's in-house lawyers to attend religious-liberty training with an ideological advocacy group.

## INTRODUCTION

Southwest fired flight attendant Charlene Carter for sending her coworker Audrey Stone hostile and graphic messages with videos and pictures about abortion, and for posting those videos and pictures publicly on Facebook while identifiable as a Southwest employee. "You truly are Despicable," Carter wrote Stone, sending a photo of a bloody aborted fetus linked to a graphic video. ROA.23-10836.14750. In another message with bloody graphics, Carter accused her coworker of "supporting this Murder." ROA.23-10836.14749. Finding Carter's messages "incredibly disturbing," Stone reported them to Southwest's human resources department. ROA.23-10836.14774. Southwest conducted an investigation, concluded that Carter's conduct violated its policies designed to ensure civility in the workplace, and fired Carter. ROA.23-10836.15007.

After an arbitrator sided with Southwest, Carter sued, claiming that Southwest fired her because of her religious belief and practice, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and for engaging in protected union activity, in violation of the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.* The district court, conflating practice and belief, sent the belief-based claim to the jury even though Carter had *no evidence*

that Southwest employees held animus toward pro-life Christians or that Southwest treated similarly situated non-pro-life-Christians more favorably. As to religious practice, the court erroneously refused to instruct the jury that "[t]he mere possibility of an adverse impact on co-workers" from accommodating a religious practice was an "undue hardship" putting that practice beyond Title VII's protections. *Weber*, 199 F.3d at 274. And the court sent the RLA claim to the jury even though Carter had no evidence that Southwest acted with anti-union animus in firing her. The jury found for Carter, and the court imposed judgment.

Southwest reinstated Carter and emailed all flight attendants the verdict and judgment. But Carter moved to hold Southwest in contempt, alleging that Southwest did not comply with the court's judgment. Although Southwest agreed to correct any mistake, ROA.23-10836.10536, the court held Southwest in contempt, ordering three of its attorneys to attend "religious-liberty" training with the Alliance Defending Freedom (ADF), ROA.23-10836.10667. This Court consolidated Southwest's appeal of the judgment and the contempt order, Doc. 20, and stayed the contempt sanction until resolution of the consolidated cases, Doc. 57.

The Court should now reverse.

1.    Carter's Title VII belief-based discrimination claim fails as a matter of law. She introduced no direct evidence that Southwest fired her for her belief (after all, Southwest did no such thing). So she had to show with circumstantial evidence that Southwest's reliance on its neutral policies was pretext under the framework from *McDonnell Douglas*. But Carter repeatedly waived a pretext theory, insisting that Southwest's reliance on its policies *was* direct evidence. That's wrong as a matter of basic Title VII and evidence law, and the district court's attempt to save her claim under *McDonnell Douglas* fails. Absent direct evidence, Carter had to show that Southwest treated a comparator employee more favorably—that it didn't fire an employee without her protected religious belief who engaged in nearly identical conduct. She didn't even try to make that showing, much less succeed.

2.    Carter's religious-practice-based discrimination claim cannot stand, either. Title VII doesn't protect an employee's religious practice if accommodating it would impose an "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). At the time of trial, "[t]he mere possibility of an adverse impact on co-workers" of accommodating a religious practice constituted undue hardship, and no evidence of business costs was required. *Weber*, 199 F.3d at 274. But the district court, over Southwest's

repeated and strenuous objections, and despite overwhelming evidence of the adverse effects of accommodating Carter's conduct on employee morale, told the jury it had to find "financial costs or disruption of the business." ROA.23-10836.13406-13407. That was error. Southwest didn't present evidence of costs to the business because this Court's decisions disclaimed the need for it to do so.

Although the Supreme Court held after the verdict and judgment that an employer asserting undue hardship must show substantial business costs, *Groff*, 143 S. Ct. at 2295, that new standard still requires a new trial. This Court requires a new trial when intervening precedent sets a new standard so that parties can present evidence relevant to that standard—exactly as Southwest would do on remand. Southwest would (a) connect the harm to employee morale of accommodating Carter's practice of sending her coworkers hostile and graphic messages to substantial costs to Southwest's business, and also (b) show that accommodating such conduct would risk creating a hostile work environment for other employees—itself a Title VII violation.

**3.** Carter's RLA claim fails as a matter of law. Where there is already a certified union, an employee asserting a violation of 45 U.S.C. § 152

Third and Fourth, like Carter, must show that her employer acted with anti-union animus. After all, § 152 Third and Fourth, which protect employee organizing and collective bargaining, create a very narrow cause of action permitting judicial intervention only when the RLA's dispute-resolution mechanisms cannot operate fairly. But Carter claims nothing more than an internal dispute with Audrey Stone, a union official (and Southwest flight attendant), about union dues. The RLA doesn't police that dispute. Even if it did, the district court erroneously instructed the jury that the RLA protects "abusive" activity, when the caselaw says just the opposite.

**4.** The district court's Contempt Order is invalid, too. For one thing, it must fall along with the invalid judgment. For another, Southwest substantially complied with the judgment, and the Contempt Order exceeds the district court's civil-contempt authority. The court's authority extended only to ensuring compliance with the judgment and compensating Carter for any noncompliance. The court thus had no authority to go beyond requiring Southwest to issue a new verbatim statement correcting any misstatement and pay Carter's contempt-related attorneys' fees—both of which Southwest voluntarily agreed to do. By the same token, religious-liberty training is not the least-restrictive way to achieve the permissible goals of civil contempt.

Worse still, it violates the First Amendment because it punishes Southwest and its in-house attorneys for protected speech disagreeing with the (invalid) jury verdict and effectively gagging any future speech about the case.

The Court should reverse the jury verdict and vacate the Contempt Order and remand with instructions to enter judgment as a matter of law for Southwest on Carter's belief-based Title VII claim and RLA claim and proceed toward a new trial on Carter's practice-based Title VII claim.

## STATEMENT OF THE CASE

## I.   Factual background

### A.   Carter sends fellow flight attendant Audrey Stone hostile and graphic direct messages on Facebook.

In January 2017, Carter, a Southwest flight attendant, learned that some members of Transport Workers Union Local 556, the exclusive bargaining representative for Southwest flight attendants, attended the Women's March in Washington, DC. ROA.23-10836.11407-11408, 12492. Carter was upset that union members attended the march and believed her union dues had paid for their trip. ROA.23-10836.12493.

In February 2017, Carter sent a series of hostile and graphic direct messages on Facebook to Audrey Stone, a fellow flight attendant and President

of Local 556. ROA.23-10836.11407, 14749-14752. Carter's first message featured a graphic image of a fetus in a metal bowl that linked to a video about abortion. She wrote: "TWU-AFL-CIO and 556 are supporting this Murder." ROA.23-10836.14749. Carter then sent another message with an image of an aborted fetus in the palm of a hand, linking to a video described as "An aborted baby alive even after the abortion." ROA.23-10836.14750. Carter wrote: "This is what you supported during your Paid Leave with others at the Women's MARCH in DC….You truly are Despicable in so many ways… cant wait to see you back on line." *Id.* Carter then sent a picture of women wearing hats with explicit likenesses of vaginas, writing: "Did you all dress up like this…" ROA.23-10836.14751. Carter also sent Stone a link to an article about an organizer of the Women's March, commenting, "you are nothing but a SHEEP in Wolves Clothing or you are just so un-educated you have not clue who or what you were marching for! Either way you should not be using our DUES to have Marched in this despicable show of TRASH!" ROA.23-10836.14752. Carter continued to send Stone similar messages until Stone reported Carter to her manager. ROA.23-10836.14774-14775.

**B.** **Carter posts graphic videos on her public Facebook account, which identified her as a Southwest employee.**

Carter did not limit her hostile, graphic messages to private communications with Stone. She also posted similar messages on her Facebook page, which was "open to the public," ROA.23-10836.12999, and which advertised her role as a Southwest flight attendant with pictures of her in her uniform, with Southwest pilots, and of her Southwest employee badge, ROA.23-10836.14852-14855.

On her Facebook page, for instance, Carter posted the same video of a fetus in a bowl that she sent Stone. The caption stated, "If its your body your choice, who is this laying in the fucking bowl?" Carter wrote above the video, "WARNING this is VERY GRAPHIC!!... This is MURDER." ROA.23-10836.14747. Carter also posted the video of the fetus in the palm of a hand, adding: "THIS IS GRAFIC….but it needs to be shared over and over….this is MURDER!" ROA.23-10836.14748.

**C.** **Southwest investigates Carter's behavior and fires her for it.**

**1.** Stone reported Carter's messages to her manager. ROA.23-10836.14774-14775. Stone said she saw the messages while "waiting to board a flight," and that she "sat in the gate area alone and cried." ROA.23-

10836.14774. Finding the messages "incredibly disturbing," as well as "threatening," "obscene and violent," Stone reported them out of concern that they would "be sent to another flight attendant." *Id.* Stone was "fearful to return to [her] job as a line-flying Flight Attendant due to repeated personal attacks and threats." *Id.* Southwest held a factfinding meeting with Stone, who explained that she perceived Carter's statement "cant wait to see you back on line" to be a threat given other physical threats made against Stone on Facebook, including pictures of her with a knife to her head. ROA.23-10836.14847-14848; *see also* ROA.23-10836.11950-11951.

Southwest's Employee Relations team held a factfinding meeting with Carter. ROA.23-10836.11408, 14887. Carter, represented by a Local 556 representative, ROA.23-10836.14905, told Southwest that she is "Christian" and "pro-life" and that abortion "is a huge issue" for her, ROA.23-10836.14887. Carter said she has a "deep, deep want to get the word out" about abortion to "more and more people [to] see what actually happens." *Id.* She explained that, "as a Christian, if [she] can get the word out in any way, to every group as possible to touch [abortion]," she will. ROA.23-10836.14888. Carter explained that she accused Stone of supporting murder because Local 556 attended the Women's March. ROA.23-10836.14892.

Southwest's Employee Relations team concluded that "[Carter] used Facebook Messenger to send [Stone] videos which depicted abortions and pictures of women dressed as vaginas." ROA.23-10836.15004. The team noted that Carter "explained she did so because she is a 'Christian and a Conservative'" and because Stone "participated in the National Women's March in Washington, D.C." *Id.*

**2.**    Southwest sent Stone a termination notice. ROA.23-10836.11408, 15007. The notice explained that Carter admitted she had posted graphic videos on Facebook, where she was identifiable as a Southwest employee, and that she sent graphic videos of aborted fetuses and an image of people wearing vagina costumes to a coworker. Carter "agreed that the pictures and videos were graphic." ROA.23-10836.15007. Southwest determined that Carter's Facebook posts were "highly offensive" and that her messages to Stone were "harassing and inappropriate." *Id.* Southwest thus concluded that Carter's conduct was "in direct violation of the Southwest Airlines Mission statement," "Workplace Bullying and Hazing Policy," and "Social Media Policy," and that it could violate Southwest's Policy Concerning Harassment, Sexual Harassment, Discrimination and Retaliation. *Id.*

**D.    Carter, represented by Local 556, grieves her termination, and the arbitrator sides with Southwest.**

In accordance with Local 556's collective-bargaining agreement, ROA.23-10836.14438, Carter filed a grievance challenging her termination, *see* ROA.23-10836.14708. Two union representatives represented her at the grievance hearing. ROA.23-10836.15157. After the hearing, Southwest offered to reinstate Carter and reduce her termination to a 30-day suspension. ROA.23-10836.12571-12572, 14708. Carter rejected the offer, ROA.23-10836.2357, and the parties proceeded to arbitration, ROA.23-10836.14439. After a two-day hearing involving 32 exhibits and testimony from nine witnesses, the arbitrator concluded that it was "clear beyond a reasonable doubt that [Southwest] had just cause to terminate [Carter]" because Carter violated the Social Media Policy, the Workplace Bullying and Hazing Policy, and the Harassment Policy. ROA.23-10836.3159. Each of those policy violations was "an independently sufficient basis for termination." ROA.23-10836.3161.

## II.   Procedural background

### A.   Carter sues Southwest and Local 556, and the district court denies Southwest's motion to dismiss and motion for summary judgment.

**1.**   Carter sued Southwest and Local 556. Against Southwest, as relevant here, her operative complaint alleges violations of Title VII and the Railway Labor Act. ROA.23-10836.999-1031. *First*, Carter alleges that Southwest violated Title VII by "terminat[ing] [her] for her religious beliefs." ROA.23-10836.1027. *Second*, Carter alleges that Southwest violated Title VII by firing her "for engaging in the religious practice of sharing religious beliefs on abortion with the union president and on her personal Facebook page." *Id. Finally*, Carter alleges that Southwest fired her in retaliation for engaging in protected activity, in violation of 45 U.S.C. § 152 Third and Fourth of the RLA. In her view, § 152 Third and Fourth protect an employees' rights to "oppos[e], challeng[e], and advocat[e] against" a union, and she engaged in such activity when she sent Facebook messages to Stone. ROA.23-10836.1023-1024.

Carter also brought an RLA claim against Local 556 for breaching its duty of fair representation. ROA.23-10836.1019-1023. She claims that Local 556 caused Southwest to discipline her because Stone reported Carter's

conduct to Southwest, breaching the union's duty "to act with complete loyalty towards those it represents." ROA.23-10836.1019-1020.

**2.**    Before Carter filed her operative complaint, the district court dismissed with prejudice two RLA claims she had raised in her prior complaint while allowing her RLA retaliation claim against Southwest and her RLA fair-representation claim against Local 556 to proceed. The court agreed with Southwest that the RLA plays a very limited role after a union is certified. Specifically, § 152 Third and Fourth, the provisions Carter invoked, protect employees' right to choose their union representatives and bargain collectively without interference, meaning that, after certification, the provisions apply "in only limited circumstances," such as where there has been "a fundamental attack on the collective bargaining process" or a "direct attempt to destroy a union." ROA.23-10836.858.

The district court reasoned that Carter did not allege "anti-union animus or a fundamental attack on the collective bargaining process." ROA.23-10836.859. Instead, Carter alleged at most "an internal Union dispute" between Carter and Stone. ROA.23-10836.860. But § 152 "was not designed to give minority groups within a union a cause of action against their employer when they cannot persuade their own union to take actions they deem to be

in the union's best interest." *Id.* (quoting *Renneisen v. American Airlines, Inc.*, 990 F.2d 918, 92 (7th Cir. 1993)). And Carter could not establish that she had no remedy to enforce her RLA statutory rights, because she used the grievance procedure set out in the CBA. ROA.23-10836.860-861. The court thus concluded that Carter "failed to state a statutory cause of action under 45 U.S.C. § 152, Third and Fourth of the RLA." ROA.23-10836.859-860.

Despite dismissing Carter's first two RLA claims, the district court found that she had stated a claim "that Southwest retaliated against her for the exercise of her rights … under the RLA." ROA.23-10836.861-863. The court did not identify which provision of the RLA supposedly protected Carter's actions, or the elements of such an RLA retaliation claim, even though it had just found that Carter could not state a cause of action under § 152 Third and Fourth.

The district court also allowed Carter's Title VII claims to proceed, finding that Southwest's undue hardship defense was a "fact-intensive inquiry" to be addressed later. ROA.23-10836.870.

**3.**     Southwest moved for summary judgment, which the district court denied. The court reasoned that Carter's RLA retaliation claim was permissible because it does not "require interpretation of the collective

bargaining agreement" or "bring the meaning of any collective bargaining agreement provisions into dispute." ROA.23-10836.6815-6816. The court ignored Southwest's argument that the court's motion-to-dismiss opinion had "*already* concluded that [Carter] has not presented any evidence of 'anti-union animus,'" as necessary to bring an RLA claim. ROA.23-10836.2126. As to Carter's Title VII claims, the court concluded without analysis that the parties genuinely disputed "the reason that Southwest terminated Carter." ROA.23-10836.6824.

**B.    A jury rules for Carter.**

**1.**    At trial, Carter relied on her Facebook posts and messages, her termination letter, and notes from Southwest's investigation to show that Southwest knew she was a pro-life Christian before firing her, and that it fired her for her posts and messages. ROA.23-10836.14747-14773, 14887-14889, 15002-15003, 15007. Carter claimed the posts and messages were her religious practice. ROA.23-10836.12498-12499. But she produced no evidence that Southwest fired her for her religious *belief*.

To the contrary, Southwest supervisors—themselves pro-life Christians, ROA.23-10836.12828-12829—testified that Carter's religious belief played no role in the decision to fire Carter. Southwest fired Carter, they

explained, because sending graphic and hostile messages to coworkers, and posting such messages on Facebook while identifiable as a Southwest employee, violated Southwest's policies on bullying, social media, and harassment. *E.g.*, ROA.23-10836.14747-14773, 14887-14889, 15002-15003, 15007. As one supervisor testified, "[t]he decision was based on … the egregiousness of the videos and the posts that were made and the personal messages that were sent depicting a very graphic image." ROA.23-10836.12878-12879.

Southwest employees also testified about the hardship to employee morale that would result from allowing Carter to continue sending graphic videos to her colleagues. A senior supervisor explained that if Southwest accommodated Carter's conduct, employees "would lose respect for each other, we would lose the family-type feel that Southwest Airlines has always been a proponent of in how we treat each other. and it would have an adverse affect on how we work together and how we interact[] as a group of employees." ROA.23-10836.12880. And several employees testified that they were "horrified" by the videos, ROA.23-10836.12998, that the posts were "obscene and violent," ROA.23-10836.14774, and that they "felt physically ill" viewing them ROA.23-10836.12798. Given this Court's longstanding,

clear precedent that "[t]he mere possibility of an adverse impact on co-work-ers" of accommodating a religious practice constitutes undue hardship placing the practice beyond Title VII's protection, *Weber*, 199 F.3d at 274, Southwest did not need or seek to introduce evidence of the economic costs of accommodating Carter's conduct.

**2.**    At the close of evidence, the court instructed the jury on Carter's RLA count and two Title VII counts.

On Carter's RLA claim, the district court instructed the jury that Carter needed to show that (1) she engaged in activity that is protected by § 152 Third or Fourth; (2) Southwest discharged her; and (3) her protected activity was a substantial or motivating factor in Southwest's decision to discharge Carter. ROA.23-10836.13398-13399. As to the first prong, Carter had sought an instruction that her conduct did "not lose its protection" under the RLA "even if the jury decides that Carter's protected activity is 'vulgar, offensive, abusive, threatening, or harassing.'" ROA.23-10836.7000. Southwest re-quested just the opposite instruction—that protected activity does not include conduct that "is flagrant, violent, extreme, egregious, inappropriate, offensive, obscene, harassing, intimating, or hostile." ROA.23-10836.13205-

13206; *see* ROA.23-10836.8413-8414. Over Southwest's repeated objection, the district court gave Carter's requested instruction:

> All union oppositional and organizational activity is protected under Section 152 Third and Fourth unless it: One, constitutes a threat of violence; Or, two, is a false statement made with knowledge of its falsity or with reckless disregard for the truth. Activity that is intemperate, abusive, insulting, or hyperbolic is protected activity under Section 152 Third and Fourth.

ROA.23-10836.13399-13400.

As to Title VII, the district court instructed the jury on two counts, which the court described as an "unlawful discharge claim" and a "failure to accommodate claim." ROA.23-10836.13398-13401, 13405. On unlawful discharge, the district court instructed the jury that Carter needed to prove that (1) Southwest discharged Carter; and (2) Southwest was motivated to discharge her because of her sincerely held religious observances, beliefs, or practices. ROA.23-10836.13401-13402.

On Carter's failure to accommodate claim, the court instructed the jury that Carter needed to prove that (1) Carter's sincerely held religious beliefs, observances, or practices conflicted with a job requirement; (2) Southwest discharged Carter for failing to comply with that conflicting job requirement; and (3) Southwest discharged Charter with a motive of avoiding the need to

accommodate a religious belief, observance, or practice. ROA.23-10836.13406. Southwest requested an instruction on the "undue hardship" defense to religious-practice discrimination, that "[a]n 'undue hardship' is an action that imposes more than a de minimis burden on the employer or the co-workers of the individual seeking an accommodation." ROA.23-10836.7091; *see* ROA.23-10836.8416. The district court refused. At the formal charge conference, Southwest objected that "the Court's [proposed] instruction overstates the burden and doesn't include all of the various burdens that could constitute an undue hardship, including but not limited to burden to other employees," because such harm "doesn't actually have to be any kind of monetary loss" under Fifth Circuit precedent. ROA.23-10836.13223. The court again refused. The court instead instructed the jury that "[u]ndue hardship cannot be proven by merely proving any cost or any disruption or inconvenience to the business," and that "undue hardship means more than a de minim[i]s cost on the conduct of the employer's business either in terms of financial costs or disruption of the business." ROA.23-10836.13406-13407.

The jury found Southwest liable for retaliating against Carter "for engaging in activity protected by the Railway Labor Act"; for discharging Carter because of her religious observances, beliefs, or practices; and for

failing to accommodate Carter's religious beliefs, practices or observances. *See* ROA.23-10836.8572-8575. The district court entered judgment for Carter, ordering Southwest to reinstate her with backpay; post on company bulletin boards and email all flight attendants the verdict and judgment; and inform all flight attendants "that, under Title VII, they may not discriminate against Southwest flight attendants for their religious practices and beliefs." ROA.23-10836.8955.

### C.    The district court denies Southwest's Rule 50(b) motion.

**1.**    After the verdict, Southwest moved under Rule 50(b) for judgment as a matter of law. Southwest argued that there was insufficient evidence of religious-belief-based discrimination, because there was "no evidence of hostile comments regarding Christians generally or Carter's religious beliefs specially," nor any evidence "of any non-Christian employees who [Carter] believes Southwest treated more favorably than herself." ROA.23-10836.9477.

As to religious-practice-based discrimination, Southwest contended that the court gave an impermissibly limited undue-hardship instruction that allowed the jury to consider harms to a business only "in terms of financial costs or disruption of the business," and didn't allow the jury to consider

burdens "on an employee's co-workers." ROA.23-10836.9474. Southwest also renewed its argument that § 152 Third and Fourth do not allow post-certification claims unless "the employer's actions were animated by extreme anti-union animus or constituted a fundamental attack on collective bargaining," and that they do not protect speech "that is flagrant, violent, extreme, egregious, opprobrious, offensive, or obscene." ROA.23-10836.9485.

**2.**    The district court denied the motion. As to belief-based discrimination, the court stated that Carter had introduced evidence "that Southwest directly discriminated against her." ROA.23-10836.10408. But the court cited no such evidence, instead pointing only to Carter's messages and posts, *id.*, which are evidence of *practice*, not belief, *infra* pp. 48-50. And although Carter had expressly disclaimed relying on indirect evidence, ROA.23-10836.10354, the court also reasoned that Carter had introduced evidence of pretext by showing that Southwest terminated her for "posting religious expression on Facebook" but did not discipline "other Southwest employees who carried political messages at a divisive and highly publicized political protest." ROA.23-10836.10408.

As to practice-based discrimination, the court criticized the Supreme

Court's standard for undue hardship under *Trans World Airlines, Inc., v. Hardison*, 432 U.S. 63, 84 (1977)—the then-governing standard reflected in this

Court's then-governing caselaw—instead citing the *Hardison* dissent and

hoping that *Hardison* "may soon rest in peace." ROA.23-10836.10404. The

court concluded that its undue-hardship instruction "encompasse[d] the to-

tality of Southwest's business and did not prevent the jury from considering

potential burdens on Carter's co-workers." ROA.23-10836.10403.

Finally, the court rejected Southwest's renewed argument that § 152

Third and Fourth require anti-union animus in the post-certification context.

ROA.23-10836.10416.

**3.** Southwest appealed. ROA.23-10836.10602-10603.

**D.    The district court holds Southwest in contempt and this Court stays that order.**

**1.** To comply with the judgment, Southwest reinstated Carter,

posted the verdict and judgment in all flight-attendant breakrooms, and

emailed all flight attendants the verdict and judgment. ROA.23-10836.9442.

The email stated that "a federal court in Dallas entered a judgment against

Southwest" and "ordered us to inform you that Southwest does not discriminate against our Employees for their religious practices and beliefs." *Id.*

Southwest also published an internal Inflight Info on the Go (IIOTG) Memo for flight attendants, explaining that an employee had sued Southwest after engaging in conduct that Southwest "believed [was] inappropriate, harassing, and offensive." ROA.23-10836.9444. The memo described the judgment, which required Southwest to "pay monetary damages, distribute communication to Flight Attendants about the ruling, and reinstate [the employee's] employment with the Company." *Id.* Southwest promised to "implement the judgment" even as it was "extremely disappointed with the court's ruling and [is] appealing the decision to the Fifth Circuit." *Id.* Southwest reminded employees to adhere to Southwest policies and display "Civility, Care and Unity at all times, regardless of our differing opinions." *Id.*

**2.**     Carter moved for contempt, arguing that Southwest violated the judgment by saying it "does not discriminate" rather than "may not discriminate" and contradicting the required notice with the IIOTG Memo. ROA.23-10836.9410-9428. Although Southwest disagreed that it had violated the judgment, it offered to send a new email saying it "may not discriminate"

and to pay Carter's contempt-related attorneys' fees. ROA.23-10836.10535-10536. The district court nonetheless held Southwest in contempt, finding that Southwest's email contravened the judgment and the IIOTG Memo undermined the court's notice requirement. ROA.23-10836.10651-10653.

The district court ordered Southwest to issue verbatim a new notice to its flight attendants. ROA.23-10836.10654-10660. The court also ordered three of Southwest's in-house lawyers to complete eight hours of "religious-liberty training" with the Alliance Defending Freedom (ADF), an ideological advocacy group, before Southwest circulates the new notice. ROA.23-10836.10668. Southwest appealed, ROA.23-10836.10670-10671, and this Court consolidated the contempt appeal with the merits appeal, Doc. 20. The district court denied a stay pending appeal and set September 26, 2023, as the new training deadline. Dist. Ct. Doc. 483 (Stay Op.).

**3.**     Southwest then sought a stay from this Court. On September 25, 2023, the Court granted an administrative stay. Doc. 54. On September 26, 2023, the Court entered an order carrying the stay with the case for consideration along with the merits. Doc. 57.

## SUMMARY OF ARGUMENT

The Court should reverse and vacate the judgment, verdict, and Contempt Order against Southwest.

**I.** The jury verdict cannot stand on Carter's two Title VII claims. Carter's religious-belief-based discrimination claim fails as a matter of law because Carter introduced no evidence that Southwest fired her for her belief. And her religious-practice-based discrimination claim requires a new trial because the district court erroneously instructed the jury under then-controlling Circuit precedent, and *Groff*'s change in law requires a new trial giving Southwest an opportunity to present evidence to meet the Supreme Court's new undue-hardship standard.

**A. 1.** Title VII treats religious-belief-based discrimination and religious-practice-based discrimination differently. An employee cannot show belief-based discrimination just by showing an employer fired her for her religious practice. Although an employer may not take an adverse action against an employee because of her religious beliefs, 42 U.S.C. § 2000e-2(a), an employee's religious practice is not protected if accommodating the practice would impose an "undue hardship on the conduct of the employer's business," *id.* § 2000e(j).

**2.**    To show discrimination, a plaintiff must (a) produce direct evidence of discrimination or (b) satisfy the *McDonnell Douglas* test for pretext by introducing indirect (*i.e.*, circumstantial) evidence sufficient to show that an employer's nondiscriminatory explanations for the adverse action were pretext for discrimination. Direct evidence shows unlawful motive on its face, unambiguously, and without inference—like a supervisor firing an employee while saying, "You're too religious," *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 854 (11th Cir. 2010)—and is "rare," *Herster v. Board of Supervisors of Louisiana State University*, 887 F.3d 177, 184-85 (5th Cir. 2018). To satisfy *McDonnell Douglas*, the plaintiff must identify similarly situated employees without the protected characteristic who were treated more favorably "under nearly identical circumstances." *Alkhawaldeh v. Dow Chemical Co.*, 851 F.3d 422, 426 (5th Cir. 2017). The plaintiff cannot prevail without such "comparator" evidence. *Id.* at 426-27.

**3.**    When an employee claims she was fired because of her religious practice, the employer can show that accommodating that practice would impose an "undue hardship on the conduct of [its] business" and so the practice is not protected as "religion" under Title VII. 42 U.S.C. § 2000e(j). At the time of trial, the "mere possibility of an adverse impact on co-workers," was

an undue hardship, *Weber*, 199 F.3d at 274, even if the employer "incurred no direct money cost from" accommodating the conduct, *Howard v. Haverty Furniture Cos.*, 615 F.2d 203, 206 (5th Cir. 1980). It was also well-established that an employer didn't need to accommodate a religious practice if doing so could expose the employer to liability for creating a hostile work environment, *see Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 608 (9th Cir. 2004) — itself a Title VII violation, *e.g.*, *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 440 (5th Cir. 2011).

After the judgment, but before this appeal, the Supreme Court changed the undue-hardship standard in *Groff*, 143 S. Ct. at 2295, holding that an employer asserting undue hardship must show that accommodating the practice "would result in substantial increased costs in relation to the conduct of [the employer's] particular business." *Id*. *Groff* wrought a significant change in this Circuit, casting doubt on this Court's explicit disclaimers that cost-based evidence is unnecessary. But *Groff* did not change the basic principle that accommodating a religious practice that could create a hostile work environment for other employees creates an undue hardship.

**B.**    These principles make clear that the Title VII verdict for Carter cannot stand. Carter's belief-based discrimination fails as a matter of law

because she introduced no direct or indirect evidence that Southwest fired her because of her religious belief.

1. Carter introduced no direct evidence that anyone at Southwest had an unlawful motive in terminating her. To the contrary, Southwest employee after Southwest employee (many pro-life Christians themselves) testified that Carter was fired because she violated Southwest's neutral company policies designed to promote civility in the workplace. Carter presented *no* evidence that anyone at Southwest held animus toward pro-life Christians. And contrary to Carter and the district court, evidence that Southwest fired Carter for her *practice*—sending a coworker hostile and graphic messages about abortion and publicly posting such graphic messages on Facebook—is by definition *not* direct evidence of belief-based discrimination, because it requires (unwarranted) inferences to reach that conclusion.

2. Carter's evidence is also legally insufficient to show pretext under the *McDonnell Douglas* framework. She expressly and repeatedly waived reliance on a *McDonnell Douglas* pretext theory. In any event, she introduced no comparator evidence showing that Southwest declined to fire anyone similarly situated who engaged in "'nearly identical' conduct." *Vaughn v.*

*Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011). Her claim of belief-based discrimination fails as a matter of law.

**C.**    Carter's practice-based discrimination claim fails, too, and the Court should remand for a new trial under *Groff*.

**1.**    Southwest tried the case under this Court's controlling precedent that the mere possibility of adverse effects on employee morale is undue hardship, without the need to show any business costs. Southwest put on ample evidence of harm to morale, including the effect of Carter's messages on Stone and testimony from senior supervisors that accommodating Carter's practice of sending graphic videos to her coworkers would destroy flight attendant morale. ROA.23-10836.12874-12880. But the district court erroneously instructed the jury that an employer must show "financial costs or disruption of the business." ROA.23-10836.13406-13407. That instruction required the jury to ignore Southwest's evidence. Southwest hadn't introduced evidence of financial cost of business disruption because this Court's precedent made clear that it didn't need to. *See Weber*, 199 F.3d at 274; *Howard*, 615 F.2d at 206. That instruction was reversible error.

**2.**    *Groff*'s change in law still requires a new trial. The default rule is that when the controlling law (here, the undue-hardship standard) changes

after the verdict, but before appellate resolution, the Court will "remand for a new trial to give parties the benefit of the new law and the opportunity to present evidence relevant to that new standard." *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 282 (5th Cir. 1999). That rule applies here: Southwest had no reason to expect that the undue-hardship standard would change. Remand will allow Southwest to present evidence that accommodating Carter's conduct would impose significant costs to its business by devastating employee morale, translating directly to financial losses, and by opening Southwest up to the costly threat of Title VII liability for enabling a hostile work environment.

**II.** The verdict on Carter's Railway Labor Act claim cannot stand.

**A.** The RLA provisions Carter invokes, 45 U.S.C. § 152 Third and Fourth, are designed to protect employees' unionization efforts from employer interference. The RLA relies primarily on mandatory arbitration, rather than judicial intervention, to resolve disputes between employers and employees. After a union is certified, § 152 Third and Fourth provide a cause of action only in "extremely limited circumstances": where the employer acts with "anti-union animus," such that the RLA's arbitration mechanisms cannot be presumed to work fairly. *Wightman v. Springfield Terminal Railway,*

100 F.3d 228, 234 (1st Cir. 1996). Carter presented no evidence that Southwest acted with animus toward Local 556, the local bargaining representative. As a matter of law, her dispute with union official Stone was at most an internal union dispute that doesn't give rise to an RLA cause of action.

**B.**    Separately, the RLA does not protect offensive or abusive conduct, as decades of National Labor Relations Act (NRLA) decisions, which can be "helpful in deciding cases under the RLA," *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, 432-33 (1989), make clear. The RLA protects union organizing activity, not *all* activity, no matter how hostile or abusive. But the district court gave the *opposite* instruction, telling the jury that "abusive, insulting, or hyperbolic [conduct] *is* protected activity." ROA.23-10836.13399-13400 (emphasis added). That was error, and Carter's counsel capitalized on it in closing and rebuttal statements before the jury. That error requires a new trial.

**III.    A.**    The Contempt Order and religious-liberty-training mandate cannot stand because the underlying verdict and judgment are invalid.

**B.**    Even if the Court affirms the judgment, however, it should still vacate the Contempt Order against Southwest.

**1.** Contempt was improper because Southwest substantially complied with the district court's order. Southwest posted and distributed the jury's verdict and the judgment, thereby notifying all Southwest flight attendants that Title VII prohibits Southwest from discriminating against employees because of their religion.

**2.** The district court exceeded its civil-contempt authority by ordering religious-liberty (not even Title VII) training by the ADF, an ideological advocacy group. Religious-liberty training has nothing to do with the two permissible purposes of civil contempt: ensuring compliance with a court order and compensating a party for noncompliance. The district court had no authority to go beyond requiring Southwest to issue a new verbatim statement and pay Carter's contempt-related attorneys' fees—the least-restrictive sanctions to accomplish those permissible goals.

**3.** The Contempt Order violates Southwest's and its in-house attorneys' First Amendment rights by punishing them for expressing the view that Southwest did not violate Title VII in firing Carter. The order further violates Southwest's First Amendment rights because it chills Southwest's future speech about this case and forces Southwest and its in-house attorneys to listen to the views of an ideological advocacy group.

## STANDARD OF REVIEW

When reviewing a district court's denial of a Rule 50(b) motion, the Court reviews questions of law de novo and asks "whether a 'reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Nobach v. Woodland Village Nursing Center, Inc.*, 799 F.3d 374, 377–78 (5th Cir. 2015) (quoting Fed. R. Civ. P. 50(a)(1)).

The Court also reviews de novo the "legal conclusions underlying jury instructions," *United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 481 (5th Cir. 2015), including "question[s] of statutory construction," *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 388 (5th Cir. 2017). Reversal is warranted if the challenged instructions "affected the outcome of the case." *Jowers v. Lincoln Electric Co.*, 617 F.3d 346, 352 (5th Cir. 2010). Similarly, the Court will find reversible error for failure to give a requested jury instruction if the requested instruction "1) was a substantially correct statement of law, 2) was not substantially covered in the charge as a whole, and 3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the [party's] ability to present a given [claim]." *Baisden v. I'm Ready Products, Inc.*, 693 F.3d 491, 505 (5th Cir. 2012).

# ARGUMENT

## I.     Carter failed to prove religious-belief-based discrimination as a matter of law, and the erroneous undue-hardship instruction requires a new trial on religious-practice-based discrimination.

The jury found that Southwest violated Title VII by firing Carter because of her religious belief and her religious practice of disseminating graphic anti-abortion messages and posts. But neither finding can stand under blackletter law. Carter failed to prove discrimination because of religious belief as a matter of law, and the court's failure to correctly instruct the jury as to undue hardship requires a new trial on Carter's practice-based claim.

*First*, Carter introduced no evidence at trial that Southwest discriminated against her because of her religious *belief*. Carter offered no direct evidence—evidence requiring no inference—that Southwest fired her because of her pro-life Christianity, or even any evidence of animus toward her belief. Carter showed only that Southwest knew she was a pro-life Christian and fired her for violating company policies. But awareness of a protected characteristic and termination are insufficient as a matter of law to find a violation of Title VII. *See Clark v. Champion National Security, Inc.*, 952 F.3d 570, 580-81 (5th Cir. 2020); *Geraci v. Moody-Tottrup, International, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996). Without direct evidence, Carter had to proceed under

the framework from *McDonnell Douglas*, by putting on circumstantial evidence showing that Southwest did not fire a "similarly situated" person who was not a pro-life Christian "under nearly identical circumstances." *Alkhawaldeh*, 851 F.3d at 426. But Carter disclaimed that standard, didn't try to satisfy it, and could not do so as a matter of law anyway, because she identified nobody similarly situated who engaged in anything like her behavior.

*Second*, Title VII doesn't protect Carter's conduct as religious "practice," because accommodating it would devastate employee morale. The district court failed to properly instruct the jury on undue hardship under then-controlling Circuit precedent that Southwest relied on to try the case, which recognized that harm to employee morale, without economic quantification, constituted undue hardship. The intervening change in law in *Groff* requires a new trial giving Southwest the opportunity to put on evidence satisfying the new standard.

### A. Title VII prohibits discrimination against an employee because of her religious belief or practice.

#### 1. Religious belief and religious practice are definitionally distinct, and an employee cannot simply recast practice-based discrimination as belief-based discrimination.

Title VII prohibits discrimination "because of" an employee's "religion," 42 U.S.C. § 2000e-2-(a)(1), and defines "religion" to include both religious belief and religious practice, *id.* § 2000e(j). But Title VII does not protect a religious practice that the employer "is unable to reasonably accommodate … without undue hardship on the conduct of the employer's business." *Id.* Thus, religious-belief-based discrimination claims and religious-practice-based discrimination claims must proceed on different tracks. Although an employer cannot fire an employee for her *belief*, it *can* fire an employee because of her religious *practice* when accommodating that practice would impose an undue hardship on the employer's business. *See, e.g., Tagore v. United States*, 735 F.3d 324, 330 (5th Cir. 2013) (undue hardship to accommodate Sikh employee who requested to wear a ceremonial sword to work). In such a case, the employee's religious practice does not fall definitionally within the "religion" protected by Title VII. 42 U.S.C. § 2000e(j).

A plaintiff claiming belief-based discrimination must prove that her belief was one of her employer's motives for discriminating. *See generally University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 343 (2013). Thus, an employer discriminates because of belief if it fires an employee because she is Jewish. *Dixon*, 627 F.3d at 854. Similarly, an employee can show practice-based discrimination where, for example, her employer fires her with the motive of avoiding having to accommodate her religious practice. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015).

Because "belief" and "practice" are definitionally distinct, and an employer may raise an undue-hardship defense to a practice-based claim, 42 U.S.C. § 2000e(j), an employee cannot prove belief-based discrimination simply by showing that the employer fired her because of her religious *practice*. If she could, then undue hardship would never be a defense and an employer would always need to accommodate an employee's religious practice, shielded as belief, no matter its effect on the workplace or the business. The only way to give effect to Congress' choice to create an undue-hardship defense is to respect the line Congress drew between practice and belief. *See, e.g., Shapolia v. Los Alamos National Laboratory*, 992 F.2d 1033, 1037 (10th Cir. 1993) (in a religious belief case, "[t]here are no questions regarding

accommodation or reasonableness"). Of course, an employee may simultaneously claim belief-based and practice-based discrimination, but to prevail on the belief-based claim she must show that *the belief*, not the practice, was a motivating factor for the adverse action.

> **2.** **An employee claiming discrimination must introduce direct evidence, or satisfy the test under *McDonnell Douglas* for claims based on indirect evidence.**

An employee may introduce "either direct or [indirect] evidence" to show that her employer was motivated by a protected characteristic (like her religion) in firing her. *Nobach*, 799 F.3d at 378 n.6; *see also Portis v. First National Bank of New Albany*, 34 F.3d 325, 328 (5th Cir. 1994). Although a plaintiff can prove a Title VII case with direct evidence alone, a plaintiff with only indirect (*i.e.*, circumstantial) evidence must satisfy the standard set out in *McDonnell Douglas. Herster*, 887 F.3d at 184-86.

> **a.** Direct evidence "shows on its face that an improper criterion served as a basis … for the adverse employment action." *Id.* at 185. Put another way, direct evidence, "if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). Examples include an employer telling an employee, "You're fired, too. You're too religious," *Dixon*, 627 F.3d at 854, or

that "she would be paid less *because she was a woman*," *Portis*, 34 F.3d at 329.

Because direct evidence of discriminatory intent is "rare," *Herster*, 887 F.3d

at 185, and "difficult to obtain," the "vast majority of employment-discrimi-

nation claims will rest on circumstantial evidence," *Luster v. Illinois*

*Department of Corrections*, 652 F.3d 726, 733 (7th Cir. 2011).

An employee's termination plus her employer's general knowledge of

her protected characteristic is *not* direct evidence of discrimination. *See Clark,*

*Inc.*, 952 F.3d at 580-81 (citing Title VII cases); *Geraci*, 82 F.3d at 581. In *Clark*,

for example, this Court held that a plaintiff who "fails to point to any state-

ment or document that directly and expressly links his [protected category]

to a decisionmaker's choice to terminate him" has not provided direct evi-

dence. 952 F.3d at 580. Likewise, in *Evance v. Trumann Health Services, LLC*,

719 F.3d 673, 677 (8th Cir. 2013), the court held that an employee's "termina-

tion itself" was not "direct evidence of discrimination" against the

employee's Pentecostal beliefs, because the "record [did] not contain any ev-

idence of a discriminatory attitude" towards Pentecostals.

    **b.**    A plaintiff without direct evidence must rely on indirect (*i.e.*, cir-

cumstantial) evidence. *See, e.g.*, *Herster*, 887 F.3d at 184. If "an inference is

required for the evidence to be probative as to [an employer's]

discriminatory animus in firing [an employee], the evidence is circumstantial, not direct." *Sandstad*, 309 F.3d at 897-98.

"When confronting indirect evidence, courts use the burden-shifting framework from *McDonnell Douglas*." *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 456 (5th Cir. 2019). Under that framework, a plaintiff must show that the employer's nondiscriminatory explanations for the adverse action are pretextual, *see McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007), by showing that the employer did not take that action against "other 'similarly situated' employees for 'nearly identical' conduct," *Vaughn*, 665 F.3d at 637. The plaintiff cannot prevail if she fails to produce evidence regarding similarly situated employees, also known as "comparators." *Alkhawaldeh*, 851 F.3d at 426-27. Thus, when an employer offers a legitimate reason for firing an employee who alleges discrimination based on religious belief, the employee must identify comparators. *Id.*

The comparator requirement is rigorous. The Title VII claimant must identify at least one coworker outside of her protected class who was treated more favorably "under nearly identical circumstances." *Id.* at 426. That coworker "must hold the 'same job' or hold the same job responsibilities as the Title VII claimant; must 'share[] the same supervisor or' have his

'employment status determined by the same person' as the Title VII claimant; and must have a history of 'violations' or 'infringements' similar to that of the Title VII claimant." *Id.*

> ### 3. An employer defeats a religious-practice-based discrimination claim (also known as a failure-to-accommodate claim) by showing that accommodating the employee's religious practice would impose an undue hardship on the employer's business.

When an employee claims she was fired because of her religious *practice*, rather than her belief, the employer may raise an undue-hardship defense. *See* 42 U.S.C. § 2000e(j). If the employer shows that accommodating the practice would impose an "undue hardship on the conduct of [its] business," the practice is not protected as "religion" under Title VII. *Id.*

> **a.** At the time of trial, requiring an employer "to bear more than a *de minimis* cost" to accommodate an employee's religious practice was "an undue hardship." *Hardison*, 432 U.S. at 84. Decades of precedent defined undue hardship to include "[t]he mere possibility of an adverse impact on co-workers," *Weber*, 199 F.3d at 274, and a "disruption of work routines and a lowering of morale among" employees, *Brener v. Diagnostic Center Hospital*, 671 F.2d 141, 147 (5th Cir. 1982); *see also Eversley v. Mbank Dallas*, 843 F.2d 172, 176 (5th Cir. 1988) (undue hardship where employees "would be upset"

by the accommodation). That precedent made clear that the employer did not need to introduce evidence linking harm to morale to business cost. In *Howard*, for example, the Court explained that "[t]he fact that [the employer] incurred no direct money cost from [the proposed accommodation] is not controlling." 615 F.2d at 206.

Before the Supreme Court's 2023 decision in *Groff*, courts "consistently held that it does not constitute discrimination to discipline employees for making offensive comments in the workplace, even when those comments are tied to religion." *Rightnour v. Tiffany & Co.*, 354 F. Supp. 3d 511, 525 (S.D.N.Y. 2019) (citing cases). In particular, courts routinely applied *Hardison* to hold that accommodating an employee's desire to share her religious beliefs with her co-workers, when doing so could cause discomfort, constituted an undue hardship. *See Peterson*, 358 F.3d at 608 (citing cases).

In *Wilson v. U.S. West Communications*, 58 F.3d 1337, 1338 (8th Cir. 1995), for instance, the Eighth Circuit held that Title VII did not require an employer to allow an employee to wear a "graphic anti-abortion button" in the workplace. The court explained that "the color photograph of the fetus … offended [the plaintiff's] co-workers, many of whom were reminded of circumstances unrelated to abortion." *Id.* at 1341. The court did not require the

employer to produce any evidence of financial cost; the offense to co-workers was sufficient. And in *Peterson*, the Ninth Circuit reasoned that accommodating an employee's desire to hang posters around the office containing anti-gay messages would cause an undue burden because it would "demean or degrade … members of its workforce." 358 F.3d at 607-08.

The EEOC's Compliance Manual endorsed this precedent:

> Religious expression can create undue hardship if it disrupts the work of other employees or constitutes—or threatens to constitute—unlawful harassment. Conduct that is disruptive can still constitute an undue hardship, even if it does not rise to the level of unlawful harassment. Since an employer has a duty under Title VII to protect employees from harassment, it would be an undue hardship to accommodate expression that is harassing.

EEOC Compliance Manual, § 12-IV(C)(6)(a) (2021). The EEOC thus advised employers that "it would be an undue hardship for an employer to accommodate proselytizing by an employee if the proselytizing had adverse effects on employee morale or workplace productivity." *Id.* § 12-III(D).

**b.**     After the verdict and judgment here, *Groff* changed the undue-hardship standard. *Groff* now requires an employer to show that accommodating the plaintiff's religious practice "would result in substantial increased costs in relation to the conduct of [the employer's] particular business." 143 S. Ct. at 2295. *Groff* recognized that some "impacts on coworkers" will be

relevant, but only insofar as they "affec[t] the conduct of the business." *Id.* at 2296. Thus, "an accommodation's effect on co-workers" may constitute an undue hardship, so long as it has "ramifications for the conduct of the employer's business." *Id. Groff* thus wrought a significant change from this Court's precedent, which held that burdening coworkers is an undue hardship that "need not be quantifiable in economic terms." *Weber*, 199 F.3d at 274; *Howard*, 615 F.2d at 206.

At the same time, *Groff* did not change the basic principle that, if an employee's practice might create a hostile work environment for other employees, accommodating it would impose an undue hardship, meaning the practice is not protected. As the Ninth Circuit explained before *Groff*, "an employer need not accommodate an employee's religious beliefs if doing so would result in discrimination against his co-workers or deprive them of contractual or other statutory rights." *Peterson*, 358 F.3d at 607. *Groff* made clear that the proper way to understand *Hardison* was that accommodating a request for a Sabbath work exemption would impose an undue hardship because it would violate other employees' contractual seniority rights. 143 S. Ct. at 2288-92. Similarly, Title VII itself prohibits the creation of a hostile work environment, *see, e.g.*, *Dediol*, 655 F.3d at 440, so an employer cannot

permit, much less accommodate, a religious practice that would violate its other employees' statutory right to be free from a hostile work environment. Otherwise "Title VII would be at war with itself." *Groff*, 143 S. Ct. at 2296. The Court also noted that "a good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by our clarifying decision today," without questioning the EEOC guidance discussed above (at 46). *Id.* And, of course, defending against hostile-work-environment claims plainly imposes "substantial increased costs" on the employer's business. *Id.* at 2295.

### B. Carter's religious-belief-based discrimination claim fails as a matter of law because she introduced no evidence that Southwest fired her because of her religious belief.

The jury verdict cannot stand as to Carter's claim that Southwest fired her for her religious belief, because Carter introduced no evidence, direct or indirect, Southwest fired her because of her belief. *See, e.g.*, *Krystek v. University of Southern Mississippi*, 164 F.3d 251, 257 (5th Cir. 1999) (reversing jury verdict because the "evidence [plaintiff] marshals to his cause" was insufficient evidence of discrimination).

### 1. Carter didn't introduce direct evidence of belief-based discrimination.

Carter introduced no direct evidence that Southwest fired her because of her belief. Indeed, she didn't introduce any statements or documents so much as suggesting that any Southwest employee harbored animus toward pro-life Christians. Nor did Carter point to anything in Southwest's neutral policies, which Southwest fired Carter for violating, that was purportedly discriminatory. In fact, the Southwest employees involved in Carter's termination testified uncontradicted that they, too, were pro-life Christians. *Supra* p. 18.

Carter claims she had direct evidence—that Southwest terminated her because she sent a graphic video to a coworker, and that Southwest knew she was Christian. *See, e.g.*, ROA.23-10836.5926-5927. But that isn't evidence, much less direct evidence, of *belief-based* discrimination. It cannot be direct evidence, because it would require multiple inferences to (wrongly) conclude that Southwest discriminated against Carter because of her *belief. Supra* pp. 41-42. The jury would need to conclude that Southwest's termination letter, explaining that Carter was fired for violating various company policies (as the jointly selected arbitrator found), was really a cover for anti-pro-life-

Christian animus. But that's a pretext claim, not direct evidence, meaning that Carter needed to satisfy the *McDonnell Douglas* standard (which she cannot do, as discussed below, at 51-53).

The district court reasoned that Carter had introduced direct evidence of belief-based discrimination, but it, too, was wrong under the fundamental principles discussed above. The court said that "the most obvious example" of direct evidence was that Southwest disciplined Carter for her social media posts, but did not discipline other Southwest employees who were depicted online attending the Women's March. ROA.23-10836.10408. But that evidence likewise requires *inferences* to get to belief-based discrimination—and, as explained below (at 51-53), it fails as comparator evidence, too, because those other Southwest employees weren't similarly situated and didn't engage in nearly identical conduct. *See Herster*, 887 F.3d at 187 (same).

> **2.** **Indirect evidence cannot sustain the jury verdict, either, because Carter waived a pretext theory and introduced legally insufficient evidence of pretext anyway.**

Any attempt to salvage Carter's belief-based discrimination claim with indirect evidence fails as a matter of law under *McDonnell Douglas*.

**a.** For starters, Carter relied entirely on her assertion that she presented direct evidence of discrimination to insist that "[t]his is not a pretext

case." ROA.23-10836.7006. Carter repeatedly waived reliance on evidence of pretext, and satisfaction of "the *McDonnell Douglas* indirect proof paradigm," as "unnecessary." ROA.23-10836.10354.

That waiver is fatal. Having disclaimed reliance on a pretext theory, Carter cannot now claim that firing her for violating neutral company policies was actually pretext for belief-based discrimination. *See Biziko v. Van Horne*, 981 F.3d 418, 420 & n.1 (5th Cir. 2020). A plaintiff who abandons a *McDonnell Douglas* pretext theory because she insists "she presented direct evidence" cannot later prevail on a pretext theory. *Trautman v. Time Warner Cable Texas, LLC*, 756 F. App'x 421, 428 n.5 (5th Cir. 2018); *see also, e.g.*, *Ripoll v. Dobard*, 618 F. App'x 188, 190 n.1 (5th Cir. 2015) (plaintiff pressing only circumstantial evidence "waived any argument that the evidence should be considered outside the *McDonnell Douglas* framework and under a direct evidence standard"); *Harris v. Public Health Trust of Miami-Dade County*, No. 21-11016, 2023 WL 6451164, at *1 (11th Cir. Oct. 4, 2023) (per curiam) ("Harris puts all her eggs in the direct-evidence basket" and "has thereby forfeited any circumstantial-evidence claims that she might have had.").

**b.**    Even if Carter hadn't waived her reliance on indirect evidence, her evidence fails to make out a pretext claim as a matter of law because she

produced no valid comparator evidence. *See Vaughn*, 665 F.3d at 637; *supra* p. 43. Carter introduced no evidence that a similarly situated employee was not fired for nearly identical behavior.

The closest Carter came was introducing Facebook posts about the Women's March by Local 556 and other individuals. *See* ROA.23-10836.14719-14746. The only post Carter identified at trial was a post Local 556 made on the union's Facebook page, depicting at least 50 people and a sign reading "My body, my choice." ROA.23-10836.11624, 14722. The post said, "Women make only 80c for every dollar." ROA.23-10836.14722. Jessica Parker, Local 556's Chair of the Working Women's Committee, ROA.23-10836.11612, shared the union's post on Facebook with the caption "[W]hy we marched," ROA.23-10836.12370, 14722.

Under blackletter law, no reasonable juror could conclude that Parker was a comparator. Parker's conduct (a Facebook post about women's rights, mentioning an alleged gender-based pay disparity, while not identifiable as a Southwest employee) was nothing like Carter's (hostile, abusive messages to a coworker, plus Facebook posts, while identifiable as a Southwest employee, with graphic pictures of a bloody fetus). Parker's post wasn't "nearly

identical" conduct to Carter's. *Lee v. Kansas City Southern Railway*, 574 F.3d 253, 260 (5th Cir. 2009). Parker fails as a comparator for that reason alone.

But that's not all. Carter also failed to establish that Parker's Facebook page was public or that Parker was identifiable as a Southwest employee—all crucial features of Carter's termination. Nor did Carter show that Parker "h[e]ld the 'same job' or h[e]ld the same job responsibilities as [Carter]," "share[d] the same supervisor," or "ha[d] a history of 'violations' or 'infringements' similar to [Carter]." *Alkhawaldeh*, 851 F.3d at 426.

Because Carter introduced no direct evidence or indirect evidence that Southwest fired her for her religious belief, the verdict cannot stand as to belief-based discrimination.

### C.    A new trial is required on Carter's religious-practice-based discrimination claim.

The verdict cannot stand as to Carter's accommodation claim, either. *First*, the district court's undue-hardship instruction was erroneous under the controlling precedent Southwest relied on to present its undue-hardship defense. *Second*, *Groff*'s change in law requires a new trial so that Southwest can try the case with evidence responding to the new standard.

###### 1.    Southwest tried the case under controlling precedent making clear that the mere possibility of adverse effects on employee morale is undue hardship, and the district court erred in failing to instruct the jury on that rule.

**a.**    The district court's undue-hardship instruction was wrong at the time it was given, and the error was prejudicial, because absent the error, the jury would almost have certainly found for Southwest. The court told the jury that it could find undue hardship only if Southwest proved "financial costs or disruption of business," ROA.23-10836.13407, and rejected Southwest's proposed instruction that undue hardship included "burden to other employees," ROA.23-10836.13223. But this Court's precedent did *not* require employers to connect harm to morale with financial costs or business disruption. *See Weber*, 199 F.3d at 274; *Howard*, 615 F.2d at 206. All Southwest had to show was "[t]he mere possibility of an adverse impact on co-workers" of accommodating Carter's conduct. *Weber*, 199 F.3d at 274.

Southwest met that standard by showing, without contradiction, that accommodating Carter's conduct would destroy employee morale. For example, a Denver Base Manager supervising 2,400 flight attendants (including Carter) testified that allowing employees to send graphic videos to coworkers, especially on such a difficult topic, would be "detrimental to

someone psychologically." ROA.23-10836.12874. For instance, "[s]ocial media has a way of affecting people," the supervisor testified, and "suicide is a big thing out there." ROA.23-10836.12874-12875. "Southwest has a great culture, and our habits have always been to take care of each other and treat each other with kindness and caring," the supervisor continued, and accommodating Carter's conduct would destroy this culture: "We would lose respect for each other, we would lose the family-type feel that Southwest Airlines has always been a proponent of in how we treat each other. And it would have an adverse affect on how we work together and how we interacted as a group of employees." ROA.23-10836.12879-12880.

Similarly, the Senior Director of Labor Relations testified that accommodating Carter's behavior would hurt the company's ability to recruit talent. *See* ROA.23-10836.12842, 12847. Southwest strives for a "[d]iverse work group," she explained, and Southwest's mission to promote kindness between employees is "engrained in applicants." *Id.* Accommodating Carter's practice of sending graphic videos would be "not acceptable" to Southwest's corporate culture. ROA.23-10836.12842.

Other Southwest employees echoed this testimony, underscoring just how damaging accommodating Carter's conduct would be to Southwest and

employee morale. Stone explained that she "found [Carter's] messages to be incredibly disturbing, … obscene and violent, as well as threatening." ROA.23-10836.14774. Another employee testified that after watching the video, she "felt physically ill," "had to get up from [her] desk and exit the building," and "walk[] around the building several times before [she] came back in." ROA.23-10836.12798. A third employee said she felt "horrified by the images because … it felt like an exploitation of something very personal and horrific and it made [her] feel queasy" and "ruined [her] day." ROA.23-10836.12998. And a senior manager testified that she "hated" the videos, finding them "very impactful," "ugly," and "disgusting. That's just the tip of the iceberg …. It made me feel sick." ROA.23-10836.13035-13036.

**b.** The district court defended its instruction by reasoning that the instruction "plainly encompasses the totality of Southwest's business and did not prevent the jury from considering potential burdens on Carter's co-workers." ROA.23-10836.10403. That's wrong. This Court's precedent did not require disruption-to-business harms or any showing of economic impact from harm to employee morale. *See Brener*, 671 F.2d at 147. The court's instruction erased the morale-based undue-hardship defense as it then existed under this Court's precedent.

### 2. *Groff*'s new test requires a new trial.

After the verdict and judgment, the Supreme Court held in *Groff* that an employer raising an undue-hardship defense must show that accommodating the plaintiff's religious practice "would result in substantial increased costs in relation to the conduct of [the employer's] particular business." 143 S. Ct. at 2295. Under this Court's longstanding precedent, *Groff* requires a new trial to give Southwest an opportunity to meet that new standard.

**a.** The default rule is that when the controlling precedent changes after judgment, but before appellate resolution, the Court "will generally remand for a new trial to give parties the benefit of the new law and the opportunity to present evidence relevant to that new standard." *Deffenbaugh-Williams*, 188 F.3d at 282. That approach tracks the rule that an intervening decision must be given "full retroactive effect [to] all cases still open on direct review." *Harper v. Virginia Department of Taxation*, 509 U.S. 86, 97 (1993). The touchstone of the rule is "fairness: to prevent injustice to a party who had no reason to expect a changed rule at the time of trial." *Deffenbaugh-Williams*, 188 F.3d at 282. Thus, the Court "must consider the law of this circuit at the time of … trial" to determine whether the parties could have responded to the new rule at trial. *Id.*

*Groff* therefore requires a new trial. The district court failed to instruct the jury correctly on the then-controlling undue-hardship standard; had the jury been correctly instructed, Southwest quite likely would have prevailed. Southwest had "no reason to expect" *Groff* during trial, *id.*—indeed, the *Groff* cert petition wasn't filed until late August 2022, more than a month after the trial here. *Groff* Docket (No. 22-174), https://tinyurl.com/3n5snraj. Southwest didn't introduce evidence connecting harm to morale to costs, because this Court's precedent was clear that no business-cost evidence was required. *Supra* pp. 44-46.

On remand, Southwest would introduce evidence showing the business costs of accommodating Carter's religious practice. That evidence would include testimony from Southwest executives in the Inflight Department, the Labor Administration Department, and the People Department about the risks that flight attendants would refuse to work together, and the flight cancellations and poor customer experiences that would result and have resulted in the past. Southwest would also introduce expert testimony connecting harm to morale with lost revenue. In addition, Southwest would show that accommodating Carter's conduct would risk creating a hostile work environment violating other employees' Title VII rights and subjecting

Southwest to the substantial costs of defending against Title VII liability. *See supra* pp. 47-48. Accommodating Carter's conduct would put Title VII "at war with itself." *Groff*, 143 S. Ct. at 2296.

**b.**    Carter's and the district court's reasoning that Southwest cannot win under *Groff* because *Groff* imposes a more difficult standard, or that the district court's then-erroneous instructions have become correct under *Groff*, lack merit and are incompatible with *Deffenbaugh-Williams*: had *Groff* been the standard, Southwest would have *litigated* the case differently.

**II.    The verdict on Carter's RLA claim must be reversed because Carter produced no evidence that Southwest acted with anti-union animus, and she did not engage in protected activity.**

The judgment on Carter's RLA count must also be reversed. *First*, because the RLA is designed to protect union organizing and collective bargaining, not individual employees' ability to argue with their unions, the RLA supplies a cause of action after a union is certified only in "extremely limited circumstances" in which the carrier acts with "anti-union animus." *Wightman*, 100 F.3d at 234. But Carter introduced no evidence that Southwest exhibited animus towards Local 556. Instead, Carter's theory at trial was that Southwest and Local 556 *worked together* to take action against union objectors—the *opposite* of anti-union animus. Carter argued that Southwest fired

her for criticizing Audrey Stone, a union officer and fellow flight attendant. That expansive theory of RLA liability fails as a matter of law because the RLA doesn't give employees a federal cause of action for intra-union disputes. *Second*, even if the RLA regulated internal union disputes, Carter didn't engage in RLA-protected activity because her conduct was abusive and obscene. The district court's contrary instruction, that "abusive, insulting, or hyperbolic [conduct] is protected activity," ROA.23-10836.13399-13400, was error.

**A.    Carter's RLA claim fails as a matter of law because Carter produced no evidence that Southwest fired her with anti-union animus.**

**1.    RLA § 152 Third and Fourth provide a very narrow cause of action for post-certification plaintiffs alleging anti-union animus.**

"Congress enacted the RLA to minimize disruptions to railway service caused by labor disputes," *Brotherhood of Locomotive Engineers v. Union Pacific Railroad*, 31 F.4th 337, 342 (5th Cir. 2022), and soon amended the act to apply to airlines, 49 Stat. 1189 (1936) (codified at 45 U.S.C. § 181). The RLA relies on union organizing and collective bargaining, and sets out specific "procedures for resolving 'major' and 'minor' disputes between carriers and their employes." *Brotherhood of Locomotive Engineers*, 31 F.4th at 342. Major

disputes relate to the formation of collective bargaining agreements or efforts to secure them, whereas minor disputes involve the interpretation or application of those collective bargaining agreements—for examples, to issues like "rates of pay, rules, or working conditions." *Id.* (citation omitted); *see Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252-53 (1994). "[T]he RLA establishes a mandatory arbitral mechanism" for both kinds of disputes, *Norris*, 512 U.S. at 252; for instance, minor disputes "must be arbitrated before administrative bodies called Adjustment Boards," *Brotherhood of Locomotive Engineers*, 31 F.4th at 342.

Given the RLA's reliance on mandatory arbitration, courts have had a "historically limited role … in enforcing the RLA." *Minjares v. Independent Ass'n of Continental Pilots*, 293 F.3d 895, 899 (5th Cir. 2002). The provisions Carter invokes, 45 U.S.C. § 152 Third and Fourth, are designed for a limited purpose: "to protect employees' designation of bargaining representatives from employer coercion or intrusion," *National Railroad Passenger Corp. v. Lamaw*, 915 F.2d 43, 50-51 (1st Cir. 1990), "because noninterference with employees' chosen representation is a statutory right crucial to the Act's functioning," *Brotherhood of Locomotive Engineers*, 31 F.4th at 343. In other words, the statute's goal is to "allow[] employees to organize or join a labor

organization of their choice." *Johnson v. Express One International, Inc.*, 944 F.2d 247, 252 (5th Cir. 1991). Section 152 Third provides, in relevant part:

> Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives.

Section 152 Fourth provides, in relevant part:

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier … shall deny … the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees … or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization.

Section 152 Third and Fourth "address[] primarily the precertification rights and freedoms of unorganized employees" — that is, preventing interference with employees' choice of union representatives. *TWA*, 489 U.S. at 440. After a union is certified, the provisions supply a cause of action only "in extremely limited circumstances," *Wightman*, 100 F.3d at 234: "where the employer's conduct has been motivated by anti-union animus … or an

attempt to interfere with its employees' choice of their collective bargaining representative, … or constitutes discrimination or coercion against that representative, … or involves acts of intimidation [which] cannot be remedied by administrative means," *National Railroad Passenger Corp.*, 915 F.2d at 51 (quotation marks omitted); *see* Douglas W. Hall et al., The Railway Labor Act § 5-33 (4th ed. 2016) (cause of action in postcertification cases where "the challenged action was motivated by antiunion animus").

A key requirement is that the carrier acted with intent to interfere with the employees' choice of representative. A claim fails if the plaintiff "fail[s] to present adequate evidence that [the carrier's] actions have been motivated by anti-union animus or that [the carrier's] actions were an attempt to interfere with its employees' choice of their collective bargaining representative." *Brotherhood of Locomotive Engineers v. Kansas City Southern Railway*, 26 F.3d 787, 795 (8th Cir. 1994); *see also United Transportation Union v. National Railroad Passenger Corp.*, 588 F.3d 805, 813 (2d Cir. 2009); *see* 45 U.S.C. § 151 Sixth (defining "representative"). The plaintiff must show that the carrier "commit[ed] acts of intimidation that c[ould not] be remedied by administrative means, or commit[ed] a fundamental attack on the collective bargaining

process or ma[de] a direct attempt to destroy a union." *International Brotherhood of Teamsters v. United Parcel Service, Co.*, 447 F.3d 491, 502 (6th Cir. 2006).

By the same token, § 152 Third and Fourth *do not* confer a cause of action based on an employee's dispute with the union. While an employee might separately sue her union for violating the duty of fair representation, *see International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 47 (1979), the RLA does not empower employees to sue their employers over internal union disputes: "An employer has no duty to tell the union how to fulfill its duty to represent constituents." *Beckington v. American Airlines, Inc.*, 926 F.3d 595, 605 (9th Cir. 2019). Put another way, § 152 "was not designed to give minority groups within a union a cause of action against their employer when they cannot persuade their own union to take actions they deem to be in the union's best interest." *Renneisen*, 990 F.2d at 924.

### 2. Carter introduced no evidence of anti-union animus or any other evidence of intent to interfere with the union.

**a.** Carter never contended, much less produced evidence, that Southwest acted with animus toward Local 556 when it fired her, or that Southwest interfered in her relationship with Local 556. Carter's only argument was that Southwest terminated her for expressing opposition to

Audrey Stone *as an officer* of Local 556. *See* ROA.23-10836.1023-1024. Carter testified at trial that her dispute with Local 556 related to the union's expenditure of dues on the Women's March. ROA.23-10836.12497.

Rather than prove any dispute between her employer and her union, Carter showed only her internal union dispute with a union officer about spending union dues. Carter might feel that Local 556 didn't fairly represent her, but she has no claim against *Southwest*.

Endorsing Carter's theory would transform countless internal union disputes into a federal cause of action against employers. But the RLA "contains no provision to support that theory of … liability, and [the Court] cannot invent one absent 'an expression of congressional direction to do so.'" *Beckington*, 926 F.3d at 607. The RLA applies to postcertification disputes "in extremely limited circumstances," *Wightman*, 100 F.3d at 234, precisely because it is designed to *minimize* the role of federal courts in labor disputes, *Brotherhood of Locomotive Engineers*, 31 F.4th at 342.

What's more, the RLA permits "judicial intervention" only when "there would be no remedy to enforce the [RLA's] statutory commands." *TWA*, 489 U.S. at 441 (citation omitted). But Carter *used* an RLA remedy — the dispute resolution process created by the collective bargaining

agreement negotiated between Local 556 and Southwest, with Local 556 as her representative—and never alleged that Southwest interfered with that process or that it was otherwise deficient. To counsel's knowledge, but for the district court's decision, "no federal court has permitted an employee to pursue a claim under §§ 2 Third and Fourth after the employee has submitted to arbitration under the collective bargaining agreement." *Held v. American Airlines, Inc.*, No. 06-cv-4240, 2007 WL 433107, at *6 (N.D. Ill. Jan. 31, 2007).

    **b.**    Because Carter failed to allege that Southwest fired her with anti-union animus, the district court should have dismissed Carter's claim at the motion-to-dismiss stage. Indeed, it's unclear why the court allowed the claim to proceed, because it found that Carter's allegations "have little, if anything, to do with the anti-union animus or threats to the collective bargaining process," ROA.23-10836.859, and that Carter had a "'remedy to enforce' her statutory rights under the RLA," ROA.23-10836.860 (quoting *TWA*, 489 U.S. at 441). *Supra* pp. 16-17. The court nonetheless submitted the claim to the jury, erroneously instructing it that "[a]ll union oppositional and organizational activity is protected under Section 152 Third and Fourth." ROA.23-10836.13399. That was wrong, for the reasons just explained. Thus,

even assuming Carter's RLA claim properly reached the jury, the instructional error would require a new trial.

## B. Even if Carter properly reached the jury, a new trial would be required because the district court erroneously instructed the jury that the RLA protects obscene and abusive activity.

### 1. The RLA does not protect obscene and abusive activity.

Congress enacted the RLA to protect unionization and collective bargaining, not *all* forms of employee organizing. The RLA doesn't protect activity that is offensive, abusive, or violent, as caselaw interpreting the RLA and the related National Labor Relations Act makes clear. The NLRA also doesn't protect organizing activity that is offensive or abusive, and the RLA should not be read more broadly than the NLRA.

Section 152 Fourth protects employees' rights to "organize and bargain collectively through representatives of their own choosing." 45 U.S.C. § 152 Fourth. But some "organizing activity may be 'so flagrant, violent or extreme' or so 'egregious,' 'opprobrious,' 'offensive,' 'obscene' or 'wholly unjustified' that it loses the protection of the RLA." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 883 n.11 (9th Cir. 2002) (quoting *Reef Industries v. NLRB*, 952 F.2d 830, 837 & n.19 (5th Cir. 1991)).

To delineate activity protected under § 152 Fourth, the Supreme Court has looked to "comparable" caselaw interpreting the closely parallel Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, which also protects the right join, organize, and assist in joining a labor organization. *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 385 & n.20 (1969); *see TWA*, 489 U.S. at 432-34. Decisions interpreting § 157 confirm that abusive conduct is not protected: "An employee may engage in concerted activity in such an abusive manner that he loses the protection of § [157]." *NLRB v. City Disposal Systems Inc.*, 465 U.S. 822, 837 (1984). National Labor Relations Board (NLRB) decisions agree that "even an employee who is en-gaged in concerted protected activity can, by opprobrious conduct, lose the protection of the [NLRA]." *Atlantic Steel Co.*, 245 NLRB 814, 816 (1979). If anything, the RLA is *less* protective of employees than the NLRA, because NLRA § 157, unlike RLA § 152, protects employees' right "to engage in other concerted activities for the purpose of … other mutual aid of protection," 29 U.S.C. § 157, beyond the more limited "right to organize and bargain collec-tively" that the RLA protects, 45 U.S.C. § 152 Fourth. *See Johnson*, 944 F.2d at 252.

**2.    The district court's protected activity instruction was legally wrong and prejudiced Southwest.**

**a.**    Although the RLA does *not* protect conduct that is offensive, abusive, or violent, the district court gave the *opposite* instruction, telling the jury that activity "that is intemperate, abusive, insulting, or hyperbolic *is* protected." ROA.23-10836.13400 (emphasis added). That error prejudiced Southwest. In his closing statement, Carter's counsel focused on the jury instructions and the notion that Carter's conduct was "protected speech" even if it was "really offensive." ROA.23-10836.13439. And on rebuttal, Carter's counsel twice returned to the erroneous instruction, claiming the activity "is protected if it is intemperate, abusive, insulting, or hyperbolic," ROA.23-10836.13549, "even if it is … as over the top as you can come up with abusive," ROA.23-10836.13551-13552. That instruction was wrong, and Carter's counsel exploited it to great effect. A new trial is required.

**b.**    To justify its instruction, the district court pointed to *Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 61 (1966), which cited several NLRB decisions "tolerat[ing] intemperate, abusive and inaccurate statements made by the union during attempts to organize employees." But in the five decades since *Linn*, the NLRB has significantly modified that

NLRA standard. In *Atlantic Steel Co.*, the NLRB ruled that "even an employee who is engaged in concerted protected activity can, by opprobrious conduct, lose the protection of the [NLRA]." 245 NLRB 814, 816 (1979). The Board reasoned that it would not be "consistent with the [NLRA]" to protect union-related speech presented "in an obscene fashion without provocation and in a work setting where such conduct was not normally tolerated." *Id.* at 817. In short, the district court relied on overruled NLRB precedent.

At the same time, the court rejected Southwest's proposed instruction because it believed Southwest's instruction to come from the NLRA, refusing to "judicially shoehorn" the NLRA into the RLA. ROA.23-10836.10413. In reality, *the district court's* instruction came from the NLRA — or, to be more precise, an outdated and overruled interpretation of the NLRA. In any event, the district court's purported refusal to look to the NLRA for guidance on the RLA was wrong. NLRA caselaw, the Supreme Court has emphasized, "may be helpful in deciding cases under the RLA," *TWA*, 489 U.S. at 432-33, and it confirms that abusive conduct like Carter's isn't protected activity.

### III.    The Contempt Order rests on an invalid judgment, exceeds the district court's authority, and violates the First Amendment.

As Southwest explained in its stay papers, Docs. 102, 113, the Contempt Order cannot stand because it rests on an invalid judgment, *see supra* pp. 37-70; it exceeds the district court's civil-contempt authority; and it violates the First Amendment.

### A.    The Contempt Order must be vacated because the verdict and judgment are invalid.

Because the verdict and judgment cannot stand, neither can the contempt order. "[C]ivil contempt falls with the order if [the order] turns out to have been erroneously or wrongfully issued." *Cliett v. Hammonds*, 305 F.2d 565, 570 (5th Cir. 1962); *accord Massaro v. Palladino*, 19 F.4th 197, 216 (2d Cir. 2021) ("judgments of civil contempt fall when the order underlying them is vacated"). The district court held Southwest in contempt based solely on its finding that Southwest did not comply with its judgment. *Supra* pp. 25-27. Thus, if that judgment is invalid, so is the Contempt Order.

### B.    The Contempt Order is invalid even if the Court affirms the underlying judgment.

Even if the Court affirms the underlying judgment, the Court should still vacate the Contempt Order for several reasons.

### 1.    The Contempt Order is invalid because Southwest substantially complied with the judgment.

Civil contempt is warranted only when a party "violates an order of a court requiring in specific and definite language that person do or refrain from doing an act." *Baddock v. Villard (In re Baum)*, 606 F.2d 592, 593 (5th Cir. 1979). A court may not hold in contempt a party that substantially complies with an order. *See Whitfield v. Pennington*, 832 F.2d 909, 914 (5th Cir. 1987).

Southwest substantially complied with the judgment requiring Southwest to inform flight attendants that Title VII prohibits discrimination based on religion. ROA.23-10836.8955 Its email notice, with the judgment and verdict form attached, informed employees that the court had entered judgment against Southwest in a case alleging religious discrimination. ROA.23-10836.9442.

The district court seized on the difference between "may not" and "does not." ROA.23-10836.10648-10653. But the notice as a whole, together with the attached judgment and verdict form, substantially complied with the judgment, communicating that federal law does not allow Southwest to discriminate against flight attendants. Taken in context, the "may not"/"does not" distinction does not materially change the email's message.

If the district court were right that the notice undercut the court's judgment, one would expect at least some flight attendants to be confused by the apparent contradiction between the email and the attached judgment and verdict form. But not one of the approximately 15,000 flight attendants who received the notice reported any confusion.

>    **2.    The district court exceeded its civil-contempt power by ordering religious-liberty training.**

**a.**    A court's civil-contempt power "is not a broad reservoir of power, ready at an imperial hand"—instead, it is "a limited source; an implied power squeezed from the need to make the court function." *In re U.S. Bureau of Prisons*, 918 F.3d 431, 438 (5th Cir. 2019).

Civil-contempt sanctions are permissible only to secure a party's compliance with a court order or to compensate for losses from noncompliance. *American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000). The only permissible beneficiary of civil-contempt sanctions is the opposing party. *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976). A civil contempt sanction cannot be used to "punish defiance of the court and deter similar actions," because punishment and deterrence are hallmarks of criminal sanctions. *In re Stewart*, 571 F.2d 958, 964 (5th Cir. 1978). Unlike

criminal-contempt proceedings, "[c]ivil contempt proceedings are remedial and coercive, not punitive, in their nature, they look only to the future. They are not instituted as punishment for past offenses, but to compel" obedience with the court's orders. *Boylan v. Detrio*, 187 F.2d 375, 378 (5th Cir. 1951).

Thus, a "sanction counts as compensatory only if it is 'calibrate[d] to [the] damages caused by' the bad-faith acts on which it is based." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017). In other words, because civil contempt gives a court only the "least possible power adequate to the end proposed," *In re Oliver*, 333 U.S. 257, 274 (1948), a court exceeds its civil-contempt power when "a lesser sanction" would do, *Natural Gas Pipeline Co. of America v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996). Thus, when the justifications for contempt reach beyond compliance and compensation, a court must turn to criminal contempt, triggering additional protections. *See, e.g.*, *United States v. Rizzo*, 539 F.2d 458, 463-65 (5th Cir. 1976) (specific notice required); Fed. R. Crim. P. 42.

**b.**    The district court abused its civil-contempt power by imposing religious-liberty training, which neither secures compliance with an order nor compensates Carter for any noncompliance and is not the least-restrictive means to achieve those ends. The court held Southwest in contempt

because it thought that the "does not discriminate" email did not comply with its judgment and the IIOTG Memo undermined its judgment. ROA.23-10836.10648-10653. Thus, the only permissible sanctions were requiring a new "may not discriminate" email and awarding Carter contempt-related attorneys' fees, because those are the least-restrictive means of ensuring compliance with the judgment and compensating Carter. Training will do nothing to compel compliance with the judgment and will not benefit Carter, particularly because none of the three in-house attorneys ordered to attend training was involved in the decision to terminate Carter, supervises Carter, or holds any animus toward Carter, her belief, or any other religion. Indeed, training cannot constitutionally tell Southwest what views to hold, *infra* pp. 76-78, and isn't required to secure a new email or prevent contradiction of the court's verbatim notice anyway. Put simply, the district court couldn't articulate what permissible purpose training serves.

Even if training were necessary, *religious-liberty* training is an abuse of discretion. "Religious liberty" encompasses topics, like the First Amendment and Religious Freedom Restoration Act, that have nothing to do with this case and cannot possibly be the least-restrictive means of securing compliance with a Title VII judgment. The district court's defense of the ADF as

mandatory trainer—that the ADF has won several *non–Title VII* "Supreme Court cases in recent years," and the court doesn't have "knowledge of what will be discussed in Southwest's training," Stay Op. 16-17—proves the point. The court didn't order *Title VII* training from a neutral trainer (like the Practising Law Institute). Instead, the court ordered Southwest to attend "religious-liberty" reeducation conducted at the ADF's unguided discretion. Rather than exercise "the least possible power adequate to the end proposed" by specifying exactly what training is required and why, *Oliver*, 333 U.S. at 274, the district court appears to have delegated that Article III civil-contempt authority to an ideological advocacy group.

### 3. The contempt order violates Southwest's First Amendment rights.

**a.** The First Amendment guarantees the rights to speak and not to speak. *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Content-based restrictions on a corporation's right to speak are subject to strict scrutiny, because "governments 'have no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018). A restriction fails strict scrutiny unless it is "narrowly tailored" to serve compelling interests.

*Id.* Similarly, an order limiting future speech activities is presumptively unconstitutional as a prior restraint. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

**b.** The Contempt Order violates Southwest's First Amendment rights by punishing Southwest for speaking on a matter of fundamental importance: its disagreement with, and right to appeal, a decision it believes is wrong in a developing area of law. *See* ROA.23-10836.9444; *Groff*, 143 S. Ct. 2279. The order justifies training on the ground that the IIOTG Memo undermined the required notice to flight attendants. But the memo expressly promises to "implement the judgment." ROA.23-10836.9444. The memo also expresses Southwest's view of Carter's conduct, the jury's verdict, and the court's holdings while vowing to advance that view on appeal. *Supra* p. 26. The First Amendment protects Southwest's expression of its view, especially about legal issues. *See First National Bank of Boston v. Bellotti*, 435 U.S. 765, 778-81 (1978).

In requiring religious-liberty training and threatening future sanctions, the district court announced a "continued partnership" for superintending Southwest's speech. ROA.23-10836.10644. That content-based prior restraint on Southwest's speech is doubly unconstitutional as a

gag order based on the content of prior speech. *See In re Murphy-Brown, LLC*, 907 F.3d 788, 796-97 (4th Cir. 2018). Compounding the problem, the district court's ongoing prohibition of Southwest's speech is vague, chilling Southwest's First Amendment right to speak. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012). In the district court's view, Southwest should speak only after it is "[a]rmed with a better understanding of the legal area at issue." ROA.23-10836.10666. But it is appellate review, not the ADF's religious-liberty training, that will clarify what the law requires.

Even then, while it must comply with Title VII, Southwest is constitutionally entitled to hold and express the view that it did not discriminate against Carter and that the courts have misinterpreted Title VII. As Southwest argued (ROA.23-10836.10701-10702), compelling its attorneys to listen to an ideological group's opposing views presents yet another First Amendment problem. *See* C.M. Corbin, *The First Amendment Right Against Compelled Listening*, 89 B.U. L. Rev. 939 (2009). Despite these grave concerns, the district court kept the prior restraint unconstitutionally vague, leaving Southwest to "guess at [the] contours" of the prohibition. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048 (1991). The court even admitted that it had no idea what the

ADF would tell Southwest, Stay Op. 16, *proving* that the sanction is vague and the compelled listening unjustified.

## CONCLUSION

The Court should reverse the judgment and verdict and the Contempt Order with instructions to enter judgment in Southwest's favor on Carter's RLA claim and her belief-based claim under Title VII, and for a new trial on Carter's practice-based claim under Title VII.

Dated: October 12, 2023

Respectfully submitted,

*/s/ Shay Dvoretzky*

Paulo B. McKeeby
Brian K. Morris
REED SMITH LLP
2850 N. Harwood St., Ste. 1500
Dallas, TX 75201

Andrew B. Ryan
Ryan Law Partners LLP
3811 Turtle Creek Blvd., Ste. 780
Dallas, TX 75219

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Steven Marcus
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Defendant-Appellant/Cross-Appellee Southwest Airlines Co.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that (1) this brief complies with the type-volume limitation of 15,500 words, as authorized by this Court's September 1, 2023, Order and Federal Rule of Appellate Procedure 32(e), because it contains 15,461 words, as calculated by Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), and (2) this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: October 12, 2023          */s/ Shay Dvoretzky*
                                 Shay Dvoretzky

                                 *Counsel for Defendant-Appellant/*
                                 *Cross-Appellee Southwest Airlines Co.*

# CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2023, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: October 12, 2023            */s/ Shay Dvoretzky*
                                   Shay Dvoretzky

                                   *Counsel for Defendant-Appellant/*
                                   *Cross-Appellee Southwest Airlines Co.*