**Case Nos. 23-10008, 23-10536, and 23-10836**

_____

In the
United States Court of Appeals
for the Fifth Circuit

_____

CHARLENE CARTER,

*Plaintiff-Appellee/Cross-Appellant*,

v.

LOCAL 556, TRANSPORT WORKERS UNION OF AMERICA;
SOUTHWEST AIRLINES CO.,

*Defendants-Appellants/Cross-Appellees*.

CHARLENE CARTER,

*Plaintiff-Appellee*,

v.

SOUTHWEST AIRLINES CO.

*Defendant-Appellant*.

_____

On Appeal from the United States District Court for the
Northern District of Texas, Case No. 3:17-cv-02278-X,
Hon. Brantley Starr, *United States District Judge*

_____

**CARTER'S PRINCIPAL BRIEF AND RESPONSE TO
SOUTHWEST AIRLINES CO. AND TWU, LOCAL 556**

Matthew B. Gilliam
*Counsel of Record*
Milton L. Chappell
c/o National Right to Work Legal
Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
(703) 321-8510
mbg@nrtw.org

Bobby G. Pryor
Matthew D. Hill, Of Counsel
PRYOR & BRUCE
302 N. San Jacinto
Rockwall, TX 75087

David E. Watkins
JENKINS & WATKINS, P.C.
25 Highland Park Vlg., Ste. 100-359
Dallas, Texas 75205

*Counsel for Plaintiff-Appellee/Cross-Appellant Charlene Carter*

# CERTIFICATE OF INTERESTED PERSONS

**Nos. 23-10008 and 23-10536,** *Charlene Carter v. Local 556, Transport Workers Union of America; Southwest Airlines Company*

**No. 23-10836,** *Charlene Carter v. Southwest Airlines Company*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    Plaintiff-Appellee/Cross-Appellant: Charlene Carter;

2.    Counsel for the Plaintiff-Appellee/Cross-Appellant: Matthew B. Gilliam, Milton L. Chappell, Bobby G. Pryor, Matthew D. Hill, Pryor & Bruce, David E. Watkins, Jenkins & Watkins;

3.    Defendant-Appellant/Cross-Appellee: Southwest Airlines Co.;

4.    Counsel for Defendant-Appellant/Cross-Appellee Southwest Airlines Co.: Shay Dvoretzky, Parker Rider-Longmaid, Steven Marcus, Skadden, Arps, Slate, Meagher & Flom LLP, Paulo B. McKeeby, Brian Morris, Reed Smith LLP, Andrew B. Ryan, Ryan Law Partners LLP;

5.    Defendant-Appellant/Cross-Appellee: Transport Workers Union of America, Local 556;

6.    Counsel for Defendant-Appellant/Cross-Appellee Transport Workers Union of America, Local 556: Adam Greenfield, Cloutman &

i

Greenfield, P.L.L.C.

/s/ Matthew B. Gilliam
Matthew B. Gilliam

*Counsel of record for Plaintiff-Appellee/Cross-Appellant*

## CARTER'S STATEMENT REGARDING ORAL ARGUMENT

Charlene Carter requests oral argument in this case. Southwest Airlines Co. ("Southwest") and Transport Workers Union of America, Local 556 ("TWU") fired Carter for her religious beliefs, observances, and practices in violation of Title VII of the Civil Rights Act of 1964, and for union opposition speech and activities in violation of the Railway Labor Act ("RLA"). While the District Court entered judgment on the jury's verdict that Southwest and TWU retaliated against Carter's RLA-protected rights, the District Court, earlier in the case, dismissed Carter's RLA interference/coercion claim against Southwest.

Southwest also violated the District Court's order to notify Southwest flight attendants that it *may not*, under Title VII, discriminate against flight attendants because of their religion. Southwest did the opposite, and informed flight attendants that the District Court wanted Southwest to tell them that it *does not* discriminate against religion. Southwest sent a contemporaneous memo to flight attendants conveying that it could continue using its social media policies to discriminate against their religious beliefs. The District Court found Southwest in contempt and that it willfully violated its orders. The District Court ordered Southwest attorneys to attend Title VII religious-liberty training to ensure compliance with the District Court's notice order. This Court should hold oral argument on all these matters because it will be beneficial to the proper application of federal law.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ....................................................... i

CARTER'S STATEMENT REGARDING ORAL ARGUMENT ......................... iii

TABLE OF CONTENTS ........................................................................................ iv

TABLE OF AUTHORITIES ................................................................................. ix

JURISDICTIONAL STATEMENT ....................................................................... 1

STATEMENT OF ISSUES PRESENTED .............................................................. 2

INTRODUCTION .................................................................................................. 4

STATEMENT OF THE CASE ............................................................................... 6

I.  Factual Background ......................................................................................... 6

    A. Carter sent the TWU President private religious and union-protected
       videos and messages ................................................................................... 7

    B. Carter posted two pro-life religious videos and messages on her own
       personal Facebook page .............................................................................. 9

    C. The TWU President reported Carter for two private videos and
       messages exercising her Title VII and RLA-protected rights ...................... 9

    D. Southwest investigated Carter's Title VII-protected religious beliefs,
       observances, and practices, and RLA-protected union opposition activity ..11

    E. Southwest terminated Carter for her Title VII-protected religious beliefs,
       observances, and practices, and RLA-protected union opposition activity ..15

II. Procedural background related to contempt proceedings against
    Southwest ...................................................................................................... 18

# TABLE OF CONTENTS (cont'd)

**Page**

SUMMARY OF ARGUMENT ...........................................................21

STANDARD OF REVIEW ...............................................................23

ARGUMENT ..................................................................................25

I.  Southwest and TWU violated Carter's Title VII-protected rights ....................25

   A. Southwest and TWU unlawfully discharged and otherwise discriminated
      against Carter's religious beliefs, observances, and practices .....................27

      1. Southwest unlawfully discharged Carter because of her religious
         beliefs, observances, and practices...........................................27

      2. TWU caused and attempted to cause Southwest discharge Carter
         and otherwise discriminated against her because of her religious
         beliefs, observances, and practices...........................................31

      3. TWU and Southwest did not assert a non-discriminatory
         motive for Carter's unlawful discharge for religion...............................34

   B. TWU and Southwest failed to accommodate Carter's religious
      observances, beliefs, and practices, and have no undue hardship defense....36

      1. Southwest and TWU are not entitled to raise an undue
         hardship defense ....................................................................37

      2. The District Court correctly instructed the jury on undue
         hardship in accordance with Fifth Circuit precedent and pattern
         jury instructions. Moreover, Southwest had no evidence of
         any hardship............................................................................40

      3. Southwest is not entitled to a new trial under *Groff*'s elevated undue
         hardship standard where it could not establish any harm to its business
         under the lower pre-*Groff* standard .........................................43

# TABLE OF CONTENTS (cont'd)

Page

C. The District Court's Title VII injunctions protect Southwest flight attendants' rights from the continuing threat of unlawful religious discrimination ............................................................46

II. Southwest and TWU violated Carter's RLA-protected rights ..........................49

A. Carter showed that Southwest and TWU retaliated against her exercise of RLA-protected rights .....................................................49

 1. The RLA protects Carter's nonmember speech and association activities opposing the union's representation and advocating for the removal of union officers ..............................53

 2. Carter's RLA-protected activities were a substantial or motivating factor for Southwest's and TWU's adverse actions against her........................................................57

B. Carter's RLA-protected activities did not exceed the Act's protection ........58

 1. The District Court correctly instructed the jury on vigorous speech protection for union opposition and representation speech in accordance with Supreme Court and federal court precedent ........58

 2. Carter's nonmember union opposition and representation speech and activities were directed solely to the TWU President and did not exceed RLA protection ...........................................61

 3. The NLRB has re-affirmed *Austin* protections for employee speech, and the Board's policy-based precedent of applying workplace restrictions on "offensive" speech is inapposite where the RLA prohibits "any limitations" on RLA-protected rights and Carter's speech did not affect the workplace ....................63

# TABLE OF CONTENTS (cont'd)

**Page**

III. The District Court should not have dismissed Carter's RLA
interference/coercion claim against Southwest ...............................66

  A. Carter's Count I RLA interference claim did not have to allege animus ...66

  B. Carter could not enforce her RLA-protected rights in arbitration .............79

IV. TWU breached its duty of fair representation to Carter ..................................71

V.  The District Court's Contempt Order ensures Southwest's compliance
following its willful violations of the court's Notice Order ...........................73

  A. Southwest's willful misrepresentations did not "substantially comply"
with the District Court's Notice Order........................................................73

  B. Title VII legal training is a commonplace civil contempt sanction
within the courts' inherent powers..............................................................75

    1. Title VII training secures Southwest's compliance by
ensuring Southwest attorneys comprehend employees'
Title VII-protected rights ....................................................76

    2. Title VII training is the least severe sanction adequate to
correct Southwest's misinformation and prevent it from
undermining the Notice Order ............................................78

  C. The Contempt Order does not violate Southwest's First Amendment
speech rights ..............................................................................................79

    1. The Contempt Order does not sanction Southwest for disagreeing
with and appealing the judgment ......................................80

    2. The Contempt Order does not contain a prior restraint or
speech prohibition ...............................................................81

## TABLE OF CONTENTS (cont'd)

**Page**

3.  Title VII training does not require Southwest to hear an "ideological" message ........................................................................82

CONCLUSION ..................................................................................................84

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

*Acklin Stamping Co.*,
    351 N.L.R.B. 1263 (2007) ........................................................72

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
    228 F.3d 574 (5th Cir. 2000) ........................................25, 76

*Ams. For Prosperity Found v. Bonta*,
    141 S. Ct. 2373 (2021) ..........................................................53

*Atlantic Steel Co.*,
    245 N.L.R.B. 814 (1979) ......................................................65

*Ballew v. Cont'l Airlines, Inc.*,
    668 F.3d 777 (5th Cir. 2012) ..............................................70

*Bhd. of Locomotive Eng'rs & Trainmen v. Union Pacific R.R. Co.*,
    31 F.4th 337 (5th Cir. 2022) ........................................*passim*

*Bisous Bisous, LLC v. The CLOE Group, LLC*,
    Civil Action No. 3:21-CV-1614-B,
    2021 WL 4219707 (N.D. Tex. Sept. 16, 2021) ..................74

*Bostock v. Clayton, Cnty.*,
    140 S. Ct. 1731 (2020)..................................................28, 30

*BRAC v. Ass'n for the Benefit of Non-Contract Emps.*,
    380 U.S. 650 (1965)..............................................................54

*Brady v. Trans World Airlines, Inc.*,
    401 F.2d 87 (3d Cir. 1968) ..........................................52, 57

*Brazos Valley Coal. For Life, Inc. v. City of Bryan*,
    421 F.3d 314 (5th Cir. 2005) ..............................................61

*Brener v. Diagnostic Ctr. Hosp.*,
    671 F.2d 141 (5th Cir. 1982) ..............................................40

# TABLE OF AUTHORITIES

**CASES**                                                                **Page(s)**

*Brown v. Ent. Merchs. Ass'n.*,
  564 U.S. 786 (2011) ........................................................................ 62

*Caravan Knight Facilities Mgmt., Inc.*,
  362 N.L.R.B. 1802 (2015) .............................................................. 72

*CareFlite v. Off. and Prof'l Emps. Int'l Union, AFL-CIO*,
  612 F.3d 314 (5th Cir. 2010) ......................................................... 70

*Carmona v. Sw. Airlines Co.*,
  536 F.3d 344 (5th Cir. 2008) ......................................................... 70

*Chi. Tchrs. Union v. Hudson*,
  475 U.S. 292 (1986) ........................................................................ 76

*City of Renton v. Playtime Theatres, Inc.*,
  475 U.S. 41 (1986) .......................................................................... 81

*Clayton v. UAW*,
  451 U.S. 679 (1981) ........................................................................ 57

*Cooper v. General Dynamics*,
  533 F.2d 163 (5th Cir. 1976) ......................................................... 39

*Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*,
  477 F.3d 807 (6th Cir. 2007) ......................................................... 62

*Culpepper v. Reynolds Metals Co.*,
  421 F.2d 888 (5th Cir. 1970) ......................................................... 48

*Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*,
  188 F.3d 278 (5th Cir. 1999) ......................................................... 43

*Dunn v. Air Line Pilots Ass'n.*,
  193 F.3d 1185 (11th Cir. 1999) ..................................................... 60

# TABLE OF AUTHORITIES

## CASES                                                                Page(s)

*Eastman Chem. Co. v. Plastipure, Inc.*,
    775 F.3d 230 (5th Cir. 2014) ..................................................24, 25

*Edmonds v. Seavey*,
    379 F. App'x 62 (2d Cir, 2010 ...............................................76

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
    575 U.S. 768 (2015) ..............................................................*passim*

*EEOC v. Boh Bros. Constr. Co., L.L.C.*,
    731 F.3d 444 (5th Cir. 2013) ..................................................47

*EEOC v. Hacienda Hotel*,
    881 F.2d 1504 (9th Cir. 1989) ...............................................37

*EEOC v. Serv. Temps Inc.*,
    679 F. 3d 323 (5th Cir 2012) ..................................................47

*Ellis v. Bhd. of Ry., Airline and S.S. Clerks*,
    466 U.S. 435 (1984) ...............................................................69

*FCC v. Pacifica Found.*,
    438 U.S. 726 (1978) ...............................................................61

*Fla. Steel Corp. v. N.L.R.B.*,
    648 F.2d 233 (5th Cir. 1981) ..................................................78

*Gentile v. State Bar of Nev.*,
    501 U.S. 1030 (1991) .............................................................83

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949) ...............................................................81

*Gilbert v. Donahoe*,
    751 F.3d 303 (5th Cir. 2013) ..................................................25

# TABLE OF AUTHORITIES

**CASES** **Page(s)**

*Gordon v. JKP Enters., Inc.,*
No. 01-20420, 2002 WL 753496 (5th Cir. Apr. 9, 2002)....................................48

*Graphic Commc'ns Local 1-M (Bang Printing, Inc.),*
337 N.L.R.B. 662 (2002) ......................................................................72

*Grimes v. BNSF Ry. Co.,*
746 F.3d 184 (5th Cir. 2014) ...............................................................70

*Groff v. DeJoy,*
600 U.S. 447 (2023) ..................................................................*passim*

*Hawaiian Airlines, Inc. v. Norris,*
512 U.S. 246 (1994)........................................................................69, 70

*Hebrew v. Tex. Dep't of Crim. Just.,*
80 F.4th 717 (5th Cir. 2023) ........................................................*passim*

*Heller v. EBB Auto Co.,*
8 F.3d 1433 (9th Cir. 1993) ...............................................................37

*Hersh v. United States ex rel. Mukasey,*
553 F.3d 743 (5th Cir. 2008) .............................................................83

*Hill v. Colorado,*
530 U.S. 703 (2000)..........................................................................62

*Hornbeck Offshore Servs., L.L.C. v. Salazar,*
713 F.3d 787 (5th Cir. 2013) .........................................................74, 76

*Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. Of Boston, Inc.,*
515 U.S. 557 (1995)..........................................................................61

*Hustler Mag., Inc. v. Falwell,*
485 U.S. 46 (1988)............................................................................62

# TABLE OF AUTHORITIES

**CASES**                                                     **Page(s)**

*In re Bradley,*
   588 F.3d 254 (5th Cir. 2009) .............................................................. 76

*Int'l Ass'n of Machinists v. Street,*
   367 U.S. 740 (1961) .................................................................... 56, 69

*Int'l Union, United Mine Workers of Am. v. Bagwell,*
   512 U.S. 821 (1994) ......................................................................... 76

*Konop v. Hawaiian Airlines, Inc.,*
   302 F.3d 868 (9th Cir. 2002) ..................................................... *passim*

*Lebow v. Am. Trans Air, Inc.,*
   86 F.3d 661 (7th Cir. 1996) ............................................................. 50

*Linn v. United Plant Guard Workers of Am., Local 114,*
   383 U.S. 53 (1966) ............................................................ 59, 60, 64, 65

*Lion Elastomers LLC,*
   372 N.L.R.B. No. 83 ........................................................................ 65

*McDonald v. Longley,*
   4 F.4th 229 (5th Cir. 2021) ............................................................. 54

*Meyer v. Brown & Root Constr. Co.,*
   661 F.2d 369 (5th Cir. 1981) ...................................................... 46, 48

*Miller v. California,*
   413 U.S. 115 (1973) ......................................................................... 62

*Mobil Expl. and Producing U.S., Inc. v. NLRB,*
   200 F.3d 230 (5th Cir. 1999) .......................................................... 55

*NLRB v. Burnup & Sims, Inc.,*
   379 U.S. 21 (1964) ........................................................................... 67

# TABLE OF AUTHORITIES

## CASES                                                                Page(s)

*OOGC Am., L.L.C. v. Chesapeake Expl. L.L.C.*,
  975 F.3d 449 (5th Cir. 2020) ...............................................................82

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
  418 U.S. 264 (1974)..................................................................*passim*

*Petrisch v. JP Morgan Chase*,
  789 F. Supp. 2d 437 (S.D.N.Y. 2011) .................................................77

*Procter & Gamble Co. v. Amway Corp.*,
  376 F.3d 496 (5th Cir. 2004) ..............................................................25

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992).............................................................................81

*Radio Officers' Union of Com. Telegraphers Union v. NLRB*,
  347 U.S. 17 (1954).......................................................................67, 68

*Red Cab, Inc.*,
  194 N.L.R.B. 279 (1971) .....................................................................56

*Ricci v. DeStefano*,
  557 U.S. 557 (2009).............................................................................34

*Rightnour v. Tiffany & Co.*,
  354 F. Supp. 3d 511 (S.D.N.Y. 2019) .................................................35

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984)) .....................................................................53, 54

*Roscello v. Sw. Airlines Co.*,
  726 F.2d 217 (5th Cir. 1984) ......................................................*passim*

*Roy v. Am. Pro. Mktg.*,
  117 F.R.D. 687 (W.D. Okla. 1987) .....................................................77

# TABLE OF AUTHORITIES

**CASES**                                                          **Page(s)**

*Russell v. NMB*,
   714 F.2d 1332 (5th Cir. 1983) ....................................................54, 69

*Russell v. Plano Bank & Trust*,
   130 F.3d 715 (5th Cir. 1997) ............................................................25

*Shea v. Int'l Ass'n of Machinists and Aerospace Workers*,
   154 F.3d 508 (5th Cir. 1998) ..................................................56, 57, 69

*Spencer v. Gen. Elec. Co.*,
   894 F.2d 651 (4th Cir. 1990) ............................................................46

*Steele v. Louisville & N.R. Co.*,
   323 U.S. 192 (1944) ...............................................................*passim*

*Swagher v. Neighoff*,
   398 F. App'x 872, 881 (4th Cir. 2010) ...............................................62

*Switchmen's Union of N. Am. v. NMB*,
   320 U.S. 297 (1943) ...................................................................69, 70

*Test Masters Educ. Servs., Inc. v. Singh*,
   428 F.3d 559 (5th Cir. 2005) .......................................................76, 81

*Texas v. Johnson*,
   491 U.S. 397 (1989) .........................................................................61

*Texas & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks*,
   281 U.S. 548 (1930) ....................................................................68, 69

*Thomas v. Hughes*,
   27 F.4th 995 (5th Cir. 2022) .............................................................23

*Thomas v. Tex. Dep't of Crim. Just.*,
   220 F.3d 389 (5th Cir. 2000) .............................................................23

# TABLE OF AUTHORITIES

**CASES**                                                          **Page(s)**

*Topalian v. Ehrman,*
  3 F.3d 931 (5th Cir. 1993) ...................................................78

*Trans World Airlines, Inc. v. Hardison,*
  432 U.S. 63 (1977)............................................................22

*Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants,*
  489 U.S. 426 (1989)...........................................................69

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
  582 U.S. 449 (2017)...........................................................84

*United States v. Lynd,*
  349 F.2d 790 (5th Cir. 1965) ...............................................75

*United States v. Marcavage,*
  609 F.3d 264 (3d Cir. 2010) ................................................29, 61, 62

*United States v. Orji-Nwosu,*
  549 F.3d 1005 (5th Cir. 2008) .............................................24

*United States v. Sheridan,*
  838 F.3d 671 (5th Cir. 2016) ...............................................41

*United States v. Toure,*
  965 F.3d 393 (5th Cir. 2020) ...............................................41

*United States v. Williams,*
  610 F.3d 271 (5th Cir. 2010) ...............................................24, 25

*United States ex rel. Rafizadeh v. Cont'l Common, Inc.,*
  553 F.3d 869 (5th Cir. 2008) ...............................................44

*Vaca v. Sipes,*
  386 U.S. 171 (1967)...........................................................51, 57

# TABLE OF AUTHORITIES

**CASES**                                              **Page(s)**

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,
   300 U.S. 515 (1937)........................................................................68, 69

*Vizaline, L.L.C. v. Tracy*,
   949 F.3d 927 (5th Cir. 2020) ...............................................................25

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
   945 F.3d 206 (5th Cir. 2019) ...............................................................43

*Wantou v. Wal-Mart Stores Texas, L.L.C.*,
   23 F.4th 432 (5th Cir. 2022) ................................................................24

*Waste Mgmt., Inc. v. AIG Specialty Ins. Co.*,
   974 F.3d 528 (5th Cir. 2020) ...............................................................25

*Weber v. Roadway Express, Inc.*,
   199 F.3d 270 (5th Cir. 2000) ...............................................................40

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000)............................................................................43

*Welsh v. United States*,
   398 U.S. 333 (1970)............................................................................29

## Constitution, Rules, Statutes & Other

United States Const., Amend. I.......................................................*passim*

Fed. R. App. P. 4(a)(4)(A) ....................................................................2

Fed. R. Civ. P. 8(c)(1)..........................................................................39

Fed. R. Civ. P. 50(b) ..............................................................................1

Fed. R. Civ. P. 59(a)...............................................................................1

# TABLE OF AUTHORITIES

**Page(s)**

**Constitution, Rules, Statutes & Other**

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1331 ..............................................................................1

Civil Rights Act of 1964, Title VII
    42 U.S.C. § 2000e *et seq.* ...........................................*passim*
    42 U.S.C. § 2000e-2......................................................82
    42 U.S.C. § 2000e-2(a)(1) ................................2, 28, 32
    42 U.S.C. § 2000e-2(c)(1) ........................2, 3, 34, 42
    42 U.S.C. § 2000e-2(c)(3) ...........................................*passim*
    42 U.S.C. § 2000e-2(m)................................................28
    42 U.S.C.  2000e-5(g)........................................3, 33, 47
    42 U.S.C. § 2000e-5(h)................................................49
    42 U.S.C. § 2000e(j) ...................................................*passim*

National Labor Relation Act
    29 U.S.C. § 151, *et seq.* .............................................*passim*

    29 U.S.C. § 157.................................................56, 59

Norris-LaGuardia Act
    29 U.S.C. § 101 *et seq.* ...............................................49

The Railway Labor Act
    45 U.S.C. § 151 *et seq.* ...............................................*passim*
    45 U.S.C. § 151a.................................................54, 64
    45 U.S.C. § 151a (2) ........................................54, 64
    45 U.S.C. § 151a (3) ................................................54
    45 U.S.C. § 151 (Fifth) ...........................................57
    45 U.S.C. § 152 (Third)............................................*passim*
    45 U.S.C. § 152 (Fourth)..........................................*passim*
    45 U.S.C. § 152 (Eleventh)........................................53

Fifth Circuit Pattern Jury Instructions (civil cases) (2020) ....................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Constitution, Rules, Statutes & Other**

Caroline M. Corbin, *The First Amendment Right Against Compelled Listening*,
89 B.U. L. Rev. 939 (2009) ..........................................................................83

# JURISDICTIONAL STATEMENT

Plaintiff-Appellee/Cross-Appellant Charlene Carter does not object to TWU's and Southwest's jurisdictional statements as to their appeals. Carter provides this separate jurisdictional statement with respect to her cross-appeal against Southwest. Pursuant to 28 U.S.C. § 1331, the District Court had jurisdiction because Carter claims that Southwest unlawfully interfered with and coerced her exercise of rights under Section 152 (Fourth) of the Railway Labor Act, 45 U.S.C. § 151 *et seq.* ("RLA"). *See* 45 U.S.C. § 152 (Fourth).

On February 1, 2019, on Southwest's motion to dismiss, the District Court issued an order dismissing Carter's RLA Section 152 (Fourth) interference/coercion claim against Defendant-Appellant/Cross-Appellee Southwest.[1] The District Court entered judgment in the case for Carter on December 5, 2022.[2] On January 2, 2023, Southwest filed a Federal Rule of Civil Procedure 50(b) renewed motion for judgment as a matter of law and 59(a) motion for new trial,[3] which the District Court denied on April 24, 2023.[4] On May 23, 2023, Carter timely appealed.[5] This Court has jurisdiction to review the District Court's order dismissing Carter's RLA interference/coercion claim against Southwest 28 U.S.C. § 1291, which became final

---

[1] ROA.23-10836.843-78.
[2] ROA.23-10836.8921-52; ROA.23-10836.8953-55.
[3] ROA.23-10836.9454-55.
[4] ROA.23-10836.10395-10416.
[5] ROA.23-10836.10604-06.

on April 24, 2023. *See* Fed. R. App. P. 4(a)(4)(A).

## STATEMENT OF ISSUES PRESENTED

1. Whether Southwest showed that no reasonable juror could find that Southwest unlawfully discharged Carter because of her religious observances, beliefs, or practices, in violation of 42 U.S.C. § 2000e-2(a)(1), where Southwest expressly fired Carter for her pro-life religious videos and messages privately sent to TWU's President and for posting pro-life religious videos and messages on her own personal Facebook page, saying that Carter's religion violated its social media policies.

2. Whether TWU showed that no reasonable juror could find that TWU unlawfully caused or attempted to cause Southwest to discriminate and otherwise discriminated against Carter because of her religious observances, beliefs, or practices, in violation of 42 U.S.C. § 2000e-2(c)(1), -2(c)(3), where the jury found that TWU President Stone acted in her official capacity for TWU, and where President Stone attempted to discipline Carter for religious comments when Carter sent her pro-life messages and videos to President Stone following the union's participation in the Planned Parenthood-sponsored Women's March on Washington D.C.

3.   Whether the District Court could award backpay, prejudgment interest, and injunctive relief against TWU under 42 U.S.C. § 2000e-5(g) for its violations of 42 U.S.C. § 2000e-2(c)(1), -(2)(c)(3).

4.   Whether (a) the District Court correctly instructed the jury, in accordance with Fifth Circuit pre-*Groff* precedent, that "undue hardship means more than a de minimis cost on the conduct of the employer's business either in terms of financial costs or disruption of the business;" and (b) whether the Supreme Court's intervening decision in *Groff v. DeJoy*, 600 U.S. 447 (2023), allows Southwest and TWU to demand a new trial on undue hardship.

5.   Whether Southwest and TWU showed that no reasonable juror could find that Carter's RLA-protected conduct—her private Facebook communications to TWU President Stone opposing the union's representation and leadership—was a substantial or motivating factor for TWU's attempt to cause her discipline and Southwest's actual termination of Carter's employment.

6.   Whether the District Court correctly instructed the jury, in accordance with Supreme Court and federal case law, that RLA Section 152 (Third) and (Fourth) protect speech opposing union representation, even if it is "intemperate, abusive, insulting, or hyperbolic," particularly where Carter's union-related speech was communicated solely in private messages to the union president, not to the workplace.

7. Whether the District Court erred in dismissing Carter's RLA Section 152 (Fourth) interference/coercion claim against Southwest where, in accordance with the plain text of the statute and Supreme Court authority, proving Southwest's motive or animus was not necessary, and where the District Court and arbitrator agreed, in accordance with Fifth Circuit precedent, that Carter had no arbitration remedy for her RLA statutory rights.

8. Whether the District Court properly exercised its inherent civil contempt powers, when Southwest willfully violated a district court order and Southwest's speech and actions towards employees demonstrated a chronic failure to comprehend federal protections for employees' Title VII religious freedoms and liberties, by requiring Title VII religious-liberty legal training to ensure Southwest's and its attorneys' discrimination and misinformation regarding Title VII-protected religious liberties do not recur.

## INTRODUCTION

Contrary to Southwest's and TWU's characterizations, this case is about Southwest firing Charlene Carter and TWU causing Carter's termination for exercising (1) her Title VII religious beliefs, observances, and practices, and (2) her RLA-protected rights, as a nonmember of the union, to communicate her religious objections and opposition to the union's representation through *private* messages. Neither Southwest nor TWU contest the jury's verdict that TWU President Stone

acted for the union when she reported Carter for discipline under Southwest's social media policies.

This case is also about Southwest summarily firing Carter, without initiating any accommodation efforts, for posting her religious beliefs, observances, and practices on her own personal Facebook page, where no employee reported or complained about Carter's posts and Southwest had no evidence of harm or disruption to its business whatsoever. Carter's exercise of her Title VII and RLA-protected rights did not occur in the workplace, and her protected activities never affected the workplace.

After the District Court entered judgment on a jury verdict for Carter on all claims, Southwest violated the District Court's order to inform flight attendants that it may not discriminate against their Title VII-protected rights. Southwest willfully violated that order by instead telling flight attendants that it does not discriminate, and conveying that it could continue to use its social media policies to discriminate against their religious rights. This Court should affirm the District Court's judgment, the jury verdict, and the District Court's Contempt Order. This Court should also reverse the District Court's dismissal of Carter's Count I RLA interference claim against Southwest and remand that claim for the District Court to enter judgment for Carter.

## STATEMENT OF THE CASE

### I.  Factual Background

Charlene Carter, a Southwest flight attendant, is a pro-life Christian who believes that abortion is the taking of a human life contrary to the teachings of the Bible and the will of God.[6] Carter's religious beliefs require her to share with others that abortion is the taking of a human life.[7]

Transport Workers Union of America, Local 556 ("TWU") is, by law, the government-certified exclusive bargaining representative for all Southwest flight attendants, including Carter, a nonmember of the union.[8] Even as a nonmember objector, Carter was still required to pay the union compulsory fees for its representation.[9] From 2015 through 2017, Carter actively supported a recall campaign to remove union officers from leadership, including TWU President Stone.[10] Carter learned in 2017 that TWU used her forced union fees to fund the union's and its president's participation in the January 21, 2017 pro-abortion Planned Parenthood Women's March on Washington, D.C.[11]

---

[6] ROA.23-10836.8496, ¶1.
[7] ROA.23-10836.12433-39 (1197:18-1203:21); ROA.23-10836.14905.
[8] ROA.23-10836.8497, ¶¶ 3, 4, 6.
[9] ROA.23-10836.8497, ¶¶4, 6.
[10] ROA.23-10836.8497, ¶8.
[11] ROA.23-10836.8497, ¶¶9-11; ROA.23-10836.1256

### A. Carter sent the TWU President private religious and union-protected videos and messages.

On February 14, 2017, Carter sent TWU President Audrey Stone several private messages via Facebook Messenger regarding TWU's participation in the Planned Parenthood-sponsored Women's March.[12]

**1.** Carter's first private message to Stone contained a video showing an aborted baby and a message telling President Stone:

> This is what you supported during your Paid Leave with others at the Women's MARCH in DC….You truly are Despicable in so many ways…by the way the RECALL is going to Happen and you are limited in the days you will be living off of all the [Southwest Airlines Flight Attendants]..cant wait to see you back on line.[13]

**2.** Carter's second private message to Stone contained a second video of an aborted infant and a message telling President Stone: "TWU-AFL-CIO and 556 are supporting this Murder . . ."[14] Carter testified that she was expressing her religious beliefs when she sent her videos to Stone.[15] Carter testified there was no more effective means to explain what abortion is than the videos.[16] Carter obtained the videos from another website, and did not write the caption as Southwest suggests.[17]

---

[12] ROA.23-10836.8498, ¶11.
[13] ROA.23-10836.14750.
[14] ROA.23-10836.14749.
[15] ROA.23-10836.12567-68 (1289:14-1290:6).
[16] ROA.23-10836.12495-99 (1259:4-1263:4).
[17] ROA.23-10836.12622-23 (1344:22-1345:6); ROA.23-10836.12974 (1654:9-25); ROA.23-10836.11968-69 (76918-770:2).

**3**. Carter also sent Stone a third private message that contained a picture of women wearing anatomically-correct hats depicting female genitalia like those worn by Women's March participants. Carter's message stated:

> Did you all dress up like this…Wonder how this will be coded in the LM2 Financials…cause I know we paid for this along with your Despicable Party you hosted for signing the Contract….The RECALL [of the TWU Executive Board] is going to Happen we are even getting more signatures due to other [flight attendants] finding out what you guys do with our MONEY!!! Can't wait for you to have to be just a regular flight attendant again and not stealing from our DUES for things like this![18]

President Stone testified that after the Women's March she found out that there were groups of women wearing the anatomically-correct hats at the Women's March.[19]

Carter sent Stone other private Facebook messages that day expressing her religious beliefs, opposing the union's activity and expenditures at the March, and voicing her support for the recall to remove union officers, including Stone.[20] Southwest did not cite them as a basis for firing Carter. Stone and Southwest could not identify any messages Carter sent that were not union-protected activity.[21] Carter only sent her religious and union-related messages to the TWU President and nobody else.[22]

---

[18] ROA.23-10836.14751.
[19] ROA.23-10836.12004 (805:17-806:1; ROA.23-10836.12642 (Tr.1364:8-10).
[20] ROA.23-10836.14752-14773.
[21] ROA.23-10836.14749.
[22] ROA.23-10836.12002 (803:6-10).

**B. Carter posted two pro-life religious videos and messages on her own personal Facebook page.**

Carter also posted two pro-life videos and messages on her own personal, publicly-visible Facebook page, which included the same two videos sent to President Stone.

**1.** Carter first posted a video on her Facebook page on February 7, 2017, showing an aborted baby along with a post, which stated: "WARNING this is VERY GRAPHIC!! I want my Tax Dollars to STOP funding this….PERIOD!!!! This is MURDER."[23]

**2.** On February 14, 2017, Carter posted on her Facebook page the video she sent to President Stone. In that post Carter stated: "THIS IS GRAFIC (sic)….but it needs to be shared over and over….this is MURDER! So for all of you that are Pro-Abortion GOD HELP YOU!"[24]

**C. The TWU President reported Carter for two private videos and messages exercising her Title VII and RLA-protected rights.**

Prior to reporting Carter, President Stone consulted with TWU Second Vice President and negotiating team member Nevarez about Carter's communications.[25] Nevarez testified that Stone handed him her phone while at a meeting in Baltimore the same day she had received it.[26] Stone played one of Carter's videos for Nevarez,

---

[23] ROA.23-10836.14747.
[24] ROA.23-10836.14748.
[25] ROA.23-10836.12759 (1481:12-17).
[26] ROA.23-10836.12762 (1484:3-21).

9

who told Stone that he considered it offensive and suggested that she complain to Southwest.[27] Nevarez testified that he supported President Stone making a complaint about it in her role as union president, and said that you cannot "separate the roles between flight attendant and employee and president of the union[.]"[28]

On February 22, 2017, President Stone reported Carter to her Southwest Base Manager for sending the two private Facebook communications, described *supra* at ¶A(1) & (2), "in regards to a TWU Local 556 Women's Committee meeting that [President Stone] participated in" and "a march that [she] voluntarily participated in a few days later."[29] Stone complained to Southwest that Carter's messages refer to "murder as well as political and religious comments[.]"[30] At trial Stone admitted that her Complaint reported Carter's union and religious activity.[31] Yet Stone told Southwest she believed that Carter's messages, including her references to religion, violated the company's harassment, social media and "Workplace Bullying and Hazing" policies and its "work and conduct rules under Class II.3 as well as Class IV.6&7," the very same policies that President Stone stated should not be applied to flight attendants' union activities.[32]

---

[27] ROA.23-10836.12760 (1482:11-18).
[28] ROA.23-10836.12760-61 (1482:11-1483:3).
[29] ROA.23-10836.14774-81
[30] ROA.23-10836.14774.
[31] ROA.23-10836.11651-52 (492:13-493:19); ROA.23-10836.12005-6 (806:23-807:6).
[32] ROA.23-10836.14774; ROA.23-10836.11651-52 (492:13-493:19).

### D. Southwest investigated Carter's Title VII-protected religious beliefs, observances, and practices, and RLA-protected union opposition activity.

Upon receiving President Stone's Complaint, Denver Base Manager Ed Schneider ("Schneider") assumed responsibility for investigating Carter, and made the ultimate decision to fire Carter.[33] Southwest went searching on Carter's personal Facebook page and found the two additional pro-life religious posts that Carter made [B(1) and B(2)].

Southwest interviewed President Stone as part of the investigation.[34] Southwest asked Stone to gather all the messages and information she had received from Carter, even if it seemed trivial, and send it to Southwest.[35] Stone sent Southwest multiple emails attaching screenshots of Facebook messages that Carter had sent her during the previous two years.[36] Stone admitted at trial that every Facebook message she gathered and turned into Southwest (that she could read) was union protected activity.[37] Stone testified at trial that, as TWU president, she could have declined Southwest's request that she collect more evidence of Carter's union activity and not send it to Southwest management to take action against an employee for her

---

[33]   ROA.23-10836.12066-67   (867:16-868:3);   ROA.23-10836.12165   (929:21-23);   ROA.23-10836.12075 (876:14-16).

[34] ROA.23-10836.14845-49.

[35] ROA.23-10836.14847.

[36] ROA.23-10836.14547-14605; ROA.23-10836.8497, ¶¶7-8.

[37]   ROA.23-10836.14547-14605;   ROA.23-10836.11691-11711   (532:10-552:14);   ROA.23-10836.11796 (597:10-16).

protected activity.[38] When Southwest asked President Stone what she wanted Southwest to do about Carter, Stone responded with Labor Relations present, "Make Charlene [and another union opponent and recall supporter]… stop … They [Southwest] need to protect me."[39]

On March 7, 2017, Southwest held a fact-finding meeting with Carter as part of its investigation of Stone's Complaint.[40] Southwest asked Carter why she posted the Facebook pictures on her personal page.[41] Carter explained: "I'm a Christian, I'm a conservative, and I'm pro-life. This happens to be a huge issue for me and I get the message out wherever I can … I have a deep, deep want to get the word out."[42] When Southwest asked Carter what she meant when she said, "this has happened to me," she explained:

> I had an abortion and I regret every bit of it so I work with other pro-life groups and for me as a Christian, if I can get the word out in any way, to every group as possible to touch this issue I do. If I had known what was involved in it I wouldn't have ever done it.[43]

When Southwest asked Carter what is being depicted in the Facebook videos Carter posted, she said: "It's an abortion. It's a baby. People say it's just cells- that it's not just a tissue, it's a baby. It shows someone who made the same mistake that

---

[38] ROA.23-10836.1169596 (536:21-537:12).
[39] ROA.23-10836.12318-20 (1082:15-1084:11); ROA.23-10836.14847-48; ROA.23-10836.11865-66 (666:11-667:15); ROA.23-10836.12318-21 (1082:4-1085:8).
[40] ROA.23-10836.14904-39.
[41] ROA.23-10836.14905.
[42] ROA.23-10836.14905.
[43] ROA.23-10836.14905-06.

I did- and they need to understand. They need to know that it's a life and not just a bunch of tissue that's my stance on it."[44] Schneider admitted at trial that he understood Carter was explaining that these were her religious beliefs.[45]

During the meeting, Southwest also asked Carter why she sent her private messages to President Stone.[46] Carter explained that she sent the videos to President Stone because TWU members, led by Stone, participated in the Women's March in support of Planned Parenthood and abortion.[47] Carter stated that by doing so, Stone and the TWU members purported to be representing all of the Southwest flight attendants as supporting abortion rights.[48]

Schneider prepared a synopsis of his investigation results, and summarized his findings that Carter had violated the Social Media Policies.[49] Schneider pointed out that "Carter has been making comments that indicated she was not Union friendly since 2008."[50] Schneider stated, Carter "has continually bombarded [Stone] with the recall vote and how she doesn't deserve to be in office and the recall is going to happen."[51] Schneider characterized Carter's messages to the TWU President

---

[44] ROA.23-10836.14906.
[45] ROA.23-10836.12367 (1131:3-25); ROA.23-10836.12341 (1105:4-22).
[46] ROA.23-10836.14909-12.
[47] ROA.23-10836.14910.
[48] ROA.23-10836.14910.
[49] ROA.23-10836.15002-03.
[50] ROA.23-10836.15002.
[51] ROA.23-10836.15002.

complaining about the union as harassment.[52] Schneider's Synopsis also stated that Carter "latched onto the recent Women's March and abortion issues as her defense, stating it was against her values as a Christian."[53] Schneider continued: "Charlene has several posts that are visible on her Facebook timeline showing graphic and disturbing videos of an aborted fetus and statements about her political views. Charlene stated that she had an abortion when she was young and regrets every bit of it, so she works with other pro-life groups as a Christian to spread the anti-abortion message out in any way possible."[54]

At trial, Schneider admitted that Stone was acting as union president and not as a flight attendant when she received Carter's messages.[55] As soon as he read Stone's complaint, Schneider knew that it involved Carter complaining to her union and engaging in union-related activity.[56] Schneider also acknowledged that every complaint Carter was making in her Facebook communications with Stone concerned TWU and the actions of its president.[57] Schneider further admitted that the investigation never revealed a single comment from Carter to Stone that was outside of Stone's job as union president.[58] Specifically, Schneider knew that

---

[52] ROA.23-10836.15002-03; ROA.23-10836.12363 (1127:5-25).
[53] ROA.23-10836.15002.
[54] ROA.23-10836.15002.
[55] ROA.23-10836.12355-56 (1119:24-1120:4)
[56] ROA.23-10836.12190-94 (954:17-958:2).
[57] ROA.23-10836.12268-71 (1032:21-1035:14); ROA.23-10836.12275-76 (1039:14-1040:13); ROA. 23-10836.12277-78 (1041:2-1042:1); ROA.23-10836.12283-84 (1047:16-1048:9).
[58] ROA.23-10836.12268-71 (1032:21-1035:14); ROA.23-10836.12275-76 (1039:14-1040:13);

Carter's complaints about TWU's participation in a march supported by Planned Parenthood were Carter's concerns about and to her union.[59] Schneider acknowledged at trial his understanding that employees are allowed to "have speech towards the union," to "show their opinions," and to have disputes and disagree and make their disagreements known to the union.[60]

### E. Southwest terminated Carter for her Title VII-protected religious beliefs, observances, and practices, and RLA-protected union opposition activity.

On March 14, 2017, Southwest terminated Carter for her private Facebook videos and messages sent to President Stone [(A)(1)-(3)] and for Carter's pro-life religious videos and messages posted on her own personal Facebook page [B(1)-(2)].[61] Southwest's termination letter stated that Carter's Title VII and RLA-protected communications violated Southwest's Mission statement, Workplace Bullying and Hazing Policy, and Social Media Policy, and further stated that Carter's activities "could also be a violation of Southwest's Policy Concerning Harassment, Sexual Harassment, Discrimination and Retaliation."[62] Notably, Schneider did not conclude

---

ROA. 23-10836.12277-78 (1041:2-1042:1); ROA.23-10836.12283-84 (1047:16-1048:9).
[59] ROA.23-10836.12285-86 (1049:24-1050:5).
[60] ROA.23-10836.12067-8 (868:14- 869:14).
[61] ROA.23-10836.15007; ROA.23-10836.12264-66 (1028:11-1030:25); ROA.23-10836.12077-82 (878:3-6; 879:5-9; 880:16-881:8; 882:3-17; 883:17-20).
[62] ROA.23-10836.15007.

that Carter threatened President Stone when she commented "Can't wait to see you back on line," and ultimately Southwest did not fire Carter for making a threat.[63]

Carter had never received any prior discipline during her twenty-year career at Southwest.[64] Schneider even admitted at trial that his decision to fire Carter was "definitely" heavy-handed.[65] Although Carter repeatedly raised her religious beliefs, observances, and practices, and Southwest recognized the overt religious nature of Carter's communications,[66] Southwest summarily fired Carter without making any efforts to accommodate Carter's religious observances, beliefs, and practices.[67] Southwest never even *contemplated* any efforts to accommodate Carter.[68]

Despite Southwest's annual training and policies regarding protected religious activity and knowing that Carter's religious beliefs, observances, and practices were at issue, nobody referred Carter's need for an accommodation to Southwest's "Accommodations and Career Transitions Team ("ACT Team").[69] Even though ACT Team policies required Schneider to report Carter's accommodation need,[70]

---

[63] ROA.23-10836.12276 (1040:14-24); ROA.23-10836.12253 (1017:3-15).

[64] ROA.23-10836.12331 (1095:10-23).

[65] ROA.23-10836.12377 (1141:17-22).

[66] ROA.23-10836.14747-73, 14905-21, 15002-03, 15007; ROA.23-10836.12194-95 (958:7-959:19); 12341-43 (1105:3-22, 1106:23-1107:25); ROA.23-10836.12367-68 (1131:3-1132:22); ROA.23-10836.12567 (1289:8-24); ROA.23-10836.12873 (1595:9-16); ROA.23-10836.12980-82 (1660:5-1662:8); ROA.23-10836.12072 (873:13-23) SWA Br. 64-66

[67] ROA.23-10836.12294 (1058:8-12); ROA.23-10836.12294-95 (1058:19-1059:4); ROA.23-10836.15007; ROA.23-10836.12304 (1068:23-25);

[68] ROA.23-10836.12294 (1058:8-12); ROA.23-10836.12568-69 (1290:23-1291:8).

[69] ROA.23-10836.12305 (1069:5-19).

[70] ROA.23-10836.12978-12982 (1658:6-1662:8).

Southwest went digging through old photos on Carter's Facebook page to gather questionable "nexus" evidence to contrive a connection between her religious posts and the workplace. Southwest pulled pictures from Carter's Facebook timeline, and determined that Carter's religious videos and messages posted on her own personal Facebook page had a nexus to the company, even though Carter's videos or messages did not reference or exhibit any connection to the company.[71]

Southwest claimed that Carter's 3-5 year old photos and the indiscernible Southwest identification lanyard connected Southwest to her pro-life religious communications.[72] Carter's uncontroverted testimony showed that all the nexus pictures from her Facebook timeline, except for the picture of her standing in an airport in plain clothes wearing a blurry, barely discernible badge, were 3-5 years old.[73] Schneider admitted at trial that you cannot tell from looking at the blurred lanyard photo, the only version of the Facebook post he had ever seen, that it was a Southwest badge.[74]

Carter only sent communications to one person—President Stone.[75] Southwest never received any complaints about the posts Carter made on her Facebook page.[76]

---

[71] ROA.23-10836.14747-48.
[72] ROA.23-10836.12356 (1120:15-25).
[73] ROA.23-10836.12568 (1290:9-22).
[74] ROA.23-10836.14850-58; ROA.23-10836.12322-25 (1086:11-1089:16).
[75] ROA.23-10836.12569; 12619-20 (1291:10-15, 1341:25-1342:4); ROA.23-10836.13085 (1765:6-22); ROA.23-10836.13086-87 (1766:13-1767:7); ROA.23-10836.12667 (1389:11-23).
[76] ROA.23-10836.3834 (221:13-16).

Southwest did not have any evidence that Carter's Facebook communications caused Southwest any financial harm.[77] Southwest never contemplated or discussed possible accommodations with Carter before firing her, even some obvious ones that would have imposed no burden on the company. Southwest never discussed with Carter whether she would be willing to post a disclaimer on her Facebook page that her posts do not necessarily represent the views of Southwest.[78] Schneider admitted that he could have run that through his legal team and he would have considered it if they told him he could do that, but he did not.[79] Nobody at Southwest ever asked Carter if she would remove Facebook posts that it considered to have a nexus to the workplace, which Schneider testified was something he could have also done.[80]

## II. Procedural background related to contempt proceedings against Southwest.

Carter addresses the relevant procedural background with her legal arguments below, but provides additional procedural detail related to the contempt proceedings for a full record. Following the jury verdict that Southwest fired Carter because of her religion, the District Court entered judgment and issued injunctive orders against Southwest that became immediately effective and have remained in effect at all times through the present.[81] The District Court ordered Southwest:

---

[77] ROA.23-10836.12305 (1069:20-23); ROA.23-10836.3835 (222:3-4).
[78] ROA.23-10836.12305-07 (1069:24-1071:6).
[79] ROA.23-10836.12305-07 (1069:24-1071:6).
[80] ROA.23-10836.12307-08 (1071:7-1072:20); ROA.23-10836.12569 (1291:2-8).
[81] ROA.23-10836.8921-55.

> [T]o inform Southwest flight attendants that, under Title VII, the Defendants *may not* discriminate against Southwest flight attendants for their religious practices and beliefs, including—but not limited to—those expressed on social media and those concerning abortion.[82]

Critically, Southwest never sought to stay the Notice Order. Instead, fifteen days after the judgment, Southwest violated the order when it emailed flight attendants the "Recent Court Decision" notice[83] and a contemporaneous "Inflight Info On The Go" ("IIOTG") Memo.[84]

Southwest's "Recent Court Decision" notice told flight attendants that the District Court ordered it to inform them that it *does not* discriminate against their religious beliefs and practices, and failed to mention Title VII.[85] Southwest's IIOTG Memo also informed flight attendants that Southwest terminated Carter for her religious messages concerning abortion, which it disparaged as "inappropriate, harassing, and offensive."[86] Southwest said Carter "created unnecessary tension among a workgroup," and "crossed the boundaries of acceptable behavior."[87] It also told flight attendants that the company's arbitrator backed Southwest's termination decision and called Carter's protected religious speech "repulsive and beyond the bounds of civility."[88] The IIOTG Memo instructed flight attendants that they "must

---

[82] ROA.23-10836.8955, ¶10 (emphasis added).
[83] ROA.23-10836.9442.
[84] ROA.23-10836.9444.
[85] ROA.23-10836.9442 (emphasis added).
[86] ROA.23-10836.9444.
[87] *Id*.
[88] *Id*.

adhere to Southwest's" social media policies, and conveyed that if they engaged in religious activities like Carter's, they would be subject to the same discipline.[89]

The District Court issued a Contempt Order, concluding that Southwest's IIOTG Memo, issued contemporaneously with the willfully faulty "does not discriminate" notice, violated the Notice Order to inform flight attendants that, under Title VII, Southwest *may not* discriminate against their religious beliefs and practices by using its social media policies to do so.[90] The Contempt Order requires the three Southwest attorneys responsible to attend legal training because they were at the root of the IIOTG Memo problem.[91]

Contrary to Southwest's representations,[92] Southwest rejected Carter's requests for Southwest to issue corrective notices, which she made prior to filing her December 30, 2022 contempt motion.[93] Southwest "strongly disagree[d]" with Carter and insisted its use of "does not" versus "may not" was a "distinction without a difference."[94] Southwest only offered to circulate the "may not" discriminate notices less than two weeks before the Show Cause Hearing.[95] Southwest never

---

[89] *Id.*

[90] ROA.23-10836.10650-51; ROA.23-10836.10657-58; ROA.23-10836.10660-63.

[91] ROA.23-10836.10662. ROA.23-10836.9435-40; ROA.23-10836.9451-52; ROA.23-10836.10533; ROA.23-10836.9451-52; ROA.23-10836.10532-37; ROA.23-10836.10558; 10646-47; ROA.23-10836.10663-64.

[92] Case No. 23-10836, Doc. 64, at 42-43 (cited to hereinafter as "SWA Br. __").

[93] ROA.23-10836.9436-40, 9451-53.

[94] ROA.23-10836.9452-53, ¶¶II-III.

[95] ROA.23-10836.10533.

backed down from its justifications for the IIOTG Memo.[96]

## SUMMARY OF ARGUMENT

**I.** The Court should affirm the District Court's judgment and the jury verdict for Carter. Carter presented trial evidence from which the jury could conclude that Southwest discharged her because of her religious beliefs, observances, *and* practices, not just because of her beliefs. Carter also showed that TWU attempted to cause and did cause Southwest to discriminate against her because of each religious aspect. Southwest and TWU failed to show that no rational jury could agree with Carter.

While Southwest and TWU do not contest the jury's finding that they failed to accommodate her religious beliefs, observances, and practices, Southwest and TWU are not entitled to any undue hardship defense where both failed to initiate any accommodation efforts. *Hebrew v. Tex. Dep't of Crim. Just.*, 80 F.4th 717, 722 (5th Cir. 2023).

While TWU waived its undue hardship defense, Southwest's objections to the District Court's undue hardship instructions fail because the instruction reflected Fifth Circuit precedent and pattern jury instructions: "Undue hardship means more than a de minimis cost on the conduct of the employer's business either in terms of financial costs or disruption of the business." Southwest is not entitled to a new trial

---

[96] ROA.23-10836.9452-53; 10532-37; 10558; 10646-47; 10663-64.

based on *Groff v. DeJoy*, 600 U.S. 447 (2023)'s elevated undue hardship standard when it could not even meet the lower *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) threshold, and where it has consistently represented that it has no evidence that it suffered financial harm from Carter's religious Facebook posts.

**II.** This Court should affirm the District Court's judgment and jury verdict on Carter's Count IV RLA retaliation claim against Southwest and TWU because Carter showed that her RLA-protected activity was a substantial or motivating factor for Southwest and TWU's unlawful retaliation, which was itself the requisite "animus" for proving her claim. *Roscello v. Sw. Airlines Co.*, 726 F.2d 217, 222 (5th Cir. 1984) (citation omitted); *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pacific R.R. Co. ("BLET")*, 31 F.4th 337, 342-43 (5th Cir. 2022).

The District Court correctly instructed the jury in accordance with Supreme Court and other federal court precedent that Carter's RLA-protected speech and activities opposing her union's representation did not exceed the RLA's protection even if the employer and union considered it "offensive." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 277 (1974).

**III.** While the Court should affirm the District Court's judgment and jury verdict below on Carter's RLA retaliation claim, Carter's cross-appeal shows that the District Court should not have dismissed her Count I RLA interference/coercion claim against Southwest, because it was not necessary for Carter to prove animus

or show Southwest's motive for terminating her employment, and she could not protect her RLA statutory rights in arbitration.

**IV.**     The Court should also deny TWU's narrow duty of fair representation appeal because, contrary to the union's suggestions, the District Court's instructions and federal law did not require Carter to show that she engaged in protected activity to succeed on that claim.

**V.** This Court should affirm the District Court's contempt order because Southwest and its attorneys *willfully* violated the court's December 5, 2022 Notice Order, which they never appealed or requested to stay. Southwest has demonstrated a chronic failure to comprehend and respect Title VII, and its Title VII training requirement, which is an appropriate civil contempt sanction within the courts' inherent powers, and is necessary to ensure Southwest's compliance with its continuing obligation to ensure flight attendants' notice of their Title VII-protected religious liberties.

## STANDARD OF REVIEW

When reviewing a jury verdict, the Court must affirm unless the appellant can show that "the facts and inferences point so strongly in [its] favor … that a rational jury could not reach a contrary verdict." *Thomas v. Hughes*, 27 F.4th 995, 1009 (5th Cir. 2022) (citations omitted). The Court must draw "all reasonable inferences in the light most favorable to the verdict." *Thomas v. Tex. Dep't of Crim. Just.*, 220 F.3d

23

389, 392-93 (5th Cir. 2000) (citations omitted). "[T]he jury, alone, weighs evidence and determines credibility." *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 440 (5th Cir. 2022) (citation omitted).

The Court "review[s] challenges to jury instructions for abuse of discretion and afford[s] the trial court great latitude in the framing and structure of jury instructions." *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 240 (5th Cir. 2014). The District Court has "substantial latitude … in describing the law to the jury." *United States v. Williams*, 610 F.3d 271, 285 (5th Cir. 2010). The Court only evaluates "whether the 'charge, as a whole, was a correct statement of the law and whether it clearly instructed the jurors as to the principles of the law applicable to the factual issues confronting them.'" *United States v. Orji-Nwosu*, 549 F.3d 1005, 1008 (5th Cir. 2008) (citation omitted). "[W]hen a jury instruction hinges on a question of statutory construction, [this Court's] review is de novo." *Williams*, 610 F.3d at 285.

"[T]he party challenging the instruction must show that the charge 'creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.'" *Eastman Chem.*, 775 F.3d at 240 (citation omitted). "'The instructions need not be perfect in every respect provided that the charge in general correctly instructs the jury, and any injury resulting from the erroneous instruction is harmless.'" *Id*. (citation omitted). This Court "do[es] not reverse on the grounds

of an erroneous instruction if the error 'could not have affected the outcome of the case.'" *Id.* (citation omitted). To appeal the District Court's instructions, this Court makes it a "prerequisite" to raise the objection to the District Court at trial. *Russell v. Plano Bank & Trust*, 130 F.3d 715, 719 (5th Cir. 1997) (citations omitted).

For Carter's cross-appeal of the District Court's dismissal of her Count I RLA interference claim against Southwest, this Court reviews dismissal for lack of jurisdiction and failure to state a claim de novo. *Gilbert v. Donahoe*, 751 F.3d 303, 306-07 (5th Cir. 2014); *Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 931 (5th Cir. 2020).

The Court reviews contempt findings for abuse of discretion. *See Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000) (citations omitted). The district court's underlying findings of fact are reviewed for clear error and its underlying conclusions of law reviewed de novo. *Id.* (citations omitted).

Where appellant fails to raise its specific argument in its opening appellate brief, it is waived. *Waste Mgmt., Inc. v. AIG Specialty Ins. Co.*, 974 F.3d 528, 533 n.2 (5th Cir. 2020); *Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004).

## ARGUMENT

### I. Southwest and TWU violated Carter's Title VII-protected rights.

The Court should affirm the District Court judgment and jury verdict because (A) Carter showed that Southwest unlawfully discharged her and TWU unlawfully

caused and attempted to cause Carter's discharge because of her religious beliefs, observances, *and* practices, not just beliefs.[97]

The District Court's jury instructions allowed Carter, in accordance with Title VII's express statutory text, to prove her Title VII unlawful discharge and failure to accommodate claims by showing Southwest's and TWU's discrimination against "all aspects of [her] religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j); *see also EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771-72, 774-75 (2015).[98] Southwest and TWU never objected to including all aspects.[99] While Southwest and TWU attempt to recast Carter's Title VII unlawful discharge and failure to accommodate claims as "belief-based discrimination" and "practice-based discrimination," that misstates both Carter's claims and the law.[100]

(B) Carter also proved that Southwest and TWU failed to accommodate her religious beliefs and observances, not just her religious practice. Southwest and TWU do not contest this jury decision.[101] Moreover, neither Southwest nor TWU is even entitled to *raise* an undue hardship defense, let alone hold a new trial under *Groff*'s elevated standards, because they summarily terminated Carter's employment and attempted to discipline Carter without initiating *any* accommodation efforts.

---

[97] Case No. 23-10008 Doc. 151 (cited to hereinafter as "TWU Br. __"). SWA Br. 53-57, 60, 64-66, 69; TWU Br. 27-30, 32-33; ROA.23-10836.8953-55; ROA.23-10836.8570-71; 74-76.
[98] ROA.23-10836.8507-12.
[99] ROA.23-10836.13207-27; ROA.23-10836.13217-19.
[100] SWA Br. 53-57, 60, 64-66, 69; TWU Br. 26-30, 32-33.
[101] ROA.23-10836.8575-76.

(C) Contrary to TWU's assertions,[102] the District Court also awarded appropriate Title VII injunctive relief to enjoin Southwest and TWU from religious discrimination and to protect TWU-represented flight attendants' religious freedoms under the Act.[103] Southwest did not contest the Title VII injunctive relief.

### A. Southwest and TWU unlawfully discharged and otherwise discriminated against Carter's religious beliefs, observances, and practices.

Carter showed that her religious beliefs, observances, and practices, were all motivating factors for (1) Southwest unlawful discharge and (2) TWU's unlawfully causing and attempting to cause Carter's discharge.[104] Southwest and TWU both failed to show that no reasonable jury could find for Carter.[105]

### 1. Southwest unlawfully discharged Carter because of her religious beliefs, observances, and practices.

Carter's direct evidence showed that her beliefs, observances, *and* practices, were *the* motivating factor for Southwest's termination decision, and Southwest failed to show that no reasonable jury could agree that *any* religious aspect was *a* motivating factor for Southwest's unlawful decision. Title VII makes it unlawful for employers "to discharge any individual … because of such individual's … religion[.]" 42 U.S.C. § 2000e-2(a)(1). "[R]eligion," as stated, "includes all aspects of religious

---

[102] TWU Br. 35-37.
[103] ROA.13-10836.8922-23, 44-49; ROA.23-10836.8953-55, ¶¶5-6.
[104] Carter also prevailed on another religious discrimination claim against TWU, which will be discussed *infra* at 33-34.
[105] SWA Br. 53-57, 60, 64-66, 69; TWU Br. 27-35.

observance and practice, *as well as* belief[.]" 42 U.S.C. § 2000e(j) (emphasis added). "Title VII … prohibit[s] even making [religious observances, practices, or beliefs] a 'motivating factor' in an employment decision." *Abercrombie*, 575 U.S. at 773; *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739-41 (2020); *Hebrew*, 80 F.4th at 724; 42 U.S.C. § 2000e-2(m).

Carter only had to prove that any aspect of her religious beliefs, observances, or practices, was a factor in Southwest's termination decision. The District Court instructed the jury, without objection, that Southwest unlawfully discharged Carter if Carter's religious observances, beliefs, or practices were a motivating factor for Southwest's termination decision.[106]

Carter presented direct evidence at trial showing that her religious beliefs, observances, and practices were all motivating factors for Southwest's termination decision.[107] Carter's private messages to TWU's President and posts on her own personal Facebook page showing that abortion is taking of human life contrary to God's will reflect Carter's religious beliefs.[108] Religious beliefs are not only overarching religious ideologies, but also include "moral [or] ethical beliefs about what is right and wrong" which are sincerely "held with the strength of traditional

---

[106] ROA.23-10836.8507; ROA.23-10836.13207-27.
[107] ROA.23-10836.14747-73, 14905-21, 15002-03, 15007; ROA.23-10836.12194-95 (958:7-959:19); 12341-43 (1105:3-22, 1106:23-1107:25); ROA.23-10836.12367-68 (1131:3-1132:22); ROA.23-10836.12567 (1289:8-24); ROA.23-10836.12873 (1595:9-16); ROA.23-10836.12980-82 (1660:5-1662:8); SWA Br. 64-66.
[108] ROA.23-10836.14749-50; ROA.23-10836.14747-48.

religious convictions." *Welsh v. United States*, 398 U.S. 333, 339-40 (1970). Carter's religious Facebook communications were also religious expression observing and practicing her beliefs.[109]

Carter's evidence included Southwest's numerous statements and admissions that it fired Carter for privately sending and publicly posting on her own Facebook page overtly religious pro-life videos, posts, and messages reflecting her belief that abortion is the taking of human life contrary to God's will, and her belief in sharing that message.[110]

Southwest fired Carter because it determined that both the religious content of Carter's Facebook posts and messages (i.e., her beliefs) and her observance and practice of it violated its social media policies.[111] When anyone restricts expression "based on its perception that the speech will spark fear among or disturb its audience, such regulation is by definition based on the speech's content." *United States v. Marcavage*, 609 F.3d 264, 282 (3d Cir. 2010). Carter told Southwest at her fact-finding that she had a religious belief in showing that abortion takes human life.[112] Schneider testified that the investigation evidence demonstrated to him that Carter was exercising her religious beliefs in sending the videos and messages for which

---

[109] ROA.23-10836.14749-50; ROA.23-10836.14747-48.
[110] ROA.23-10836.15007;
[111] *Id.*
[112] ROA.23-10836.14905-06.

they fired her.[113]

When Southwest fired Carter for privately messaging her religious videos and messages to TWU's president (which Southwest called "harassing and inappropriate")[114] and for posting them on her own Facebook page, Southwest targeted the beliefs reflected in the communications' content as much as Carter's expression of them, calling that religious content "highly offensive in nature" in its termination letter.[115] While Southwest reframes social media policy violations as an additional motivation, Southwest's motivation still intentionally discriminated against Carter's religious beliefs, observances, and practices when it enforced Southwest's policies against Carter's Title VII-protected rights, and unlawfully fired her: "Intentionally burning down a neighbor's house is arson, even if the perpetrator's ultimate intention (or motivation) is only to improve the view." *Bostock*, 140 S. Ct. at 1742.

While Carter never waived her right to present indirect evidence,[116] Carter's direct evidence supported the jury's verdict. The jury found that Carter proved

---

[113] ROA.23-10836.12341 (1105:11-22); ROA.23-10836.12342-43 (1106:23-1107:3); ROA.23-10836.14905-21; ROA.23-10836.15002-03.

[114] ROA.23-10836.15007; ROA.23-10836.14747-73, 14905-21, 15002-03, 15007; ROA.23-10836.12194-95 (958:7-959:19); 12341-43 (1105:3-22, 1106:23-1107:25); ROA.23-10836.12367-68 (1131:3-1132:22); ROA.23-10836.12567 (1289:8-24); ROA.23-10836.12873 (1595:9-16); ROA.23-10836.12980-82 (1660:5-1662:8); ROA.23-10836.12264-66 (1028:11-1030:25); ROA.23-10836.12077-82 (878:3-6; 879:5-9; 880:16-881:8; 882:3-17; 883:17-20).

[115] ROA.23-10836.15007; *see also id.*

[116] SWA Br. 67; ROA.23-10836.8507-08.

Southwest discriminated against Carter by discharging her.[117] Southwest's repeated, explicit, and direct admissions that it fired Carter because the contents and expression of her overtly religious videos and communications—showing that abortion was the taking of human life—violated its social media policies do not require any inference that each aspect of Carter's religion was a motivating factor for her termination. As the District Court recognized, Carter also presented indirect evidence supporting her claim.[118]

Contrary to Southwest and TWU's characterizations,[119] Carter did not need to show that Southwest or TWU generally harbored animus towards pro-life Christians.[120] *Abercrombie*, 575 U.S. at 773. Instead, Carter was only required to show that her religious beliefs, observances, or practices, was a motivating factor in her termination (which she did). *Id.*

> ## 2. TWU caused and attempted to cause Southwest to discharge Carter and otherwise discriminated against her because of her religious beliefs, observances, and practices.

**a**. Contrary to TWU's assertions,[121] the District Court correctly instructed the jury that TWU violated Title VII if it caused or attempted to cause Southwest to

---

[117] ROA.23-10836.8574.

[118] ROA.23-10836.10408-09; ROA.23-10836.14719-14746.; ROA.23-10836.12344-49 (1108:13-1113:1).

[119] SWA Br. 65; TWU Br. 15, 30.

[120] ROA.23-10836.8507-09; ROA.23-10836.10407.

[121] TWU Br. 27. Despite these arguments, TWU later admits "a union cannot cause or attempt to cause an employee to be fired for her belief." TWU Br. 33.

discriminate against Carter.[122] Title VII prohibits a union from "caus[ing] or attempt[ing] to cause an employer to discriminate against an individual" because of her religion, which includes her religious observances, beliefs, and practices. 42 U.S.C. § 2000e-2(c)(3); 42 U.S.C. § 2000e(j). The District Court correctly rejected TWU's demand to use the Fifth Circuit's Pattern Jury Instructions for a 42 U.S.C. § 2000e-2(a)(1) unlawful discharge claim against an *employer* apply to Carter's claim that the *union* violated 42 U.S.C. § 2000e-2(c)(3).[123]

Carter showed that TWU attempted to cause—and did in fact cause—her termination, and that her religious beliefs, observances, and practices were a motivating factor in President Stone's decision to report Carter to Southwest for discipline.[124] Stone reported Carter for "religious comments" and contended that those comments violated Southwest policies, which she specifically identified so Southwest could discipline Carter.[125] TWU and Southwest also failed to contest the jury's finding that President Stone acted in her official capacity when she reported Carter.[126] TWU failed to show that a reasonable juror could not side with Carter.

While TWU asserts that no Southwest manager testified that the union influenced

---

[122] ROA.23-10836.8508-09.
[123] TWU Br. 27. TWU cites to a duty of fair representation objection, not to a Title VII objection. *Id.* ROA.23-10836.13214-18.
[124] ROA.23-10836.14774-81.
[125] ROA.23-10836.14774; ROA.23-10836.11651-52 (492:13-493:19).
[126] ROA.23-10836.8565.

their decision,[127] that misses the point that TWU violated 42 U.S.C. § 2000e-2(c)(3) when President Stone, acting in her official capacity, filed the complaint against Carter, and attempted to cause Southwest to discriminate against Carter by disciplining or firing her for "religious comments."[128] President Stone also admitted that she was reporting Carter's religious activity at trial.[129] Accordingly, TWU was jointly and severally liable with Southwest for all backpay damages, including pre and post judgment interest under 42 U.S.C. § 2000e-5(g).[130]

**b**. TWU failed to contest Carter's separate religious discrimination claim against the union in its opening brief, and waived its appeal of the jury's verdict that the union treated Carter less favorably than other employees (separate and apart from its attempt to cause Southwest to discriminate against her) because of her religious observances, practices, and beliefs.[131] Title VII prohibits a union from discriminating against an individual because of her "religion." 42 U.S.C. § 2000e-2(c)(1); 42 U.S.C. § 2000e(j).

Even if TWU had not waived its argument (which it did), TWU failed to show that no reasonable juror could find that its union officials treated Carter less favorably than other represented employees and was motivated by her "religious

---

[127] TWU Br. 28.
[128] ROA.23-10836.14774.
[129] ROA.23-10836.11651-52 (492:13-493:19).
[130] TWU Br. 27-28.
[131] TWU Br. 29-32; ROA.23-10836.8570; ROA.23-10836.8509.

comments" where Carter presented evidence that Stone defended other flight attendants under Southwest's social media policies.[132] Carter showed that Stone told employees that they should not turn each other in for social media activities, and defended employees' non-religious social media activities, including one who purportedly threatened co-workers with "public execution."[133] *See e.g., Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Carter presented direct and indirect evidence that TWU President Stone treated Carter differently (and worse) than other employees by showing Stone affirmatively acted to cause Carter discipline, and was motivated by Carter's "religious comments" and her religious videos and messages.[134] TWU failed to show that no reasonable jury could find for Carter.

### 3. TWU and Southwest did not assert a non-discriminatory motive for Carter's unlawful discharge for religion.

Neither Southwest nor TWU asserted a legitimate *nondiscriminatory* reason for firing Carter. TWU posits that a legitimate non-discriminatory reason for reporting Carter exists if her Facebook communications to President Stone are not protected,[135] but Carter showed, and the jury agreed, that her religious messages and posts were protected.[136] TWU failed to show otherwise either by law or by showing

---

[132] ROA.23-10836.14691-97; ROA.23-10836.14653-54.
[133] *Id.* ROA.23-10836.14653-54; ROA.23-10836.12648 (1370:4-20); ROA.23-10836.12648 (416:3-12); ROA.23-10836.11598-11604 (439:11-440:23, 443:8, 445:4-16); ROA.23-10836.11964-5 (765:10-766:15).
[134] ROA.23-10836.14691-97; ROA.23-10836.14653-54; ROA.23-10836.14774.
[135] TWU Br. 27.
[136] ROA.23-10836.8569-71; ROA.23-10836.8510-11.

that no reasonable juror could find for Carter.

While Southwest asserts that it fired Carter because her religious observances, beliefs, and practices (i.e., her religious Facebook communications) violated its "otherwise neutral social media policies," that is a *discriminatory* reason.[137] That "argument that a neutral policy cannot constitute 'intentional discrimination' may make sense in other contexts[,] [b]ut Title VII does not demand mere neutrality with regard to religious [beliefs or] practices—that they be treated no worse than other [beliefs, observances, or] practices. Rather, [Title VII] gives them favored treatment, affirmatively obligating employers not 'to fail or refuse to hire or discharge any individual … because of such individual's' 'religious observance and practice.'" *Abercrombie*, 575 U.S. at 775. *See also Hebrew*, 80 F.4th at 721, 724-25.

Southwest invokes pre-*Abercrombie* and pre-*Hebrew* authority[138] allowing employers to discipline employees for "offensive" religious comments in the workplace, but that predates binding Fifth Circuit and Supreme Court precedent to the contrary. *Abercrombie*, 575 U.S. at 775; *Hebrew*, 80 F.4th at 724-25.

Southwest also asserts that Carter did not point to anything discriminatory in Southwest's "neutral" social media policies, but Southwest discriminated against Carter by firing her under its social media policies for religious beliefs and

---

[137] SWA Br. 65, 67.

[138] SWA Br. 61 (citing *Rightnour v. Tiffany & Co.*, 354 F. Supp. 3d 511, 525 (S.D.N.Y. 2019) (collecting pre-*Abercrombie* and pre-*Hebrew* out-of-circuit cases).

communications.[139] "Title VII requires otherwise-neutral policies to give way to the need for an accommodation." *Abercrombie*, 575 U.S. at 775; *Hebrew*, 80 F.4th at 724-25. "When an employee "requires an accommodation as an 'aspec[t] of religious … practice,' it is no response that the subsequent [discharge] was due to an otherwise-neutral policy." *Id.*

## B. TWU and Southwest failed to accommodate Carter's religious observances, beliefs, and practices, and have no undue hardship defense.

Southwest and TWU failed to contest and waived any objections to the District Court's judgment and instructions, and the jury verdict, deciding their failure to accommodate Carter's religious observances, beliefs, and practices.[140] Firing an employee because of her religious practice "is *synonymous* with refusing to accommodate the religious practice." *Abercrombie*, 575 U.S. at 772 n.2 (emphasis in original). Carter showed at trial that she confronted Southwest and TWU with her need for a religious accommodation, and they unlawfully avoided her need by firing her.[141] *Id.* at 773-74; *Hebrew*, 80 F.4th at 724.

Southwest and TWU now only argue they have an undue hardship to

---

[139] SWA Br. 65.

[140] *See supra* at 26; ROA.23-10836.8571, 8575-76; ROA.23-10836.8571, 8509-12; SWA Br. 53-54, 56, 60-64, 69-75; TWU Br. 33-35.

[141] *See supra* at 12-14; ROA.23-10836.14747-73, 14905-06; 14907-21, 15002-03, 15007; 12341-43 (1105:3-22, 1106:23-1107:3); ROA.23-10836.12367-68 (1131:3-1132:22); ROA.23-10836.12567 (1289:8-24); ROA.23-10836.12873 (1595:9-16); ROA.23-10836.12980-82 (1660:5-1662:8); ROA.23-10836.12304-08 (1068:23-1072:20); ROA.23-10836.12289 (1053:2-15); ROA.23-10836.12073 (874:1-15); ROA.23-10836.14544; ROA.23-10836.12304-08 (1068:23-1072:20); ROA.23-10836.12978-82 (1658:8-1662:8).

accommodating Carter's religion.[142] But they fired Carter without even attempting or discussing any accommodation.[143] TWU and Southwest are not entitled to a new trial to re-argue baseless undue hardship claims because (1) they are not entitled to raise an undue hardship defense, (2) the District Court correctly instructed the jury on undue hardship, and (3) Southwest cannot reach *Groff*'s elevated undue hardship standard where it could not establish any harm to its business under the lower pre-*Groff* standard.

**1. Southwest and TWU are not entitled to raise an undue hardship defense.**

**a.** Southwest may not raise an undue hardship defense in this case because it summarily fired Carter without initiating accommodation efforts. Employers cannot raise an undue hardship defense if they do not even initiate accommodation efforts. *See Hebrew*, 80 F.4th at 721, 722; *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1440 (9th Cir. 1993); *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1513 (9th Cir. 1989). "The prohibition of discrimination because of religious practices is meant to force employers to consider whether those practices can be accommodated without undue hardship." *Abercrombie*, 575 U.S. at 778 (Alito, J., concurring).

Having learned in the fact-finding of Carter's religious reasons for her communications, Title VII required Southwest to consider and evaluate possible

---

[142] SWA Br. 53-54, 56, 60-64, 69-75; TWU Br. 33-35.
[143] *Supra* at 15-18, 37 n.141.

religious accommodation. Southwest never considered or evaluated *any* potential accommodations.[144] Even at trial Southwest failed to show that there was no possible accommodation for Carter's religious communications and that immediate termination was its only recourse.[145] Carter showed that Southwest could have made minimal efforts to accommodate her that would not have imposed *any* burden.[146]

**b.** Contrary to TWU's assertions,[147] the District Court correctly found that the union waived any undue hardship defense it might have had, and correctly denied the union's request at trial to amend its answer to assert an undue hardship defense.[148] TWU failed to plead undue hardship as an affirmative defense in its answer,[149] never sought leave to amend its answer at any time during the 4-5 years before trial, and never argued an undue hardship defense at any time. *See* Fed. R. Civ. P. 8(c)(1).

Even if TWU had raised an undue hardship defense, Title VII does not give unions that defense. While unions must accommodate employees' religious observances, beliefs, and practices, Title VII's plain statutory text does not countenance a union undue hardship defense for union business or otherwise.

---

[144] *See supra* at 15-18, 37 n.141.
[145] ROA.23-10836.8576.
[146] ROA.23-10836.12305-08 (1069:24-1072:20); ROA.23-10836.12569 (1291:2-8); ROA.23-10836.12307-08 (1071:22-1072:20).
[147] TWU Br. 34.
[148] ROA.23-10836.12565-66 (1287:19-1288:15); ROA.23-10836.7167-68.
[149] ROA.23-10836.1080-82.

*Cooper v. General Dynamics*, 533 F.2d 163, 171-72 (5th Cir. 1976) (Brown, J., concurring) (recognizing the majority agreement that the union has a duty to accommodate). Title VII sets forth the *employer*'s undue hardship defense, requiring accommodation "unless an *employer* demonstrates that he is unable to reasonably accommodate to an employee's … religious observance or practice without undue hardship on the conduct of the *employer*'s business." 42 U.S.C. § 2000e(j) (emphasis added).

To be sure, the Fifth Circuit held in a plurality opinion that a union can raise an undue hardship defense. *Cooper*, 533 F.2d at 172-73 (Brown, C.J., concurring); *id.* at 174-77 (Rives, J. concurring). But Judge Gee dissented: "Because of what the statute says … none of these reasons persuades me … that when Congress has said A, in words which admit of neither construction nor misunderstanding, we should say A and B." *Id.* at 170-71 (Gee, J., dissenting); *see also id.* at 171 n.15.

Even if TWU could assert undue hardship, the union failed to make any accommodation efforts. President Stone reported Carter's "religious comments" for discipline under specific policies she enumerated without attempting accommodation.[150] President Stone admitted at trial that she could have simply blocked Carter's communications instead of trying to discipline her.[151]

---

[150] ROA.23-10836.14774; ROA.23-10836.11651-52 (492:13-493:19).
[151] ROA.23-10836.11701 (542:2-13).

**2. The District Court correctly instructed the jury on undue hardship in accordance with Fifth Circuit precedent and pattern jury instructions. Moreover, Southwest had no evidence of any hardship.**

**a**. Contrary to Southwest's assertions,[152] the District Court correctly instructed the jury that "[a]n undue hardship means more than a *de minimis* cost on the conduct of the employer's business either in terms of financial costs or disruption of the business."[153] Pre-*Groff* Fifth Circuit precedent held that undue monetary or scheduling burdens on co-workers vis-à-vis the employer's business operations might suffice for an undue hardship. *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 273-74 (5th Cir. 2000) (adverse impact of "skipping over" co-workers because it unduly burdens co-workers with respect to compensation and "time off" concerns); *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 146-47 (5th Cir. 1982) (requiring the employer to direct employees to trade shifts, which inflicted hardship on the hospital);[154] 42 U.S.C. § 2000e(j) (requiring employer to demonstrate "undue hardship on the conduct of the employer's *business*") (emphasis added). Fifth Circuit precedent shows that, contrary to Southwest's arguments, an employee's hurt feelings alone are not undue hardship on the employer's business.

The Fifth Circuit pre-*Groff* Pattern Jury Instructions, while defining undue hardship in the context of the ADA, provides that the employer must prove an undue

---

[152] SWA Br. 60-62, 69-72; ROA.23-10836.10401-06.
[153] ROA.23-10836.8510-11.
[154] ROA.23-10836.10402-06.

hardship to "*its business operations.*" Fifth Circuit Pattern Jury Instructions, 11.10 pp.205-206 (2020) (emphasis added); *id*. at 11.7 p.180. "It is well-settled … that a district court does not err by giving a charge that tracks this Circuit's pattern jury instructions and that is a correct statement of the law." *United States v. Sheridan*, 838 F.3d 671, 673 (5th Cir. 2016) (citations omitted); *United States v. Toure*, 965 F.3d 393, 403 (5th Cir. 2020).

The District Court's jury instructions allowed the jury to consider evidence of burdens on co-workers and harm to employee morale in connection with showing business disruption, but Southwest had no such evidence.[155] Carter only sent her private messages to one person—the TWU President, who the jury determined (without appeal) acted in her official capacity on behalf of the union.[156] TWU and its officials owe employees affirmative accommodation duties under Title VII, as well as separate and independent duties of loyalty under the RLA and duty of fair representation. 42 U.S.C. § 2000e-2(c)(1), -2(c)(3); § 2000e(j); *Steele v. Louisville & N.R. Co.,* 323 U.S. 192, 198-199, 202-203 (1944). TWU's affirmative duties to Carter were at issue, not employee burdens.

Southwest never presented evidence that any employee ever reported or complained about Carter's religious Facebook posts because there was no

---

[155] ROA.23-10836.8510-11.
[156] ROA.23-10836.12002 (803:6-10); ROA.23-10836.12569; 12619-20 (1291:10-15; 1341:25-1342:4); ROA.23-10836.13086-87 (1766:13-1767:7); ROA.23-10836.13085 (1765:6-22); ROA.23-10836.12667 (1389:11-23); ROA.23-10836.12569 (1291:16-23); ROA.23-10836.8565.

evidence.[157] Southwest's self-serving testimony speculating about employee morale came solely from Southwest *managers* involved in Carter's investigation (including Schneider, the manager who fired her), not ordinary flight attendant employees.[158] Thus, Southwest's and TWU's speculative workplace proselytization and hostile work environment arguments are baseless.[159]

Southwest and TWU invoke *Groff* and raise baseless workplace harassment claims to justify religious discrimination against Carter,[160] but that flips *Groff* on its head: "If bias or hostility to a religious practice or a religious accommodation provided a defense to a reasonable accommodation claim, Title VII would be at war with itself." *Groff*, 600 U.S. at 472 (citations omitted). Southwest management's and the union's bias, hostility, and dislike of Carter's religious beliefs and expression is not an undue hardship defense: "[A] coworker's dislike of 'religious practice and expression in the workplace' or 'the mere fact of an accommodation' is not 'cognizable to factor into the undue hardship inquiry." *Groff*, 600 U.S. at 472 (cleaned up).

---

[157] ROA.23-10836.3834 (221:13-16).
[158] ROA.23-10836.12851 (1573:21-23); ROA.23-10836.12994 (1674:3-20); ROA.23-10836.12836-37 (1558:23-1559:24); ROA.23-10836.12789-90 (1511:20-1512:12); ROA.23-10836.12736-37 (1686:19-1687:14); ROA.23-10836.12745-46 (1695:25-1696:8); SWA Br. 70-72; TWU Br. 34-35.
[159] SWA Br. 62-64, 74; TWU Br. 33-34.
[160] SWA Br. 64; TWU Br. 33.

**3.  Southwest is not entitled to a new trial under *Groff*'s elevated undue hardship standard where it could not establish any harm to its business under the lower pre-*Groff* standard.**

Pre-*Groff* Fifth Circuit and Supreme Court precedent put Southwest on notice that it should have presented evidence of business cost at trial.[161] The Fifth Circuit will not remand a case for a new trial if "the need, or certainly the helpfulness, of [] evidence [was] reasonably apparent to ordinarily prudent counsel" at the time of trial. *See Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 282 (5th Cir. 1999) (citation omitted). Southwest mistakenly believed that it could win under its erroneous view of Fifth Circuit undue hardship precedent,[162] but that does not justify its failure to present evidence that accommodating Carter would impose financial costs when "the need, or certainly the helpfulness" of that evidence was plainly apparent from Fifth Circuit precedent.

The District Court's instructions allowed Southwest to prove undue hardship with the same evidence of business costs for which it now seeks a new trial.[163] When the party had "a fair opportunity to prove their claim and they failed to do so," the appellate court should not "give [them] … a second chance to make out [the] case." *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 224 (5th Cir. 2019) (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 444 (2000). *See also*

---

[161] *See supra* at 40-41.
[162] SWA Br. 75.
[163] SWA Br. 74-75.

*United States ex rel. Rafizadeh v. Cont'l Common, Inc.*, 553 F.3d 869, 874 (5th Cir. 2008) (refusing to remand where it would be "fruitless"). Southwest had the opportunity but made a strategic litigation decision not to present evidence, if it had any, for the jury's consideration, and it did so at its peril.[164]

To prevail now under *Groff*, Southwest would have to prove "the burden of granting an[y] accommodation [let alone *considering* an accommodation] would result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 468, 470.[165] That is because Southwest repudiated every possible accommodation when it summarily fired her instead of considering accommodations. But Southwest represented at trial and in discovery that it had no evidence Carter's Facebook posts caused the company any financial harm when Southwest fired Carter.[166]

Even if Southwest believed that accommodating Carter could, in the future, affect Southwest's business that did not justify firing her without any accommodation efforts. To justify firing Carter without making any accommodation efforts, Southwest would have to show that every possible accommodation would have imposed an undue hardship on Southwest's business.[167] But the jury found that Southwest failed to prove that "any and all accommodations in this case would have

---

[164] ROA.23-10836.8510-11; SWA Br. 74-75.
[165] ROA.23-10836.15282-312.
[166] ROA.23-10836.12305 (1069:20-23); ROA.23-10836.3835 (222:3-4); *See supra* at 18.
[167] *See supra* at 37-38.

imposed an undue hardship on [] Southwest."[168] Southwest failed to contest the jury's ruling. Carter showed at trial that Southwest had several accommodation options that would have avoided any business costs.[169]

Southwest's speculation about flight cancellations, poor customer experiences, or lost revenue is specious. Carter's religious communications could not have caused Southwest's imagined harms to Southwest's business where Carter only sent private messages to the TWU President, and no other employees reported or complained about Carter's Facebook posts.[170] Furthermore, Southwest never disclosed experts, expert testimony, or any evidence of financial harm, during discovery, and waived such evidence at trial.

While Southwest demands a new undue hardship trial based on *Groff*, remanding makes no sense because the Supreme Court's decision shows that Southwest cannot assert undue hardship when it repudiated "the very notion of accommodati[on]." "An employer who fails to provide an accommodation has a defense only if the hardship is 'undue,' and a hardship that is attributable to employee animosity to a particular religion, to religion in general, or *to the very notion of accommodating religious practice* cannot be considered 'undue.'" *Groff*, 600 U.S. at 472 (emphasis added) (citations omitted). The Fifth Circuit has also recognized that *Groff* made clear "Title

---

[168] ROA.23-10836.8576.

[169] ROA.23-10836.12305-07 (1069:24-1071:6); ROA.23-10836.12569 (1291:2-8); ROA.23-10836.12307-08 (1071:7-1072:20).

[170] *See supra* at 18.

VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations." *Hebrew*, 80 F.4th at 722 (quoting *Groff*, 600 U.S. at 473). Southwest is not entitled to a new trial because it did neither.

## C. The District Court's Title VII injunctions protect Southwest flight attendants' rights from the continuing threat of unlawful religious discrimination.

TWU failed to show that the District Court abused its discretion in awarding Title VII injunctive relief to protect Carter and other Southwest flight attendants' from religious discrimination.[171] The Fifth Circuit has held that a plaintiff in a "Title VII suit takes on the mant[le] of the sovereign" with the purpose of "eliminat[ing] discrimination and recompens[ing] those who have suffered from it." *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981) (cleaned up). The District Court specifically enjoined "Defendants from discriminating against Southwest flight attendants for their religious practices and beliefs, including—but not limited to—those expressed on social media and those concerning abortion."[172]

The "district court must … exercise its [Title VII] discretion … to ensure that discrimination does not recur." *Spencer v. Gen. Elec. Co.*, 894 F.2d 651, 660 (4th Cir. 1990) (citations omitted). "[I]njunctive relief is mandatory in the wake of a Title

---

[171] TWU Br. 35-37. Southwest failed to raise that argument and has waived it. *See supra* at 26.
[172] ROA.23-10836.8954 (¶¶ 5-6).

VII violation 'absent clear and convincing proof of no reasonable probability of further noncompliance with the law." *EEOC v. Boh Bros. Constr. Co., L.L.C.*, 731 F.3d 444, 469-70 (5th Cir. 2013) (quoting *EEOC v. Serv. Temps Inc.*, 679 F.3d 323, 338 n.51 (5th Cir. 2012) (other citations omitted)); *See also* 42 U.S.C. § 2000e-5(g).

The District Court found that the Defendants were likely to repeat Title VII violations in the future.[173] While TWU asserts that the District Court's injunctions are overbroad it fails to explain why the injunctions are excessive and unnecessary to prevent its future religious discrimination violating Title VII. *See Boh Bros.*, 731 F.3d at 469-70.

The District Court found that "[t]hroughout this case—and especially in their briefing regarding the [motion for entry of judgment]—Defendants have repeatedly failed to appreciate the problem with their conduct involving Carter."[174] The District Court noted that the jury "found the Defendants were grossly intolerant of their flight attendants' speech in violation of federal law" and noted that they "appear to be monitoring other flight attendants as well, especially regarding a Facebook group with 1,600 members dedicated to sharing transcripts and depositions from this trial."[175] The District Court correctly concluded that "the policies of Title VII require

---

[173] ROA.23-10836.8947-49.
[174] ROA.23-10836.8948.
[175] ROA.23-10836.8948.

the Court to prohibit that conduct more broadly, especially when the Defendants appear poised to repeat it with other flight attendants."[176]

TWU's non-Title VII cases are inapposite to Title VII's broader-reaching remedies for religious discrimination, which are necessary to protect all employees under the Act.[177] *Meyer*, 661 F.2d at 373. "[I]n Title VII cases … the proceeding takes on a public character in which remedies are devised to vindicate the policies of the Act, not merely to afford private relief to the employee." *Gordon v. JKP Enters., Inc.*, No. 01-20420, 2002 WL 753496, at *7 (5th Cir. Apr. 9, 2002) (cleaned up).

While TWU suggests that the Norris-LaGuardia Act (29 U.S.C. § 101 *et seq.*) prohibits Title VII injunctive relief against unions, that is wrong.[178] Title VII expressly states that the NLGA "shall not apply with respect to civil actions brought under this section." 42 U.S.C. § 2000e-5(h); *Culpepper v. Reynolds Metals Co.*, 421 F.2d 888, 894 (5th Cir. 1970). TWU also asserts that the District Court's injunction "has no time constraint," but it does not cite any authority or argument why that is impermissible in this Title VII context.[179] While TWU argues that former president Stone is no longer a union officer,[180] the jury found that *TWU* violated Carter's Title

---

[176] ROA.23-10836.8948.
[177] TWU Br. 35-37.
[178] TWU Br. 36.
[179] TWU Br. 36.
[180] TWU Br. 37.

VII rights, and that the former president acted in her official capacity for the union, which decision the union did not contest.[181]

## II. Southwest and TWU violated Carter's RLA-protected rights.

The Court should affirm the District Court's judgment and jury verdict because (A) Fifth Circuit precedent required Carter to show that her RLA-protected activity was a substantial or motivating factor for Southwest and TWU's unlawful retaliation, which showing itself proved the requisite "animus;" and (B) the District Court correctly instructed the jury in accordance with Supreme Court and other federal court precedent that Carter's speech and activities opposing her union's representation did not exceed their RLA protection even if the employer and union considered it "offensive."

### A. Carter showed that Southwest and TWU retaliated against her exercise of RLA-protected rights.

Contrary to Southwest's characterizations,[182] the District Court instructions for Carter's RLA retaliation claim correctly required her to prove that her RLA-protected union opposition activities were a substantial or motivating factor in Southwest's termination of her employment and TWU's attempt to discipline her, and did not require showing any additional "anti-union animus."[183]

---

[181] ROA.23-10836.8565.
[182] SWA Br. 75-83.
[183] ROA.23-10836.8505-06; ROA.23-10836.8567-68; ROA.23-10836.8572-73.

Under Fifth Circuit RLA retaliation precedent, "animus" means "that the employee's protected conduct was a substantial or motivating factor in the adverse action." *Roscello v. Sw. Airlines Co.*, 726 F.2d 217, 222 (5th Cir. 1984) (citation omitted). "[R]etaliatory discharge of a single employee" exercising RLA-protected rights is the evidence of animus. *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pacific R.R. Co.*, 31 F.4th 337, 342-43 (5th Cir. 2022) (citations omitted).

A motivation based on union activity "invalidates even a discharge which could be justified on independent grounds." *See BLET*, 31 F.4th at 347 (citation and quoted case omitted)); *see also Lebow v. Am. Trans Air, Inc.*, 86 F.3d 661, 665-667 (7th Cir. 1996) (base manager's statement that employee "was in trouble because of his union [organizing] activities qualifies as evidence of animus under any definition"). Notably, Southwest waived its "anti-union animus" objection because it failed to object to the District Court's substantial and motivating factor instruction.[184]

Contrary to Southwest's arguments,[185] Carter, a nonmember union objector who was opposing the union, did not have to show Southwest's "anti-union animus" (i.e., animus *against* TWU) to establish her RLA-protected rights, especially where Southwest executed the TWU President's wishes to discipline Carter. The RLA

---

[184] *See supra* at 25-26; ROA.23-10836.13193-97 (1873:12-1877:11).
[185] SWA Br. 75-76, 82.

equally protects Carter's Section 152 (Third) and (Fourth) rights as a nonmember employee from employers and unions who try to harm union opponents. *Steele*, 323 U.S. at 198-99; *Vaca v. Sipes*, 386 U.S. 171, 177-78 (1967).

Southwest's "anti-union animus" requirement is improper because it discriminates against nonmember employees' RLA-protected rights, contradicts the RLA's plain statutory text, and would require this Court to invalidate the RLA's exclusive bargaining representation scheme. *Id*. The Fifth Circuit has rejected Southwest's notion, framing the protection broadly as whether the "*employee's protected conduct*" (not the employee's pro-union conduct) was a substantial or motivating factor in the adverse action. *Roscello*, 726 F.2d at 222 (citations omitted) (emphasis added).

While Southwest argues that the District Court should have dismissed Carter's RLA-retaliation claim at the motion to dismiss stage because Carter did not *prove* Southwest's animus when it fired her, the District Court allowed Carter's Count IV RLA retaliation claim to proceed because that claim *alleged* animus.[186] As the District Court observed, Southwest never objected to trying Carter's RLA retaliation claim at trial, so even if Southwest was right (and it is not), it tried the claim by consent.[187]

---

[186] ROA.23-10836.10415.
[187] ROA.23-10836.10415.

Contrary to Southwest's characterizations,[188] Carter did not arbitrate her RLA claims, which were not subject to arbitration and which the arbitrator himself said he could not reach.[189] Carter arbitrated whether Southwest had just cause to fire her under the collective bargaining agreement, which was separate and independent from enforcing her federal statutory rights. *BLET*, 31 F.4th at 345.[190]

For Carter's Count IV retaliation claims, the District Court instructions required Carter to show that Southwest fired Carter and TWU caused her to be fired, and Carter's RLA-protected activities were a "substantial or motivating factor" for her termination. *See Roscello*, 726 F.2d at 222 (citation omitted);[191] *Brady v. Trans World Airlines, Inc.*, 401 F.2d 87, 102 (3d Cir. 1968) (footnote omitted) (holding that unions are liable under the RLA Sections 2 (Fourth) and (Eleventh) "for their actions in procuring a discharge which violates the employee[] statutory rights").

Carter also showed Southwest's and TWU's "animus" at trial by proving to the jury, in accordance with the District Court's instructions (which defendants do not contest in that regard) that the RLA protected Carter's speech and association activities when she sent her private Facebook messages and videos to TWU

---

[188] SWA Br. 81.
[189] ROA.23-10836.3156 n.2.
[190] *See also infra* at 70-72.
[191] ROA.23-10836.8505-06.

President Stone,[192] and that her RLA-protected activity was a "substantial or motivating" factor for Southwest's and TWU's termination of her employment.[193]

### 1. The RLA protects Carter's nonmember speech and association activities opposing the union's representation and advocating for the removal of union officers.

The District Court correctly instructed the jury that RLA Section 152 (Third) and (Fourth) protect employees' union opposition activities.[194] Southwest waived its arguments because it failed to raise them in objections to the court's instructions.[195] The RLA protects employees' speech and activities opposing union representation, advocating for the removal of union officers, and objecting to the union's use of forced fees on its political activities. The RLA's protection of employees' union organizing rights also protects *re-organizing* rights, which includes advocating for removing union leadership and initiating decertification proceedings to remove union representatives completely. The RLA "forbid[s] *any* limitation upon freedom of association among employees" and "provide[s] for the complete independence … of employees in the matter of self-organization." 45 U.S.C. § 151a (2)-(3) (emphasis added). Freedoms of association shield dissident speech and expression *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts v. U.S.*

---

[192] *See* SWA Br. 76-80.
[193] *See* SWA Br. 83-86.
[194] ROA.23-10836.8504-06.
[195] SWA Br. 76-83; ROA.23-10836.13193-97 (1873:12-1877:11).

*Jaycees*, 468 U.S. 609, 622 (1984)); *McDonald v. Longley*, 4 F.4th 229, 245 (5th Cir. 2021) ("[T]he right to freedom of association is part of the freedom of speech.").

The Fifth Circuit recognized in *Russell v. National Mediation Board* that

> the implicit message throughout the [RLA] is that the "complete independence" of the employees necessarily includes the right to reject collective representation. Indeed, the concept of "complete independence" is inconsistent with forced representation, most especially when that forced representation is at odds with employees' will and desires.

714 F.2d 1332, 1343 (5th Cir. 1983) (footnote omitted); *BRAC v. Ass'n for the Benefit of Non-Contract Emps.*, 380 U.S. 650, 669 n.5 (1965).

RLA Section 2 (Fourth) states:

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing…. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees ... or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization[.]

45 U.S.C. § 152 (Fourth). RLA Section 2 (Third) also states that representatives "shall be designated by the respective parties [*i.e.*, employees] without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives." 45 U.S.C. § 152 (Third).

The Supreme Court has recognized that employees' rights "to form, join or assist

labor organizations" [and their rights *not* to do so]—expressly guaranteed in RLA Section 152 (Fourth)—are "[t]he primary source of protection for union freedom of speech." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 277 (1974) (footnote omitted).

Employees' RLA Section 152 (Fourth) rights—self-organization, "organiz[ing] and bargain[ing] collectively… through representatives of their own choosing," and "join[ing], organiz[ing], or assist[ing] in organizing the labor organization of their choice" (which includes employees' choice to remove their union or have no union at all)—protect employee freedoms to oppose their unions and engage in dissident speech and activities opposing union representation "without interference, influence, or coercion." 45 U.S.C. § 152 (Third) and (Fourth).

Those rights are nearly identical to employee rights under Section 7 of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing," and "to refrain from any or all of such activities" 29 U.S.C. § 157.

The Fifth Circuit has affirmed that these employee rights encompass "the right of employees to oppose the policies and actions of their incumbent union leadership and to seek to persuade other employees to take steps to align the union with these opposing views." *Mobil Expl. and Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 240

(5th Cir. 1999). "[I]nherent in [the employee's right to self-organization] is the privilege of protest and persuasion of others. Without this, effective employee representation becomes a nullity." *Id.* (quoting *Red Cab, Inc.*, 194 N.L.R.B. 279, 290 (1971) (other citations omitted).

The U.S. Supreme Court recognized that Congress preserved voluntary unionism in the RLA, that compulsory unionism cannot impair nonmember employees' freedoms of association and expression. *See Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 767-68 (1961). When Congress compels employees' association with exclusive collective bargaining representatives, as it did under the RLA, the individual

> should not be forced to surrender any matters of conscience, belief, or expression. He should be allowed to enter the group with his own flag flying, whether it be religious, political, or philosophical; nothing that the group does should deprive him of the privilege of preserving and expressing his agreement, disagreement, or dissent, whether it coincides with the view of the group, or conflicts with it in minor or major ways; and he should not be required to finance the promotion of causes with which he disagrees.

*Id.* at 776 (Douglas, J., concurring); *see also Shea v. Int'l Ass'n of Machinists and Aerospace Workers*, 154 F.3d 508, 513 (5th Cir. 1998).

Contrary to Southwest's characterizations,[196] Southwest's and TWU's violation of Carter's federal RLA, Title VII, and duty of fair representation rights are not

---

[196] SWA Br. 76, 80-81.

internal union matters. "'Internal union matters' concern disputes "involving the interpretation and application of a union constitution." They do not "extend to issues 'in the public domain and beyond the internal affairs of the union.'" *Clayton v. UAW*, 451 U.S. 679, 688 (1981).

Carter's RLA, Title VII, and duty of fair representation claims involve Southwest's and TWU's violation of her federal statutory rights, and have nothing to do with internal union rules. RLA Sections 152 (Third) and (Fourth) protect the rights of *all carrier employees*, including union nonmembers like Carter. 45 U.S.C. § 151 (Fifth); 45 U.S.C. 152 (Third) and (Fourth); *see also Steele*, 323 U.S. at 198; *Vaca*, 386 U.S. at 177-78; *Shea*, 154 F.3d at 513; *Brady*, 401 F.2d at 102 (footnote omitted).

### 2. Carter's RLA-protected activities were a substantial or motivating factor for Southwest's and TWU's adverse actions against her.

Carter showed at trial that she engaged in RLA-protected representation and re-organizing speech and association activity opposing TWU's and President Stone's representation addressing her support for the recall campaign to remove President Stone and other TWU officers from leadership. *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 882 (9th Cir. 2002) (recognizing "[t]here is no dispute" that employees' critical website publications constitute RLA-protected organizing activity under the RLA).

Carter also showed that her RLA-protected union opposition activities were *both* "substantial" *and* "motivating" factors for Southwest's termination of her employment and TWU's reporting her for discipline.[197] Southwest failed to show that no reasonable jury could agree. Southwest does not contest the jury's decision that Southwest and TWU failed to prove that they would have discharged Carter even if she had not engaged in RLA-protected activity.[198]

### B. Carter's RLA-protected activities did not exceed the Act's protection.

#### 1. The District Court correctly instructed the jury on vigorous speech protection for union opposition and representation speech in accordance with Supreme Court and federal court precedent.

Contrary to Southwest's and TWU's arguments,[199] the District Court correctly instructed the jury that "[a]ctivity that is intemperate, abusive, insulting, or hyperbolic is protected activity under [RLA] Section 152 (Third) and (Fourth)" and that "[a]ll union-oppositional-and-organizational activity is protected under Section 152 Third and Fourth unless it (1) constitutes a threat of violence or (2) is a false statement made with knowledge of its falsity or with reckless disregard for the truth."[200]

---

[197]    ROA.23-10836.8505-06; ROA.23-10836.8567-68; ROA.23-10836.8572-73; ROA.23-10836.15007; ROA.23-10836.15002-03; ROA.23-10836.14774-14781; ROA.23-10836.14905-39.

[198] ROA.23-10836.8573; ROA.23-10836.8568.

[199] SWA Br. 83-86; TWU Br. 21-25.

[200]    ROA.23-10836.8506. Contrary to TWU and Southwest's characterizations, the jury instructions did not protect violent speech or activity. ROA.23-10836.8506; SWA Br. 83, 85; TWU Br. 22. While Carter's messages to the union were not violent, the jury instructions made

The U.S. Supreme Court and other federal courts have recognized that the RLA Section 152 (Fourth) rights "to form, join, or assist labor organizations" and "not to join or remain members of any labor organization," which mirror NLRA Section 7's statutory language, are "the primary source" for employees' freedom to engage in "uninhibited, robust, and wide-open debate in labor disputes." *Austin*, 418 U.S. at 273-74, 277; *see also* 29 U.S.C. § 157.

Those RLA rights protect employees' union representation and re-organization speech even if others consider their speech to be "intemperate, abusive," or "insulting," *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 61 (1966). The Supreme Court has held federal labor statutes' protections for this "[v]igorous exercise" of the right to persuade other employees in union representation matters must not be stifled by the threat of liability under state libel and defamation laws, including "for the overenthusiastic use of rhetoric or the innocent mistake of fact." *Austin*, 418 U.S. at 277. If state libel and defamation laws cannot stifle protected RLA speech and activity, employer policies leading to discipline and termination cannot do so either.

In *Austin*, the U.S. Supreme Court explained "[l]abor disputes are ordinarily heated affairs" but "[w]ide latitude for what is written and said in election campaigns

---

clear that unlawful activity such as violence would not be protected. If the jury had believed they even conveyed a threat of violence, Carter's activities would have lost protection.

is necessary to insure the free exchange of information and opinions." 418 U.S. at 272, 277 n.12 (citation omitted). The Supreme Court recognized that the "freewheeling use of the written and spoken word … has been expressly fostered by Congress, and approved by the NLRB." *Id.* at 272.

The RLA provides the same vigorous *Austin* speech protections. *See Konop*, 302 F.3d at 882 n.10 ("We see no reason why the rule announced in *Linn* [and applied in *Austin*] … regarding protected activities, should not apply in the context of the RLA.") (cleaned up); *id.* (applying the *Austin* rule to determine whether employee's RLA-protected activity lost its protection and finding it did not); *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1191-92 (11th Cir. 1999).

Consistent with *Austin*, the Supreme Court's RLA precedent prohibits unions and employers from diminishing constitutional protections to nonmember employees' RLA Section 152 (Fourth) union-oppositional-and-organizational rights. The Court's *Steele* decision demonstrates that RLA Sections 152 (Third) and (Fourth) guarantee protections to union opposition and representation activities commensurate with First Amendment rights. The RLA imposes "constitutional limitations on [unions'] power to deny, restrict, destroy, or discriminate against ... [employees'] rights." *Steele*, 323 U.S. at 198. The RLA "would bear the stigma of unconstitutionality" if Congress conferred exclusive bargaining representative power on unions and authorized them "to ignore rights guaranteed by the

60

Constitution." *Id.* at 208 (Murphy, J., concurring).[201]

### 2. Carter's nonmember union opposition and representation speech and activities were directed solely to the TWU President and did not exceed RLA protection.

Carter's private Facebook videos showing an aborted baby—sent to TWU's president in response to the union's participation in the Women's March and other activities—did not exceed the RLA's protection just because the company and union considered them "offensive."[202] When speech is protected it is a "bedrock principle" that the expression of ideas may not be prohibited even if "society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "[T]he point of all speech protection … is to shield just those choices of content that in someone's eyes are misguided or even hurtful." *Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. Of Boston, Inc.*, 515 U.S. 557, 574 (1995).

When anyone restricts speech "based on its perception that the speech will spark fear among or disturb its audience, such regulation is by definition based on the speech's content." *Marcavage*, 609 F.3d at 282 (footnote omitted); *FCC v. Pacifica Found.*, 438 U.S. 726, 745 (1978) (stating that if the speaker's opinion gives offense that is the reason for protecting it); *cf. Brazos Valley Coal. For Life, Inc. v. City of Bryan*, 421 F.3d 314, 326 (5th Cir. 2005) (recognizing that protected speech cannot

---

[201] Notwithstanding Southwest's and TWU's arguments about counsel's closing statement, he addressed the correct jury instructions, and they failed to object to that statement at trial. SWA Br. 50, 85; TWU Br. 22-25.

[202] SWA Br. 29, 71-72; TWU Br. 19.

be restricted "out of a concern for the discomfort it might elicit in listeners.") (citations omitted).

Federal courts have also recognized that pro-life signs bearing images of aborted babies constitute protected speech, and the fact that the messages conveyed by those communications may be offensive to their recipients does not deprive them of protection. *See Hill v. Colorado*, 530 U.S. 703, 715 (2000); *Swagher v. Neighoff*, 398 F. App'x 872, 881 (4th Cir. 2010); *Marcavage*, 609 F.3d at 282; *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821-22 (6th Cir. 2007).

Carter's videos and messages were not obscene. *See Miller v. California*, 413 U.S. 15, 24 (1973) (obscene materials depict or describe sexual conduct and exclude those which, taken as a whole, do not have serious literary, artistic, political, or scientific value); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792-93 (2011) (recognizing that obscenity is not whatever someone finds shocking, but only depictions of sexual conduct); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 54 (1988); *Konop*, 302 F.3d at 883 (finding rhetorical hyperbole protected by the RLA and federal labor laws).

Carter's videos of the aborted baby have "religious, political, scientific, and educational" value, particularly here because Carter was trying to show TWU and President Stone that an aborted baby was a human life.[203] Carter's Facebook message

---

[203] ROA.23-10836.14749-50.

depicting Women's March participants who wore vagina costumes did not lose its RLA protection because it responded to TWU's own ideological message and its use of Carter's forced union fees to support the union's political and ideological activities at the Women's March, including how it represented forced fee-paying flight attendants by donning the symbolic pink hats.[204] Carter sent all these union dissident communications to President Stone via private Facebook messages, and did not send them to any other Southwest employees.[205] Carter never criticized Southwest management in her communications to President Stone, which concerned only the union and its activities.[206]

### 3. The NLRB has re-affirmed *Austin* protections for employee speech, and the Board's policy-based precedent of applying workplace restrictions on "offensive" speech is inapposite where the RLA prohibits "any limitations" on RLA-protected rights and Carter's speech did not affect the workplace.

The District Court correctly refused Southwest's requested jury instruction to shoehorn NLRB precedent limiting speech in the workplace to employees' RLA-protected rights. When the *Austin* Supreme Court reviewed an executive order guaranteeing the same rights as RLA Section 152 (Fourth) to Federal employees it applied vigorous speech protection based on those rights where the law's plain text

---

[204] ROA.23-10836.14751.
[205] ROA.23-10836.12002 (803:6-10); ROA.23-10836.12569; 12619-20 (1291:10-15; 1341:25-1342:4); ROA.23-10836.13086-87 (1766:13-1767:7); ROA.23-10836.13085 (1765:6-22); ROA.23-10836.12667 (1389:11-23); ROA.23-10836.12569 (1291:16-23); ROA.23-10836.3834 (221:13-16); ROA.23-10836.14749-73.
[206] ROA.23-10836.14749-73.

contained nothing "intended to restrict in any way the robust debate which has been protected under the NLRA." *Austin*, 418 U.S. at 275.

The RLA expressly prohibits "any limitation" on employees' freedoms of association, contains no restriction on union opposition speech and activities.[207] As in *Austin*, there is no statutory basis in the RLA for limiting or balancing RLA speech and activities opposing union representation. 45 U.S.C. §151a (2); 45 U.S.C. § 152 (Fourth). The District Court also correctly recognized that there was no Supreme Court or Fifth Circuit precedent for grafting Southwest's proposed limitation from that NLRB policy onto the RLA.[208]

Contrary to Southwest's and TWU's characterizations,[209] the Ninth Circuit's *Konop* decision did apply *Austin* and *Linn*'s vigorous speech protections to RLA-protected rights. While *Konop* speculated, in dicta, that some union organizing activity *may* be so intolerable that it loses RLA protection, it was not clear to the court whether the employer was making that argument. 302 F.3d at 883 n.11. The District Court, as in *Konop*, did not confront that situation, and it recognized that it would not have been proper to import that limitation from the NLRA without any statutory basis in the RLA for doing so.[210]

---

[207] ROA.23-10836.13203-05 (1883:17-1885:8); ROA.23-10836.10413.
[208] ROA.23-10836.13203-05 (1883:17-1885:8); ROA.23-10836.10413.
[209] SWA Br. 83.
[210] ROA.23-10836.863.

Contrary to Southwest's characterizations,[211] the NLRB did not overrule or modify the Supreme Court's *Austin* and *Linn* decisions. While the NLRB could not overrule the Supreme Court decisions, it recently re-affirmed them as controlling law. *Lion Elastomers LLC*, 372 N.L.R.B. No. 83, at \*5, 5 n.23 (2023). NLRB precedent rejects the same speech and association limitations that Southwest and TWU seek to engraft here. Southwest and TWU also rely on the NLRB's *Atlantic Steel* decision,[212] but that case reflects NLRB policy decisions regarding employer rights to manage employee speech and activities *in the workplace*. *Lion Elastomers*, 372 N.L.R.B. No. 83, at \*1; *Atlantic Steel Co.*, 245 N.L.R.B. 814, 816 n.12, 816-17 (1979) (governing employees' conduct towards management in the workplace).

It does not make sense in this case to engraft fact-specific NLRB precedent's limitations restricting offensive speech in the workplace because Carter's activities never reached or impacted the workplace.[213] Unlike Southwest and TWU's inapposite cases, Carter did *not* direct her RLA speech at the company, and it had *no* adverse effect on the workplace.[214] Carter never criticized Southwest management in her communications to President Stone, which concerned only the union and its activities, and Carter's speech never affected the employer's ability to control the

---

[211] SWA Br. 50, 86; TWU Br. 24.
[212] SWA Br. 84, 86; TWU Br. 24.
[213] ROA.23-10836.13203-05 (1883:17-1885:8); ROA.23-10836.12357 (1121:18-20); ROA-10836.10413; SWA Br. 86.
[214] ROA.23-10836.14749-14773.

workplace.[215]

## III. The District Court should not have dismissed Carter's RLA interference/coercion claim against Southwest.

While the Court should affirm the District Court judgment and jury verdict on Carter's Count IV RLA retaliation claim, it should reverse the District Court's dismissal of her Count I RLA interference claim against Southwest.[216] The District Court's February 2019 order erred because (A) unlike the Count IV RLA retaliation claim, Carter's Count I RLA interference claim did not need to plead "anti-union animus" to enforce her RLA-protected statutory rights from Southwest interference and coercion; and (B) Carter could not enforce her RLA-protected federal statutory rights in Southwest's CBA arbitration process.

### A. Carter's Count I RLA interference claim did not have to allege animus.

The District Court should not have dismissed Carter's Count I RLA interference/coercion claim because Southwest's termination of Carter's employment coerced and influenced her RLA-protected rights irrespective of Southwest's motive. RLA Section 152 (Fourth) expressly prohibits employers from "influenc[ing] or coerc[ing] employees in an effort to induce them to join or remain

---

[215] ROA.23-10836.12002 (803:6-10); ROA.23-10836.12569; 12619-20 (1291:10-15; 1341:25-1342:4); ROA.23-10836.13086-87 (Tr.1766:13-1767:7); ROA.23-10836.13085 (Tr.1765:6-22); ROA.23-10836.12667 (1389:11-23); ROA.23-10836.12569 (Tr.1291:16-23); ROA.23-10836.3834 (221:13-16).
[216] ROA.23-10836.642-44 (¶¶76-83); ROA.23-10836.647-49 (¶¶101-111); ROA.23-10836.1023 (¶¶93-102).

[union] members." 45 U.S.C. § 152 (Fourth). No evidence of animus or motive is required to prove interference and coercion of RLA-protected rights. *See Radio Officers' Union of Com. Telegraphers Union v. NLRB*, 347 U.S. 17, 50-51 (1954).

The Supreme Court has recognized that when employer conduct influences or coerces employees with respect to their union non-membership status the unlawful discriminatory motives are inferred from the adverse action's inherent tendency to encourage union membership, and no other evidence is required. *Id*. The Court reasoned that "[s]pecific proof of intent is unnecessary where employer conduct inherently encourages or discourages union membership[,]" which "is but an application of the common law rule that a man is held to intend the foreseeable consequences of his conduct." *Id.* at 45. The Court recognized that discharges and discipline of employees under company rules that prohibited protected activities were unlawful even though the employer action was not motivated by any bias or discrimination in enforcing the rule. *Id.* (citations omitted); *see also NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 22-23 (1964).

Carter's Count I interference claim against Southwest did not require her to allege that Southwest was motivated by her RLA-protected activity when terminating her employment inherently interfered with and coerced her exercise of RLA-protected rights as a nonmember objector opposing the union. Even if Southwest did not intend to terminate Carter for her RLA-protected activity,

Southwest's termination inherently interfered with and coerced Carter's rights to oppose the union and its president.[217]

The Fifth Circuit has recognized that "[t]he animus exception is rooted in [RLA Section 152], which provides that no carrier 'shall in any way interfere with, influence, or coerce' employees in their 'choice of representatives.'" *BLET*, 31 F.4th at 343 (citation and footnote omitted). "That requirement and similar provisions of the RLA are judicially enforceable because noninterference with employees' chosen representation is a statutory right crucial to the Act's functioning." *Id.* (citing *Virginian Ry. Co. v. Sys. Fed'n*, 300 U.S. 515, 545-46 (1937); *Texas & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 569 (1930)).

Nothing in the RLA's statutory text limits nonmember employees' Section 152 (Fourth) rights to a precertification context, or contemplates that they lose their RLA protections once a union is certified. Not only does the RLA protect employees' pre-certification rights to "organize" unions, but it also protects employees' *post*-certification rights to *continuous* "self-organization" and "re-organization" campaigns, such as engaging in decertification proceedings to remove unwanted unions, and other efforts to remove unwanted union representatives. "*[I]t is inconceivable that the right to reject collective representation vanishes entirely if*

---

[217] ROA.23-10836.8505-06; ROA.23-10836.8567-68; ROA.23-10836.8572-73; ROA.23-10836.15007; ROA.23-10836.15002-03; ROA.23-10836.14774-14781; ROA.23-10836.14905-39.

*the employees of a unit once choose collective representation.*" *See Russell*, 714 F.2d at 1345 (emphasis in original) (citations omitted). The Court should not erase nonmember employees' RLA-protected rights from the statutory text post-union certification, based on dicta in *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 440 (1989).

For nearly a century, the Fifth Circuit and U.S. Supreme Court have repeatedly recognized that employees can enforce their RLA statutory rights and stop employer and union violations post-certification (without any heightened post-certification animus pleading requirement), and that federal courts can remedy employers' and unions' violations of employees' statutory rights and duties after certification. *See Street*, 367 U.S. at 773-74; *Steele*, 323 U.S. at 207-08; *Ellis v. Bhd. of Ry., Airline and S.S. Clerks*, 466 U.S. 435, 465-66 (1984); *Texas & N.O.R.*, 281 U.S. at 569; *Virginian Ry. Co.*, 300 U.S. at 541-52; *Switchmen's Union of N. Am. v. NMB*, 320 U.S. 297, 300 (1943); *Shea*, 154 F.3d at 513.

### B. Carter could not enforce her RLA-protected rights in arbitration.

Contrary to the District Court's order dismissing Count I,[218] Carter could not submit her RLA claims to the arbitrator. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 255 (1994) (arbitration decisions quoted therein). Carter's enforcement of her RLA-protected rights under Sections 152 (Third) and (Fourth) was a separate

---

[218] ROA.23-10836.860-61.

and independent cause of action from arbitrating whether Southwest had just cause to fire her under the CBA. Claims are not "minor disputes," and therefore not subject to arbitration when they seek to enforce statutory rights separate and independent from the CBA. *See Hawaiian Airlines*, 512 U.S. at 258; *Grimes v. BNSF Ry. Co.*, 746 F.3d 184, 191 (5th Cir. 2014); *Carmona v. Sw. Airlines Co.*, 536 F.3d 344, 349 (5th Cir. 2008); *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 783-84 (5th Cir. 2012) ("[T]he assertion of any right that is not created by a CBA is … not subject to binding arbitration under the statute." (quoting *CareFlite v. Off. and Pro. Emps. Int'l Union*, 612 F.3d 314, 320–21 (5th Cir. 2010) (Dennis, J., concurring)).

The Fifth Circuit reasoned that "a statutory right [is] neither created nor defined by the parties' contract[.]" *BLET*, 31 F.4th at 345. The Court recognized that "but for the general jurisdiction of the federal courts there would be no remedy to enforce the *statutory commands* which Congress has written into the [RLA]." *BLET*, 31 F.4th at 345 (quoting *Switchmen's Union*, 320 U.S. at 300) (emphasis added). The "RLA's mechanism for resolving minor disputes does not pre-empt causes of action to enforce rights that are independent of the CBA." *BLET*, 31 F.4th at 345 (quoting *Hawaiian Airlines*, 512 U.S. at 256). Carter's nonmember objector rights to oppose her union representative are statutory ones that the CBA could not resolve.

Carter showed that CBA arbitration remedies could not enforce her RLA-interference/coercion claim, and the District Court agreed in the same order

70

dismissing that claim.[219] The District Court agreed, consistent with Fifth Circuit precedent, that CBA arbitration remedies were not adequate to protect the same RLA-protected rights.[220] The District Court also correctly recognized that Carter's RLA claims were separate and independent from the claims presented to the arbitrator (i.e., whether the company had "just cause" to fire her under the CBA).[221] The District Court ruled—by allowing Carter's Count IV RLA retaliation claim to proceed—that her RLA interference claim was also properly before the federal court, not the arbitrator. Even the arbitrator conceded that he could not consider any of Carter's RLA speech and association rights: "[T]hat the Grievant … has exercised her Railway Labor Act … rights, [is] *not germane to my determination of just cause for her termination*."[222] While the District Court also characterized Carter's RLA interference/coercion claim as an internal union dispute, that is also incorrect for the same reasons explained *supra*.[223] The District Court should not have dismissed Carter's Count I RLA interference/coercion claim.

## IV. **TWU breached its duty of fair representation to Carter.**

TWU did not contest the District Court's jury instructions regarding Carter's duty of fair representation claim, or the jury's determination that TWU breached the

---

[219] ROA.23-10836.852-53.
[220] ROA.23-10836.851-53.
[221] ROA.23-10836.852-53.
[222] ROA.23-10836.3156 n.2 (emphasis added).
[223] ROA.23-10836.860; *supra* at 57.

union's duty.[224] TWU's sole argument is that the union cannot violate its duty if Carter was not engaged in protected activity.[225] Carter has already showed she engaged in protected activity. Even if she had not shown that (which she has), the District Court's instructions and federal law did not require Carter to show that she engaged in protected activity to succeed on her duty of fair representation claim against the union. Federal law presumes that a union breaches the duty of fair representation it owes an employee when it causes a represented employee's discharge. *See e.g., Caravan Knight Facilities Mgmt., Inc.*, 362 N.L.R.B. 1802, 1805 (2015); *Acklin Stamping Co.*, 351 N.L.R.B. 1263, 1263 (2007); *Graphic Commc'ns Loc. 1-M (Bang Printing, Inc.)*, 337 N.L.R.B. 662, 673 (2002); *see also Roscello*, 726 F.2d at 221 ("[T]he union's duty of fair representation has been the same duty whether the union involved is covered by the NLRA or the RLA.").

When the TWU President turned Carter in for discipline, TWU had the burden to rebut that presumption and show it acted in good faith, based on rational considerations, or its complaint was linked in some way to the union's need to represent its constituency as a whole.[226] TWU failed to show that no reasonable jury could find that the union did not rebut the presumption that it violated federal law by attempting to discipline Carter.[227]  Carter also presented evidence showing (and

---

[224] TWU Br. 25-26.

[225] *Id*.

[226] ROA.23-10836.8503-04.

[227] TWU Br. 25-26.

the jury could find) that the union's arbitrary, discriminatory, and bad faith conduct violated the duty of fair representation without a determination that she was engaged in protected activity.[228]

## V. The District Court's Contempt Order ensures Southwest's compliance following its willful violations of the court's Notice Order.

This Court should affirm the District Court's Contempt Order[229] because Southwest *willfully* violated that court's December 5, 2022 Notice Order[230]—and did not even contest the District Court's *ex parte* addendum order finding that Southwest's and its attorneys' violations of that order was *willful*.[231] This Court should also uphold the District Court's Contempt Order because (A) Southwest did not substantially comply with the Court's order—it willfully violated the order and did the opposite of what the court required, (B) Title VII training is a commonplace civil contempt sanction within the courts' inherent powers, and (C) the Contempt Order does not violate Southwest's First Amendment speech rights.

### A. Southwest's willful misrepresentations did not "substantially comply" with the District Court's Notice Order.

Southwest's *willful* misrepresentations regarding the District Court's Notice Order (stating "does not" discriminate when the Court ordered "may not" discriminate), and undermining it with the contemporaneous IIOTG Memo, did not

---

[228] ROA.23-10836.8502-04.
[229] ROA.23-10836.10641-10699.
[230] ROA.23-10836.8955, ¶10; ROA.23-10836.9442; ROA.23-10836.9444.
[231] ROA.23-10836.10647; 10651; 10653; 10656; 10660.

substantially comply with the order. A party is under an obligation to comply with a court order in all 'meaningful respects' to achieve substantial and diligent compliance." *Bisous Bisous LLC v. The CLE Group, LLC*, Civil Action No. 3:21-CV-1614-B, 2021 WL 4219707, *2 (N.D. Tex. Sept. 16, 2021) (citations omitted).

The District Court gave Southwest clear and specific orders "to inform Southwest flight attendants that, under Title VII, the Defendants may not discriminate against Southwest flight attendants for their religious practices and beliefs, including—but not limited to—those expressed on social media and those concerning abortion."[232] *See Hornbeck Offshore Servs., L.L.C. v. Salazar*, 713 F.3d 787, 793 (5th Cir. 2013).

With Southwest's decision to do the exact opposite of what the District Court ordered in its Notice Order and to make contemporaneous misleading statements to all its flight attendants in the IIOTG Memo, the company cannot meet its burden to show that it substantially complied with the Court's order to inform flight attendants that under Title VII it "may not discriminate."[233] Southwest's message did not convey to flight attendants that Southwest may not discriminate (or is prohibited from discriminating) in the future.[234] The District Court wanted flight attendants to know that Title VII prohibits Southwest from discriminating against

---

[232] ROA.23-10836.8955, ¶10.
[233] ROA.23-10836.8955, ¶10; ROA.23-10836.9442; ROA.23-10836.9444.
[234] ROA.23-10836.10648-10653.

them.[235] But Southwest never mentioned Title VII in its "does not" discriminate message to flight attendants.[236]

While Southwest argues that its emailing of the judgment and verdict to the flight attendants demonstrates substantial compliance with the Notice Order,[237] that misses the point because emailing those items was merely *one* of several of the District Court's requirements.[238] The District Court *separately* ordered Southwest to issue the notice informing flight attendants that the company "may not discriminate."[239] But the company did not do that.[240] Southwest's compliance with emailing the judgment and verdict is not substantial compliance with the separate Notice Order requirement.

**B. Title VII legal training is a commonplace civil contempt sanction within the courts' inherent powers.**

Contrary to Southwest's arguments,[241] Title VII training is a commonplace civil contempt sanction within the District Court's inherent powers to ensure Southwest's compliance with its Notice Order. Courts have broad discretionary powers to fashion civil contempt sanctions that coerce or ensure present and future compliance with court orders. *See, e.g., United States v. Lynd*, 349 F.2d 790, 793 (5th Cir. 1965); *Int'l*

---

[235] ROA.23-10836.10654-55.
[236] ROA.23-10836.9442.
[237] SWA Br. 88.
[238] ROA.23-10836.8955, ¶9.
[239] ROA.23-10836.8955, ¶10.
[240] ROA.23-10836.9442.
[241] SWA Br. 89-90.

*Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005) (citation omitted); *Chi. Tchrs. Union v. Hudson*, 475 U.S. 292, 309 n.22 (1986) ("The judicial remedy for a proven violation of law will often include commands that the law does not impose on the community at large.") (citations omitted). *In re Bradley*, 588 F.3d 254, 265-66 (5th Cir. 2009); *Hornbeck*, 713 F.3d at 792.

The public rights that a court order seeks to protect are important measures of the remedy. *Am. Airlines*, 228 F.3d at 585 (citations omitted). The District Court properly exercised its contempt power to ensure Southwest's (and its attorneys') continued discrimination and misinformation regarding employees' Title VII-protected religious liberties do not recur.

### 1. Title VII training secures Southwest's compliance by ensuring Southwest attorneys comprehend employees' Title VII-protected rights.

Contrary to Southwest's arguments,[242] Title VII training secures Southwest's compliance by ensuring its attorneys comprehend employees' Title VII-protected rights so that its misinformation of employees does not recur. When a party "does not appear to comprehend" an area of the law, legal training "in the relevant subject area" is a commonplace civil sanction and an appropriate remedy. *Edmonds v. Seavey*, 379 F. App'x 62, 64-65 (2d Cir. 2010). Courts may order attorneys to attend

---

[242] SWA Br. 90-91.

specific legal training and determine which training is most appropriate for the attorneys to attend. *See Roy v. Am. Pro. Mktg.*, 117 F.R.D. 687, 693 (W.D. Okla. 1987); *Petrisch v. JP Morgan Chase*, 789 F. Supp. 2d 437, 456 (S.D.N.Y. 2011). The District Court is requiring Southwest to send out new notices after receiving training.[243] The District Court recognized that "[a]rmed with a better understanding of the legal area at issue, [Southwest] can better conform its [own] conduct to the law" so that no further court intervention is necessary.[244]

The District Court concluded that Southwest and its attorneys "'do[] not appear to comprehend' [the] legal concept" of employees' Title VII religious freedoms and liberties,[245] and that "Southwest's speech and actions toward employees demonstrate a chronic failure to understand the role of federal protections for religious freedom[.]"[246] Southwest's contempt "suggested that there's no such thing as Southwest's religious discrimination" and "that Southwest may, in fact, unabashedly curtail flight attendants' religious beliefs and practices expressed in their online interactions in the name of civility."[247] The District Court also found that "Southwest habitually points to its policies as a pretext for discrimination[,]" and, in the IIOTG Memo, conveyed that "firing Carter was justified because she 'did not adhere to

---

[243] ROA.23-10836.10666-68.
[244] ROA.23-10836.10666.
[245] ROA.23-10836.10662.
[246] ROA.23-10836.10644.
[247] ROA.23-10836.10655.

Southwest policies.'"[248]

While Southwest asserts the District Court did not explain what training is required[249] that is not true. The District Court explained that the training "will offer educational background on religious liberties and the workplace—a concept that Southwest has failed to grasp at any stage of this six-year-old case."[250] The District Court's orders also show the training will address the proper relationship between Title VII and company policies so that Southwest will not violate employees' Title VII-protected religious liberties in the future.[251]

2. **Title VII training is the least severe sanction adequate to correct Southwest's misinformation and prevent it from undermining the Notice Order.**

Southwest argues that Title VII training is not the least-severe sanction because it will issue the verbatim Remedial Statement.[252] Courts impose the least severe sanction adequate to correcting the contemnor's violation while ensuring "full remedial relief." *See e.g., Topalian v. Ehrman*, 3 F.3d 931, 937 (5th Cir. 1993); *Fla. Steel Corp. v. NLRB*, 648 F.2d 233, 239 (5th Cir. 1981) (internal citations omitted). The District Court concluded, "[M]ere reissuance [of the Remedial Statement]

---

[248] ROA.23-10836.10661.
[249] SWA Br. 92.
[250] District Court Doc. 483, at 15 (cited to hereinafter as "Stay Op. __").
[251] ROA.23-10836.10660-63; Stay Op. 15. Despite Southwest's quibbles, the Contempt Order arises from Southwest's violation of notice requirements regarding employees' Title VII rights, so of course that training does not involve the First Amendment or RFRA. SWA Br. 91-92.
[252] SWA Br. 90-91.

would have little probable effectiveness against [the] harm [caused by Southwest's misinformation]."[253] The Remedial Statement "does nothing to ensure [Southwest's] compliance with the negative duty" not to undermine the court-ordered notice.[254] Thus, the District Court recognized that Title VII religious-liberty training is "a particularly apropos sanction" and "has significant probable effectiveness"[255] because it secures Southwest's compliance with the Notice Order[256] by helping Southwest and its attorneys comprehend employees' Title VII-protected religious liberties.[257] Title VII training further "'help[s] ensure that Southwest will not again attempt to undermine the Court-ordered notice with another citation to its policies' like that in the IIOTG memo."[258]

### C. The Contempt Order does not violate Southwest's First Amendment speech rights.

The Contempt Order does not violate Southwest's First Amendment speech rights because it (1) does not sanction Southwest for disagreeing with and appealing the judgment; (2) does not contain a prior restraint or speech prohibition; and (3) does not require Southwest to hear an "ideological" message.[259]

---

[253] ROA.23-10836.10655-56.
[254] Stay Op. 9.
[255] ROA.23-10836.10661-62.
[256] ROA.23-10836.10663.
[257] ROA.23-10836.10660-63.
[258] ROA.23-10836.10662.
[259] SWA Br. 92-95.

### 1. The Contempt Order does not sanction Southwest for disagreeing with and appealing the judgment.

Contrary to Southwest's arguments,[260] the Contempt Order does not sanction Southwest for "disagree[ing] with, and [asserting its] right to appeal, [the] decision[.]"[261] The Contempt Order sanctioned Southwest for willfully violating an injunction that it did not seek to stay or even appeal. The District Court sanctioned Southwest because its IIOTG Memo undermined and violated the Notice Order to inform flight attendants that, under Title VII, it may not discriminate against them for their religious practices and beliefs—including but not limited to—those expressed on social media concerning abortion.[262] Southwest's IIOTG Memo informed the flight attendants that Southwest terminated Carter for her religious messages concerning abortion, which it disparaged as "inappropriate, harassing, and offensive."[263] Southwest told flight attendants that the company's arbitrator backed Southwest's termination decision and called Carter's protected religious speech "repulsive and beyond the bounds of civility."[264] The IIOTG Memo instructed flight attendants that they "must adhere to Southwest's" social media policies, and conveyed that if they engaged in religious activities like Carter's, they would be

---

[260] SWA Br. 93-95.
[261] SWA Br. 93; ROA.23-10836.8955, ¶10.
[262] ROA.23-10836.8955, ¶10.
[263] ROA.23-10836.9444.
[264] *Id.*

subject to the same discipline.[265]

### 2. The Contempt Order does not contain a prior restraint or speech prohibition.

Contrary to Southwest's characterizations,[266] the Contempt Order does not contain prior restraints or speech prohibitions. Southwest's First Amendment objections to the Contempt Order are unavailing because they are, in fact, untimely objections to the original December 5, 2022 Notice Order, not the Contempt Order itself. Southwest never raised any First Amendment objections to that order, and never attempted to stay that order's requirements on any grounds or even appeal it now. "Because the Court ordered Southwest to make several communications and because Southwest did not seek a stay, Southwest limited what it could and couldn't say."[267] Courts may enjoin and proscribe certain conduct "without reference to the content of the … speech. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) (citing 42 U.S.C. § 2000e-2) (other citations omitted); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986)); *see also Test Masters Educ. Servs.*, 428 F.3d at 580 (citing *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).

The Contempt Order only requires Southwest to "do the training and issue the remedial notice."[268] Southwest agreed to issue the remedial notice.[269] The District

---

[265] *Id.*
[266] SWA Br. 93-94.
[267] Stay Op. at 6.
[268] Stay Op. 15.
[269] ROA.23-10836.10690.

Court expressly recognized that Southwest, in complying with the Contempt Order, "remains free to speak."[270] Nor does the Title VII training requirement "superintend[]" or "restrain" Southwest's speech.[271] Title VII legal training does not tell Southwest or its attorneys what views it must hold.[272] It just tells Southwest what is legal and what violates Title VII.

### 3. Title VII training does not require Southwest to hear an "ideological" message.

Contrary to Southwest's arguments,[273] Title VII training does not raise any First Amendment concerns because it does not require Southwest's attorneys to listen to an "ideological" message. The Contempt Order requires the three Southwest attorneys who willfully violated the Court's Notice Order and who "chronically fail" to comprehend Title VII-protected religious liberties, to attend training with Alliance Defending Freedom ("ADF") on what the Title VII law is, not normative training on what the law should be.[274]

As the District Court recognized, Southwest waived any First Amendment objection to ADF conducting the training because it did not argue it at the lower court. *See OOGC Am., L.L.C. v. Chesapeake Expl. L.L.C.*, 975 F.3d 449, 456 n.10 (5th Cir. 2020). While Southwest asserted that ADF training is "unprecedented," it

---

[270] Stay Op. 15.
[271] SWA Br. 93-94.
[272] SWA Br. 94.
[273] SWA Br. 94.
[274] ROA.23-10836.10661-63; Stay Op. 17, 17 n.56.

did not present any First Amendment arguments or objections to ADF or ADF conducting the training.[275] Southwest's appeal raises a different perfunctory objection (not made below), without showing how attending legal training with ADF implicates Southwest's or its attorney's First Amendment interests.[276]

For support, Southwest cites a single law journal article,[277] which, in fact, shows there is no First Amendment issue with Title VII compliance training. "[M]ost training programs designed to combat discrimination in the workplace easily survive *strict scrutiny*" and that such goals "are consistent with and are indeed required by laws like Title VII … and clearly represent a *compelling state interest*." Caroline M. Corbin, *The First Amendment Right Against Compelled Listening*, 89 B.U. L. Rev. 939, 1013 (2009) (emphasis added). "[P]rograms providing information about what is permissible and impermissible under the law are well tailored to achieve these goals[.]" *Id*. "[P]rogram[s] focus[ing] on compliance with anti-discrimination law" are constitutional. *Id*. at 1015.

The Fifth Circuit has recognized the Supreme Court's holding that "attorney speech may be subject to diminished First Amendment protection when it is regulated in furtherance of a substantial governmental interest." *Hersh v. United States ex rel. Mukasey*, 553 F.3d 743, 756 (5th Cir. 2008); *Gentile v. State Bar of*

---

[275] ROA.23-10836.10690.
[276] SWA Br. 94-95.
[277] SWA Br. 94.

*Nev.*, 501 U.S. 1030, 1071-1076 (1991). The District Court recognized that its Notice Order served a *compelling* interest in informing flight attendants of their present and future Title VII-protected rights.[278] The District Court selected ADF because "Southwest does not appear to understand how federal law operates to protect its employees' religious liberties,"[279] and ADF's extensive Title VII litigation experience[280] "evidenc[es] an understanding of religious liberties."[281]

While Southwest objects to sending its attorneys to ADF for legal training,[282] Southwest failed to show that ADF attorneys, as officers of the court, cannot perform legal training without interjecting their faith. Southwest suggests that courts must exclude ADF because its attorneys may have religious beliefs, but courts cannot exclude law firms, persons, or organizations from providing legal training or services just because they have religious views. *See e.g., Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017).

## CONCLUSION

For the foregoing reasons, the Court should affirm the District Court's judgment and jury verdict for Carter. While the Court should affirm the District Court judgment and jury verdict on Carter's Count IV RLA retaliation claim, the Court

---

[278] ROA.23-10836.10657.
[279] Stay Op. 17; ROA.23-10836.10644, 10660-63.
[280] ROA.23-10836.10663.
[281] *Id.*
[282] SWA Br. 51, 94-95.

should reverse the District Court's dismissal of Carter's Count I RLA interference claim against Southwest and remand that claim for the District Court to enter judgment for Carter.

Dated: November 29, 2023                    Respectfully Submitted,

s/ Matthew B. Gilliam
Matthew B. Gilliam
New York Bar No. 5005996
Milton L. Chappell
District of Columbia Bar No. 936153
c/o National Right to Work Legal
  Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
(703) 321-8510
mbg@nrtw.org
mlc@nrtw.org

Bobby G. Pryor
State Bar No. 16373720
bpryor@pryorandbruce.com
Matthew D. Hill, Of Counsel
State Bar No. 24032296
mhill@pryorandbruce.com
PRYOR & BRUCE
302 N. San Jacinto
Rockwall, TX 75087
Telephone: (972) 771-3933
Facsimile: (972) 771-8343

David E. Watkins
Texas Bar No. 20922000
dwatkins@jenkinswatkins.com
JENKINS & WATKINS, P.C.
25 Highland Park Vlg., Ste. 100-359
Dallas, Texas 75205
Tel: 214-378-6675

Fax: 214-378-6680

*Plaintiff-Appellee/Cross-Appellant's
Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 29, 2023, I electronically filed this response

with the Clerk of the Court for the United States Court of Appeals for the Fifth

Circuit by using the Court's CM/ECF filing system. I certify that all participants in

the case are registered CM/ECF users and that service will be accomplished by the

CM/ECF system.

s/ Matthew B. Gilliam
Matthew B. Gilliam
New York Bar No. 5005996
c/o National Right to Work Legal
 Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Tel: (703) 321-8510
Fax: (703) 321-9319
mbg@nrtw.org

*Plaintiff-Appellee/Cross-Appellant's
Counsel*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief complies with the type-volume limitations of 18,200 words as authorized by this Court's November 16, Order (Case No. 23-10008, Doc. 164) and Federal Rule of Appellate Procedure 32(e) because it contains 18,109 words, as counted by Microsoft Word 2016, excluding the part of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6). It was prepared using Microsoft Word 2016, and was written in proportionally spaced 14-point Times New Roman font (footnotes are 12-point).

Dated: November 29, 2023                           s/ Matthew B. Gilliam
                                                               Matthew B. Gilliam

                                                               *Counsel for Plaintiff-Appellee/Cross-Appellant*